UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | |
|---|---|
| Plaintiff, | ) |
| | ) |
| RYAN DAVIS, an individual, | ) |
| | ) |
| v. | ) |
| | ) |
| Defendants, | ) |
| | ) |
| THE CITY OF POWELL, WYOMING, and | ) |
| ROY ECKERDT, CHIEF OF POLICE, | ) CASE NO. _____ |
| In his official capacity as such and in his individual | ) |
| capacity, and | ) |
| MATT MCCASLIN, POLICE LIEUTENANT, | ) |
| In his official capacity as such and in his individual | ) |
| capacity, and | ) |
| TIFFANY BRANDO, HUMAN RESOURCE DIRECTOR | ) |
| AND CITY CLERK, | ) |
| In her official capacity as such and in her individual | ) |
| capacity, and | ) |
| ZACK THORINGTON, CITY ADMINISTRATOR, | ) |
| In his official capacity as such and in his individual | ) |
| capacity, and | ) |
| JOHN DOE(S) 1-10 | ) |

---

## VERIFIED COMPLAINT

---

**COMES NOW**, Plaintiff Ryan Davis, by counsel, Daniel B. Wilkerson of Wilkerson

Law Group, and for his Verified Complaint states and alleges as follows:

## INTRODUCTION

1.      One day a hero, the next day a burden. Officer Ryan Davis fell in love with Northern Wyoming after a military buddy from Afghanistan told him about how beautiful and welcoming it was. His entire family, living in California at the time, felt like this was where they could have the life they have wanted—safer, smaller, with a strong sense of community, and especially a place where the town treated the police with respect. Officer Davis was so excited to be part of the Powell, Wyoming community and to contribute his heart to it.

2.      From his first day of work in March of 2021, Officer Davis was consistently given high praise in front of other officers and positive marks on his reports and evaluations. Around October 1, 2021, Officer Davis contracted COVID, which is presumed by Wyoming Statute to be a work-related injury. In addition to being diagnosed with Pneumonia and Tachycardia, he was diagnosed with Long COVID-19 or Chronic Post COVID-19—a disability, thus obligating the City of Powell, Wyoming and its employees to protect Officer Davis's rights under the Americans with Disabilities Act. However, and to his shock and disbelief, Officer Davis was fired, even though he and his extended family had changed the course of their lives to serve the people of Powell. There was no reasonable explanation why he was fired, and there was no effort to offer him accommodations as the law requires.

3.      This case is about Officer Davis's depravation of rights under federal and state law, but this case is also about the Defendants' efforts to wrongfully terminate Officer Davis's employment because they wanted him out, they wanted to shut him up, so that he would stop questioning policies, training, and policing actions. All of his performance reviews were exemplary except for one curious mark on his record—his "loyalty" was marked as questionable.

4.      Defendants have not only cost Officer Davis pay, benefits, and his job, which is bad enough, he has now found, to his horror, that Defendants have probably cost him his career in law enforcement. Due to Defendants' wrongful actions, Officer Davis cannot be hired as a law enforcement officer to any of the positions he has applied for.

5.      Defendants' wrongful and unlawful actions, and Officer Davis's suffering and damages, are set forth in this Verified Complaint.

## **PARTIES**

6.      **Plaintiff Officer Ryan Davis** at all times relevant to this matter was an adult resident of Park County, Wyoming. Since the events described, Officer Davis has relocated and currently resides in California**.**

7.      **Defendant The City of Powell, Wyoming** is a Wyoming municipality, located in Park County, Wyoming, and it was created pursuant to Wyo. Stat Ann. §§ 15-1-201 *et seq.*, and as such was acting under the color of state law at all times relevant to this Verified Complaint. Municipalities and local government units are persons to whom 42 U.S.C. § 1983 applies and are responsible for a plaintiff's injuries when policy, custom, or acts made by itself or its employees, which edicts or acts represent official policy, inflicts the injury. *Monell v. Department of Social Services of City of New York*, 436 U.S. 3 658, 690 and 694 (1978).

8.      **Defendant Roy Eckerdt** is currently, and was at all times relevant to this matter, Chief of Police of The City of Powell Police Department in Park County, Wyoming. He was a decision maker and policy maker in terms of the police department's personnel, employment, and training policies and procedures. He was personally involved in Officer Davis's wrongful termination. The

edicts and acts of Defendant Eckerdt are not only his own actions but are also fairly said to represent the official acts and policies of The City of Powell, Wyoming.

9.      **Defendant Matt McCaslin** is currently, and was at all times relevant to this matter, Lieutenant of Police of The City of Powell Police Department in Park County, Wyoming. He was a decision maker and policy maker in terms of the police department's personnel, employment, and training policies and procedures. He was a supervisor and manager over Officer Ryan Davis. The edicts and acts of Defendant McCaslin are not only his own actions but are also fairly said to represent the official acts and policies of The City of Powell, Wyoming.

10.     **Defendant Zack Thorington** is currently, and was at all times relevant to this matter, City Administrator of the City of Powell, Wyoming. He was a decision maker and policy maker in terms of the police department's personnel, employment, and training policies and procedures. He was personally involved in Officer Davis's wrongful termination. The edicts and acts of Defendant Thorington are not only his own actions but are also fairly said to represent the official acts and policies of The City of Powell, Wyoming.

11.     **Defendant Tiffany Brando** was at all times relevant to this matter, both Human Resources Manager, and City Clerk, for the City of Powell, Wyoming. She was a decision maker and policy maker in terms of the police department's personnel, employment, and training policies and procedures. She was personally involved in Officer Davis's wrongful termination. The edicts and acts of Defendant Brando are not only her own actions but are also fairly said to represent the official acts and policies of The City of Powell, Wyoming.

12.     **John Does 1-10** are unnamed parties or individuals that could be named at a later date.

## JURISDICTION AND VENUE

13.     This action arises under both Federal Law and Wyoming State Law: The Constitution of the United States pursuant to 42 U.S.C. § 1983, The Constitution of the United States pursuant to 42 U.S.C. § 1985, and the Constitution and the Laws of the State of Wyoming. Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

14.     Jurisdiction over Plaintiff's state law claims is proper under 28 U.S.C. § 1367(a) since it is so related to the claims arising under federal law that it forms part of the same case or controversy.

15.     Venue is proper in the District of Wyoming pursuant to 28 U.S.C. §§ 1391(b)(1) and (2). The events and omissions alleged occurred within Wyoming.

16.     This Court has personal jurisdiction over Defendant City of Powell, Wyoming because it is an incorporated municipality located within Wyoming.

17.     At the present time, and at the time of the events and omissions giving rise to this litigation, Defendants Eckerdt, McCaslin, Thorington, and Brando resided in Wyoming, thus this Court has personal jurisdiction over them.

18.     Officer Davis served the notices required by the Wyoming Governmental Claims Act, Wyo. Stat. Ann §§ 1-39-101 *et seq.* on October 23, 2023. A copy of the notices served by Officer Davis are attached as **Exhibit A** incorporated and made a part of this Verified Complaint.

19.     Officer Davis opened a case, Charge No. 541-2022-03155, with the United States Equal Employment Opportunity Commission (EEOC) in 2022. The EEOC determined that The City of Powell violated the American with Disabilities Act of 1990. The City of Powell chose not to participate in conciliation. Thus, on November 14, 2023, The United States Department of Justice Civil Rights Division granted Officer Davis the right to institute a civil action under Title I of the Americans with Disabilities Act of 1990 42 U.S.C. § 12111 *et seq*. The Department of Justices

letter granting permission to sue is attached as **Exhibit G** incorporated and made a part of this Verified Complaint.

## FACTUAL ALLEGATIONS

20.    Officer Ryan Davis is a military veteran, with 11 combined years of service in the Army, National Guard, and Reserves. During his military service, he served a combat deployment to Afghanistan. For his sacrifice in the line of duty, he was awarded the Purple Heart and the Army Commendation Medal. Prior to moving to Powell, Officer Davis was a deputy sheriff in California for seven years. His experience, accolades, and promotions include:

(a) He received the Battalion Soldier of the Cycle accommodation, which is awarded to the top all around soldier at basic training and Advanced Individual Training.

(b) He was a Distinguished Honor Graduate, which is given to the top soldiers at the Army's Basic Leader course.

(c) He received the Army Good Conduct Medal, Army Achievement Metal, Army Commendation Medal, Overseas Service Ribbon, and a NATO Ribbon.

(d) He was advanced to the rank of Sergeant during his Army service.

(e) He was awarded the Purple Heart because in September of 2012 he was on a security patrol guarding Army bridge builders in Kunar Province in Afghanistan when a suicide bomber approached Officer Davis's position and detonated his vest. 12 individuals were killed or wounded. Officer Davis was among the wounded.

(f) As a deputy sheriff with the Amador County Sheriff's Office in California, he became a field training officer, a firearms instructor, a less-lethal weapons instructor, a background investigator, an honor guard team member, and a SWAT member.



21.    Officer Ryan Davis's family consists of Officer Davis, his wife of 20 years, Theresa, his nine-year-old son, Harrison, and a seven-year-old daughter, Madison. Officer Davis's parents are also part of this close-knit family, and they uprooted and moved across the United States to Powell, Wyoming with Officer Davis's family.



22.     Officer Davis fell in love with Northern Wyoming after a military buddy from Afghanistan told him about how beautiful and welcoming it was. His entire family, living in California at the time, felt like this was where they could have the life they have wanted—safer, smaller, with a strong sense of community, and especially a place where the town treated the police with respect. Officer Davis was so excited to be part of the Powell, Wyoming community that he and his family took a significant pay reduction in order to move to Powell.

23.     Officer Davis started looking for work in Wyoming in 2020, and after communications and negotiations with The City of Powell Police Department, the department extended an offer of employment as a Police Officer I role, on December 11, 2020.  Officer Davis and his family took the difficult steps needed to wrap up their lives in Sacramento and spent many thousands of dollars to make the move. When his children's schooling ended for the year, Officer Davis's wife and two children joined him in Powell. His parents also moved to Powell to be with their grandchildren— his extended family made the major move.

**WRONGFUL TERMINATION**

24.     Around October 1, 2021, Officer Davis contracted COVID-19. He received formal confirmation of the diagnosis on October 7, 2021, from Powell Valley Healthcare. Then on October 15, 2021, Defendant Eckerdt granted benefits to Officer Davis under the Family Medical Leave Act (FMLA). He also received Workers' Compensation benefits beginning in October of 2021. Wyoming Statutes establish that COVID-19 is presumed to be a work-related injury.

25.     During October, November, and December of 2021, Officer Davis was not able to perform the normal job functions of a patrolling police officer. However, during this time period, he requested other work, including light work.

26.     On December 9, 2021, Officer Davis was diagnosed with Long COVID-19, Pneumonia, and Tachycardia. His personal physician, Dr. Kelly Christiansen, MD, examined Officer Davis and then referred him to Dr. Brian Kelly, MD, a cardiologist. Dr. Kelly diagnosed Officer Davis with Post COVID-19, Pneumonia, and Tachycardia. Dr. Kelly did not release Officer Davis to return to work due to this condition. Officer Davis was to return to his doctor in three months to be reevaluated for his return to work. These diagnoses rendered Officer Davis unable to be physically cleared to return to normal police officer duties.

27.     On January 7, 2022, Defendants Chief of Police Roy Eckerdt, Human Resources Manager Tiffany Brando, and City Administrator Zack Thorington called Officer Davis to a meeting. He was still on Workers' Compensation and Family Medical Leave Act at that time, as well as protected by the Americans with Disabilities Act (ADA). At the end of the meeting, Officer Davis was terminated with no reasonable explanation. It was obvious that the Defendants had planned and conspired, prior to the meeting, that they were going to terminate him. That very same day, Lieutenant Matt McCaslin told several employees that Officer Davis was fired because he was sick.

28.     During the firing meeting, the Defendants used legal jargon that his "illness was a hardship to the department," but they gave no legally appropriate reason for his wrongful termination. Rather, they simply stated that Officer Davis was a financial hardship to the budget. He became unemployed without insurance and was labeled disloyal, unprofessional, and a burden. The Defendants did not, at any point, engage in an interactive process with Officer Davis involving accommodations as required by the Americans with Disabilities Act. Shockingly, when the Defendants were asked what it would do if an officer was injured in a car accident in the line of duty, they answered that they would fire him.

29.    In 2022, the United States Equal Employment Opportunity Commission investigated the termination of Officer Ryan Davis. Its determination letter is attached as **Exhibit F** incorporated and made a part of this Verified Complaint. The EEOC found and determined that The City of Powell, Wyoming failed to provide Officer Davis with additional leave as required by the Americans with Disabilities Act, and the Defendants terminated him based on his disability in violation of federal law.

30.    Because of Officer Davis's wrongful termination, he has now had to sell the home he had just purchased in Powell, his parents have had to leave Powell and find a new home in California, Officer Davis has had to purchase a new home in California, and the Davis Family have had to uproot their children from school in Powell, and get them back into another school in California within a short time period. And all this is in spite of the fact that the Davis Family wanted to make Powell, Wyoming their future.

31.    Because of Officer Davis's wrongful termination, he has now had to move back to California seeking other employment. However, Officer Davis cannot now obtain a law enforcement job in California as he has applied to at least three different law enforcement agencies, and he has been frozen out each time. He has been informed that he is essentially not hirable as an employee in the State of California as a law enforcement employee directly due to his wrongful termination by the City of Powell. Sadly, his law enforcement career has possibly ended regardless of the determination of this case. Officer Davis's desires to keep working in law enforcement, and his years of training in law enforcement and the military in order to be employed in his chosen profession of serving in law enforcement, has been ruined by the Defendants wrongful actions.

**TRAINING, POLICIES AND PROCEDURES**

32.     On March 11, 2021, the *Powell Tribune* announced that Ryan Davis was sworn in as the Powell Police Department's newest officer. The article is entitled: "New officer brings experience in law enforcement, military service." The *Powell Tribune* published three separate articles spanning the months of March-August, specifically about Officer Davis, his experience, contributions to the department, saving a life, and what he and his fellow military members have experienced post 9-11. The articles are attached to this Verified Complaint as **Exhibits B, C, and D** incorporated and made a part of this Verified Complaint.

33.     From his first day of work until his wrongful termination, Officer Davis was consistently given high praise in front of other officers and during trainings. There were positive comments in his reports and evaluations that he was a team-player, personable, infectiously positive, and dedicated to learning his position. Field Training Officers (FTOs) noted that Officer Davis was very interested and dedicated to studying and understanding the laws of Wyoming, the municipal code, and policies and procedures. Officer Davis was also praised for his willingness to take feedback. Additionally, it is recorded that he cared enough to discuss where policies and procedures can be improved. Throughout his employment, it was consistently noted that his professionalism, dedication, and prior experience was an asset to the Powell Police Department.

34.     On August 15, 2021, Officer Davis and another officer's actions saved a woman's life. The Life Saving Medal for prompt and alert action in the line of duty to save the life of another was awarded to Officer Davis on September 7, 2021. This achievement was featured on the Powell Police Department public website. That article is attached to this Verified Complaint as **Exhibit E** incorporated and made a part of this Verified Complaint.

35.     On August 21, 2021, A few days after performing his act of heroism, Officer Davis received and completed his first and only performance evaluation. Except for "loyalty," he received satisfactory performance in all areas of the evaluation. The weak mark for loyalty came from Lieutenant Matt McCaslin without any input from the Field Training Officers, and without any supporting documentation. Prior to this curious mark of disloyalty, there was zero indication of any issues. Rather, Officer Davis's dedication to the city and the department was noted consistently.

36.     Throughout his training, none of Officer Davis's Field Training Officer's had any concerns with him. Interestingly, Lieutenant McCaslin was not a FTO for Officer Davis. In the little time Defendant McCaslin spent writing his evaluation, it appears that rather than seeing Officer Davis as an inquisitive and dedicated officer who regularly discussed, challenged, and offered feedback on policies and procedures, Davis's moral code was suddenly attacked.

37.     The following events describe some of Officer Davis's experiences in attempting to improve policing in the City of Powell, Wyoming and the opposition he faced, in his own words:

    (a) During my field training program in the Spring of 2021, I was to be trained by Officer Reece McLain on the use and deployment of less-lethal shotgun and flash-bang devices. Upon attending the training, Officer Reese informed me that his certification to teach the course of instruction had lapsed several months prior, and he could not provide me with a certification. I was not administered the necessary written examination. Additionally, the practical use portion of the training, which involves discharging the weapon system, was not consistent with the state and manufacturer qualifications standards. Officer Reese informed me that he had sent Chief Eckerdt and Lieutenant McCaslin several

emails regarding the problems with certifying officers to use less-lethal weapons. The response from Eckerdt and McCaslin was that the correct certification was not important and that there was not enough in the budget to comply with the proper certification. I made all of my sergeants and the lieutenant aware I would not be utilizing the weapon system under any circumstances due to the lack of proper certification. Eckerdt, McCaslin, and my superiors treated my response with indifference and anger. I was labeled as unwilling to go with the program. I was concerned that officers were being sent out with these systems without proper certification, which could lead to civil liability for both the officer and the department. More importantly, my concern was also that a citizen could be injured by improper training and knowledge. There is a reason these weapons are called "less lethal." You can absolutely kill someone with the weapon if you are not trained properly. Chief Eckerdt, Lieutenant McCaslin, Sergeant Brilakis, and the totality of patrol staff knew of this incident and my refusal to carry a weapon system that they refused to lawfully train me on. There was no further training or explanation.

(b) I voiced concerns as to how Sergeant Brilakis of the Powell Police Department was policing. While doing business "security checks" on the night shift, he would enter buildings if the door was unlocked. Rather than looking for reasonable suspicion of criminality such as broken glass, damaged doors, persons in areas they shouldn't be after hours, or ringing alarms, as any properly trained police officer would do; he would enter a building on the grounds that the door was unlocked. His approach was that the door being unlocked gave

him, a government officer, sufficient suspicion that there might be a crime occurring inside. I openly challenged this as a blatant 4th Amendment violation. No police training, or academy, that I am aware of, would ever train to police like this, in fact, training on the 4th Amendment would expressly forbid it. Sergeant Brilakis argued that since the door was unlocked it's possible there could be a crime occurring. I stated that without corroborating evidence to support criminality, an unlocked door on its own is not sufficient reasonable suspicion to enter a business without the consent of the owner especially since business owners could have multiple reasons for having one of the business doors unlocked. I advised Sergeant Brilakis that he must make a reasonable effort to contact the business owner or responsible party to obtain permission to enter the closed business prior to entering. He strongly disagreed because it would reduce his pro-active statistics drastically if he ceased the behavior. It became apparent that padding numbers or statistics was more important to him than a correct understanding of Constitutional requirements. I had conversations with him over several days in the Summer of 2021 in the presence of numerous employees. Ultimately Sergeant Brilakis called a former supervisor he worked with in Florida, to check what I was saying, and that supervisor echoed my statements, saying an officer must obtain permission from the owner in the absence of obvious criminality afoot. Other supervisors including Chief Eckerdt and Lieutenant McCaslin were clearly aware of my voiced concerns, and aware of the activity that had been happening for years, and they did nothing to curb the wrongful activity and wrongful policing.

(c) In May of 2021, after I had completed field training and was on my own, Sergeant Brilakis was my supervisor on several shifts. A dispatcher informed me that Sergeant Brilakis was claiming I did not do thorough enough security checks because I did not try to open unlocked doors around town even if there was no suspicious activity. Additionally, Sergeant Brilakis verbally reprimanded my field training officers for not training me to enter into, with no justification, buildings and residences if the door was unlocked. This was after we had already discussed the legality of his searching unlocked businesses. Sergeant Brilakis even cornered me one day in the ShopKo parking lot while not on duty and informed me I was not doing thorough police work because I was not checking for unlocked doors and walking into buildings. I reminded Sergeant Brilakis of our many conversations, and of our requirements under the Constitution, at which time Sergeant Brilakis became irate, got into his car, and sped away. He later apologized for getting angry but would not change his stance on opening unlocked doors. He made it known, and I learned, that he would enter houses and private residences on many occasions through open roll-up garage doors or unlocked doors. Again, Chief Eckerdt, Lieutenant McCaslin and all staff were aware of this wrongful activity, but there was no training and no addressing the issues.

(d) One day while I was on duty, I received a call informing me that the Trading Post, a pawn shop, had purchased a stolen firearm. Per law and policy, I determined where the firearm had been stolen from and contacted the local jurisdiction to see if they wanted it returned as evidence of their reported crime.

The jurisdiction stated they did want it returned. I was informed by Sergeant Alquist and Lieutenant McCaslin that I must inform the appropriate jurisdiction that they must obtain a search warrant to have the stolen firearm collected. As this was incorrect, I explained to Sergeant Alquist and Lieutenant McCaslin that the owner of the shop was in possession of known stolen property and must relinquish it without a warrant or be subject to criminal penalty himself. When I informed Lieutenant McCaslin I would not be requesting a warrant as there was no legal ground for one nor was it required, he became visibly upset. I explained I was going to go to the shop and demand the firearm be turned over—which was the correct lawful action. Lieutenant McCaslin again became visibly upset and stated he did not want me to do that. Ultimately, I politely asked the store owner for the firearm which he turned over without incident. Chief Eckerdt, Lieutenant McCaslin, and the totality of patrol staff knew of this incident and my reasoning for the actions I took. Ultimately, it was decided that the needs of local businesses superseded the correct law enforcement action and I was not sent to any more calls regarding stolen firearms at this business. The incorrect policies concerning these types of situations was never discussed. No memos, no emails, no follow up training, and no correction of training or procedures.

(e) In March of 2021, in reviewing policy on arrests with Officer Schmidt, while Sergeant Brilakis was present, I was reviewing the statute which states a peace officer may break a door or window of a structure in the event probable cause existed that a person to be arrested was inside. As I discussed this Sergeant

Brilakis screamed "You will not do that!" so loud that dispatchers heard in the front of the building. Meaning, Seargeant Brilakis was telling me that I will not force entry under any circumstance to effect an arrest, even if probable cause exists and there is imminent danger and risk to the citizens of Powell. I asked him to please show me the policy that forbade it, as the law clearly allows it, and he continued to yell and stomp around the room shouting that I can't do it—and the only reason he gave was "Because I said so!" Sergeant Brilakis never produced any policy or law justifying his position, and he left the room in a fury stating he wouldn't allow anyone to make a forced entry under any circumstance. I addressed the policy and statute with my field training officer and we determined Sergeant Brilakis had no authority to make a lawful command regarding this policy and his statements were not based in fact or law. It was my understanding that leadership was made aware of the incident and failed to correct the behavior of Sergeant Brilakis. Leadership never had a meeting nor sent a memo correcting this incorrect training. There was no follow up or correction to these issues of training and policy.

(f) The Powell Police Department utilizes a Computer Assisted Dispatch System (CAD) which was routinely misused and manipulated. Powell Police Department Officers were not permitted to enter their own CAD notes despite this being the standard for all modern police agencies. CAD incidents are legal documents, which are publicly discoverable and can be subpoenaed in criminal and civil cases. The notes added by officers should be a direct summary of actions taken on a call for service when the call does not warrant a case. The

CAD files are routinely reviewed by Dispatch Supervisor Bobby Colvin, who has no legal training, and she adds and deletes information to suit her reporting purposes. She also makes changes to the call classification to fit what she believes the crime occurring to be, despite what the facts articulate once an officer is on scene. Not only is this a misuse of the system, it corrupts the statements made as they do not come from the officer. I explained to all three sergeants and Lieutenant McCaslin that I would not be able to testify to anything related to the CAD in court because it isn't my words, I would have to testify if asked that the CAD had been manipulated. Additionally, the dispatchers are routinely taught to "pack the incident" which involves adding individuals who are associates of the persons involved in the calls to increase known associates. I informed Ms. Colvin she could not add persons to a call who were not involved, and she justified it by saying they are relatives who we may need to contact in the future. Ms. Colvin would go so far as to email myself and other officers concerning calls we handled and tell us how we miss-handled calls based upon the notes she read. I've brought this to the attention of Sergeant Alquist and Sergeant DelBiaggio only to be told to route the incident to them and they were "documenting" it. Sergeant Alquist ultimately admitted that Chief Eckerdt will not address the misuse of CAD by Ms. Colvin because she would be too difficult to deal with. Chief Eckerdt and Lieutenant McCaslin are aware the CAD System is being manipulated. These issues were never fixed nor addressed.

(g) At the Powell Police Department, field training officer positions are filled by any officer expressing interest in becoming a trainer. There is no interview, no specific training, and no records review. The field training officers, by no fault of their own, are undertrained, inexperienced, and non-standardized. Much of the information and training I was given came from word of mouth from one training officer to another and not directly from policy or law. As documented in my daily observation reports I directly questioned the "this is how we do it" attitude on numerous occasions and based upon a legal review, I was found to be correct. There was no basic program based on policy and statute. The field training officers were teaching things totally differently from each other and what they were teaching could change day to day. Whenever asking a training officer why are you training me this way, the response was, "well that's the way we do it." I brought these serious training issues up to my supervisors. The issues were not addressed, nothing was fixed, there was not corrective training. Statute and case law was not the basis of training.

(h) One day on duty, I was called to a residence because the electrical company was performing work and stated there was a car in their way. Upon arrival, I noted the car was legally parked in front of the residence it was registered to, and I made numerous efforts to locate the owner. No signage had been posted about work in the area and the electric company had a second gate they could have utilized. Ultimately, I informed the electric company I had no legal authority to tow the vehicle and left the area. Dispatch Supervisor Bobby Colvin sent me an internal email stating I mishandled the call and sent me a

copy of city policy stating the city reserved the right to tow vehicles if they impeded city business. I made Sergeant Alquist aware of the email as he had been on the scene of the applicable call. I informed Sergeant Alquist that despite city policy it expanded the scope of law enforcement authority inside the city limits and was not constitutional. Without posted signage or permanent no parking signs the owner would have no knowledge there was city work and therefore no knowledge they needed to move the vehicle. If I, as a peace officer were to tow the vehicle without probable cause to do so, it would be an unlawful seizure and a 4th Amendment violation. I made Lieutenant McCaslin aware of this and he simply said the City Attorney signed off on the policy so it must be legal. I refused to comply as I stated I would not knowingly tow a vehicle under the color of authority without probable cause. This was not well received by the Lieutenant McCaslin or Ms. Colvin. There was no follow up and no training on this issue.

38.    Officer Davis was obviously fired because he was a pain to the police department administration. He was fired in retaliation because he pointed out policy and training issues. He was fired because the department administration wanted to do things their way without any concern to the right or wrong of "their way." Defendants chose to use Officer Davis's sickness as a pretext for the real reason they fired Officer Davis. His rights as a disabled person were not even considered nor dealt with because Defendants felt they had found a substitute, or proxy reason, to terminate Officer Davis and get rid of him, because he wanted to clean up what was going on at the department.

## CLAIMS FOR RELIEF

**1ST CLAIM FOR RELIEF**

**42 U.S.C. § 1983**

**Wrongful Termination in Violation of, and as a Depravation of Rights, Under the**

**Americans with Disabilities Act**

**(Against All Defendants)**

39.    Plaintiff incorporates all other paragraphs of this Verified Complaint as if fully set forth herein.

40.    A disabled person is a protected class under the 14th Amendment of the United States Constitution. The purpose of the Americans with Disabilities Act is to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.  A "disability" is an impairment that substantially limits a major life activity. If an employer, including state and local governments, has 15 or more employees, it cannot inflict an adverse action upon a disabled employee, where there is a record of the disability, without engaging in an interactive process and providing reasonable accommodations.

41.    Officer Davis was disabled under the protections of the Americans with Disabilities Act evidenced by him being diagnosed with COVID-19, a presumptive disability according to Wyoming Statute, W.S. § 27-14-102(xi)(A), a condition affecting his major life activities needing to perform his duties as a police officer. Other than his disability, Officer Davis was otherwise qualified to perform the essential job functions as a police officer. Defendants did not provide Officer Davis with additional leave nor reasonable accommodations. They did not pursue the possibility of temporary light duty as Defendants had done for other employees. Defendants

terminated him based on his disability in violation of the Americans with Disabilities Act. Defendants made it clear that Officer Davis was fired because he was sick, and his sickness was a protected disability at the time of his termination. In fact, the EEOC found that "[Defendants] failed to provide [Officer Davis] with additional leave as a reasonable accommodation and terminated him based on his disability, in violation of the Americans with Disabilities Act of 1990" attached as **Exhibit F** incorporated and made a part of this Verified Complaint.

42.    Due to the wrongful actions of Defendants, Officer Davis has suffered significant damages.

**SECOND CLAIM FOR RELIEF**

**42 U.S.C. § 1983**

**Retaliation under the Americans with Disabilities Act**

**(Against All Defendants)**

43.    Plaintiff incorporates all other paragraphs of this Verified Complaint as if fully set forth herein.

44.    Under the Americans with Disabilities Act, if an individual is engaged in a protected activity, and if the individual suffers an adverse action, and if there is a causal link between the two, the Defendants have violated federal law and are liable for the damages suffered.

45.    Defendants made it clear that Officer Davis was fired in retaliation for him being sick and costing too much money to the department.

46.    Due to the wrongful actions of Defendants, Officer Davis has suffered significant damages.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### THE 1ST AMENDMENT TO THE UNITED STATES CONSTITUTION
### Free Speech Retaliation
### (Against All Defendants)

47.    Plaintiff incorporates all other paragraphs of this Verified Complaint as if fully set forth herein.

48.    Public employees cannot be fired in retaliation for speaking out on matters of public concern. A public employee's 1st Amendment rights are violated if the employee was speaking on a matter of public concern, and if the motivating reason for termination was the speech and not the pretextual reason given by the employer.

49.    Defendants, on numerous occasions, expressed to various persons, their dissatisfaction and annoyance, with Officer Davis's efforts to make suggestions and point out how training and policies were deficient in the Powell Police Department.

50.    Due to the wrongful actions of Defendants, Officer Davis has suffered significant damages.

## FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1985
### Conspiracy to Interfere with Civil Rights
### (Against All Defendants)

51.    Plaintiff incorporates all other paragraphs of this Verified Complaint as if fully set forth herein.

52.     Defendants plotted, conspired, and executed a common plan with each other to deprive Officer Davis of the privileges and immunities under the laws, in violation of the Americans with Disabilities Act as member of a protected class—a disabled person.

53.     In furtherance of their conspiracy to deprive Officer Davis of his 14th Amendment equal protection or equal privileges and immunities, Defendants engaged in acts of intimation by telling Officer Davis that he does not qualify for certain benefits and privileges.

54.     Defendants committed a concealed act in furtherance of the conspiracy to violate Officer Davis's rights, including, but not limited to, using their position of authority to deceive Officer Davis of his rights to services available to himself and others in a protected class, the purpose of which was to prevent Officer Davis from drawing from the sick leave bank, which Officer Davis contributed to and had the right to draw from, and to prevent Officer Davis the opportunity for Wyoming Medical Retirement.

55.     The conspiracy was motivated by a class-based discriminatory animus.

56.     The conspiracy was aimed at interfering with the rights that by definition are protected against private, as well as official, encroachment.

57.     Due to the wrongful actions of Defendants, Officer Davis has suffered significant damages.


# FIFTH CLAIM FOR RELIEF
## 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION
### Violation of Substantive Due Process
### (Against All Defendants)


58.     Plaintiff incorporates all other paragraphs of this Verified Complaint as if fully set forth herein.

59.    Officer Davis possessed property interests in the form of his employment, tenure thereof, the protections of the written policies and procedures adopted and enacted by the City of Powell at all times relevant hereto, and reasonable expectations of the same as discussed herein and set forth above. Officer Davis possessed liberty interests in the form of his right to be free from the arbitrary, deliberate, and willful disregard of such written ordinances, policies and procedures by Defendants, all of which are protected by the Substantive Due Process Clause of the 14th Amendment.

60.    The Due Process Clause of the 14th Amendment, in its Substantive sections, places limitations on governmental action that deprives individuals of life, liberty, or property.

61.    As a result of Defendants' conduct as set forth herein, which conduct can be described as the wrongful termination of Officer Davis in deliberate and willful violation and disregard of Defendants' own written policies, procedures and ordinances, Defendants have deprived Officer Davis of vested property and liberty interests in violations of the 14th Amendment's requirements.

62.    There is no compelling governmental interest that is furthered by Defendants' conduct as set forth herein, nor is Defendants' conduct narrowly tailored or the least restrictive alternative for promoting any governmental interest which Defendants may have. Defendants' conduct also is not rationally related to a legitimate government interest and patently violates Defendants' own written policies, procedures, and ordinances.

63.    Defendants' conduct, as set forth herein, constitutes an official custom or policy of Defendants that violates the guarantee of Substantive Due Process of the 14th Amendment to the United States Constitution, and such conduct has the actual effect of unconstitutionally depriving Officer Davis of his rights to his property and liberty interests as stated herein.

64.    Due to the Constitutional Violations by Defendants, Officer Davis has suffered substantial damages.

## SIXTH CLAIM FOR RELIEF
## 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION
### Violation of Procedural Due Process
### (Against All Defendants)

65.    Officer Davis incorporates all other paragraphs of this Verified Complaint as if fully set forth herein.

66.    The procedural Due Process Clause of the 14th Amendment to the United States Constitution prohibits Defendants from depriving "any person of life, liberty, or property without due process of law."

67.    Officer Davis possessed a liberty and property interest in the form of his continued employment, tenure thereof, the protections of the written policies and procedures adopted and enacted by the City of Powell, Wyoming and the Powell Police Department at all times relevant hereto, and reasonable expectations of the same as discussed herein, and his continued ability to derive income from the same.

68.    Defendants' conduct as set forth above unconstitutionally deprives Officer Davis of such liberty or property interest by impermissibly terminating Officer Davis's employment and the correlating rights set forth above, without any opportunity to be heard on the issue whatsoever as mandated by Defendants' own written policies, procedures and ordinances.

69.    Defendants' action as set forth above was in violation of Defendants' own written policies, procedures and ordinances, which require Defendants to provide Officer Davis with, at the very

least, an opportunity for a hearing to present defenses to the allegations against him prior to terminating him from his employment or taking other proportionate disciplinary action.

70.    The actions taken by Defendants, without the opportunity to be heard provided to Officer Davis (i.e. the wrongful termination of Officer Davis's employment without the required process or procedure) does not bear any relationship, neither legitimate, rational or otherwise, to any government interest to be served thereby.

71.    As a result, Defendants' conduct and specifically Defendants' wrongful termination of Officer Davis's employment without the requisite opportunity to be heard provided to Officer Davis, violates the Procedural Due Process Clause of the 14th Amendment.

72.     As a result of the foregoing, Officer Davis has sustained and will continue to sustain damages.

73.    Due to the Constitutional Violations by Defendants, Officer Davis has suffered substantial damages.

## SEVENTH CLAIM FOR RELIEF
### Gross Negligence or Willful or Wanton Misconduct
### (Against all Defendants)

74.    Officer Davis incorporates all other paragraphs of this Verified Complaint as if fully set forth herein.

75.    Defendants failed to train on, or even know, how to protect an employees' rights under Federal and State Laws concerning disability.

76.    Defendants were deliberately indifferent to Officer Davis's clear federal rights, including his rights under the Americans with Disabilities Act, to the point that their wrongful actions make

it impossible for their actions to be viewed as anything but intentional or gross, willful, and wanton because their wrongful actions deprived Officer Davis, and would have deprived any other employee, of rights the Defendants should have clearly been aware of. Defendants intentionally violated Officer Davis's rights.

77.    Defendants were deliberately indifferent to Officer's Davis's rights provided to him by the State of Wyoming, to the point that their wrongful actions make it impossible for their actions to be viewed as anything but intentional or gross, willful, and wanton because their wrongful actions deprived Officer Davis, and would have deprived any other employee, of rights the Defendants should have clearly been aware of. Defendants intentionally violated Officer Davis's rights.

78.    Defendants have either been willful, wanton, and intentional in their wrongful action in dealing with Officer Davis; or have been grossly negligent in their duty to learn, know, and implement the law, and safeguards, in protecting the rights of Officer Davis.

79.    Plaintiff has sustained, and will continue to sustain, damages pertaining to the wrongful actions of Defendants.

## EIGHTH CLAIM FOR RELIEF

### Breach of Contract

### (Against Defendant City of Powell, Wyoming)

80.    Officer Davis incorporates all other paragraphs of this Verified Complaint as if fully set forth herein.

81.    Defendant created a contract between itself and Officer Davis due to (1) promises of employment through written communications from The City of Powell, Wyoming to Officer Davis, (2) a probationary process and review process wherein Officer Davis was told that he would be guaranteed employment with satisfactory marks, (3) policies and procedures in the City's

employee handbook and written polices and memorandums, (4) the City's course of dealing with, and promises to, Officer Davis, (5) the City's course of dealing and conduct in the past with other employees.

82.    Through both the use of employment documents, handbooks, customs, course of dealing, conduct, and testing procedures Defendant has taken this matter outside of "at will" employment and created an employment contract.

83.    Officer Davis relied on, followed, and complied with Defendant's employment documents, handbooks, and actions of Defendant and reasonably relied on the enforcement of those documents pertaining to termination of the employment contract.

84.    In terminating Officer Davis's employment, Defendant has violated its contractual obligation to Officer Davis.

85.    Plaintiff has sustained, and will continue to sustain, damages pertaining to this breach of contract by Defendant.

## NINTH CLAIM FOR RELIEF
### Promissory Estoppel
### (Against Defendant City of Powell, Wyoming)

86.    Officer Davis incorporates all other paragraphs of this Verified Complaint as if fully set forth herein.

87.    Officer Davis was hired by Defendant, and he excelled at his duties evidenced by his review scores. After Officer Davis contracted a work-related illness and had a disability under the Americans with Disabilities Act, he relied on the fact that he could be accommodated by receiving

ample time to recover from his disability and resume his normal policing duties. His reliance was to his detriment.

88.    Officer Davis incurred substantial relocation expenses from California to Wyoming, and again incurred substantial expenses when he was wrongfully terminated by Defendant. Furthermore, Officer Davis incurred additional losses including retirement benefits, insurance benefits, seniority in his position, and other significant damages. Officer Davis's family incurred losses due to the relocation required.

## TENTH CLAIM FOR RELIEF
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against All Defendants)

89.    Plaintiff incorporates all other paragraphs of this Verified Complaint as if fully set forth herein.

90.    Officer Davis satisfactorily preformed his job duties pursuant to the terms and conditions of Defendants employment documents, handbooks, testing procedures, performance evaluations, and course of dealing with other employees. In fact, Officer Davis received accommodations for excelling in his position. Officer Davis was also the subject of news reporting in the community for his positive attributes and community involvement.

91.    Despite Officer Davis fully conducting all actions required of him by Defendants to maintain his employment, Defendants fired Officer Davis and denied a good faith opportunity for Officer Davis to perform his duties.

92.    When the Defendants called the firing meeting on January 7, 2022, the Defendants were not acting in good faith calling him to a meeting, which they wrongfully represented was to discuss

what was going on with him and his continued employment. Rather, Defendants called him there to fire him, having conspired ahead of time to fire him.

93.     Defendants have not protected Officer Davis's Constitutional Rights, instead, they conspired to terminate Officer Davis based on false pretenses and sought to get rid of Officer Davis so that they could get rid of his efforts to seek correct policy and policing procedures.

94.     Due to the wrongful actions of Defendants, Officer Davis has suffered significant damages.

## ELEVENTH CLAIM FOR RELIEF
### Negligence
### (Against All Defendants)

95.     Plaintiff incorporates all other paragraphs of this Verified Complaint as if fully set forth herein.

96.     All Defendants have failed to exercise the proper duty of care, a higher duty of care given their administrative positions over employees including Officer Davis, which higher duty of care has been entrusted to them by the citizens of Powell, Wyoming.

97.     Defendants have either been willful, wanton, and intentional in their wrongful action in dealing with Officer Davis; or have been grossly negligent in their duty to learn, know, and implement the law, and safeguards, in protecting the rights of Officer Davis.

98.     Defendants have breached their duty of care towards Officer Davis, and he has suffered damages as a result of their wrongful actions.

## TWELFTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress
### (Against All Defendants)

99.     Plaintiff incorporates all other paragraphs of this Verified Complaint as if fully set forth herein.

100.    Officer Davis has suffered severe emotional distress. He lost his dream job because Defendants violated his protect rights, and because Defendants wanted to get rid of him because he pointed out training and policy issues. He moved his whole family, including his parents, across the country to work in Wyoming, only to have to move them again months later because of Defendants wrongful actions. He has incurred great costs and damages since being fired. Due to Defendants actions, Officer Davis cannot work as a law enforcement officer in California and may never be able to work as an officer again. Officer Davis has gone from being viewed as a decorated and distinguished military man and law enforcement officer to being viewed as a pariah the government will not hire. This situation is impossible for him—Defendants actions have caused Officer Davis needless and undue anguish, stress, family distress, sleepless nights, and tears.

101.    Defendant's actions have been extreme and outrageous. They intentionally fired a disabled officer, who was an honorable veteran and respected police officer, in violation of his clear rights under the Americans with Disabilities Act. They did not even care about his rights. Defendants did not even address his rights. They also fired him in retaliation for him pointing out the major issues with training and policy happening at the City of Powell Police Department.

102.    Due to the wrongful actions of Defendants, Officer Davis has suffered significant damages.

## THIRTEENTH CLAIM FOR RELIEF

### Civil Conspiracy

### (Against Defendants Roy Eckerdt, Matt McCaslin, Tiffany Brando, Zack Thorington, and John Does 1-10)

103.    Plaintiff incorporates all other paragraphs of this Verified Complaint as if fully set forth herein.

104.    Civil conspiracy occurs when more than one person work together, or conspire, and commit an unlawful act causing harm or damages to another.

105.    Defendants worked together, conspired, schemed, and wrongly decided together, and planned together to terminate Officer Davis in an unlawful violation of his federal rights under the Americans with Disabilities Act.

106.    Due to the wrongful actions of Defendants, Officer Davis has suffered significant damages.

## PRAYER FOR RELIEF AS TO ALL COUNTS

WHEREFORE, Plaintiff, Officer Ryan Davis, respectfully requests that this Court enter judgment:

a.    Declaring that the conduct of Defendants, as discussed above, violates Officer Davis's rights under Federal Law and under Wyoming Law;

b.    Awarding Officer Davis his damages in amounts shown at trial;

c.    Awarding Officer Davis his costs, expenses, and attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws;

d.  Awarding Officer Davis punitive and exemplary damages against Defendants, in order to punish Defendants for engaging in such conduct as so to deprive Officer Davis of his federal rights, state rights, career, property, and reputation, and in order to deter others similarly situated to Defendants from engaging in similar conduct; and

e.  Granting such other and further relief as the Court deems just and proper.

f.  The relief requested in this action is sought against each Defendant, against each Defendant's officers, employees, and agents; and against all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control.

### **JURY DEMAND**

Plaintiff, Officer Ryan Davis, hereby prays for a trial by jury as to all matters and claims set forth herein so triable under the laws of the United States and Wyoming.


Respectfully submitted this 5th day of December 2023.


WILKERSON LAW GROUP


Daniel B. Wilkerson #7-6415
Attorney for Plaintiff
PO Box 607
Gillette, WY 82717-0607
Telephone: 307-686-6347
infowy@wilkersonlawgroup.com

## VERIFICATION

I, Ryan S. Davis, being duly sworn, verify and affirm that I have read the foregoing Verified Complaint and I certify under penalty of false swearing that the foregoing is true to the best of my knowledge, information and belief.

_____
Ryan S. Davis

STATE OF WYOMING            )
                                                  )§
COUNTY OF CAMBELL        )

Subscribed and sworn to before me this 5th day of December 2023, by Ryan S. Davis, by way of remote online notarization using Microsoft Teams.

With my hand and official seal.

JENNIFER M. HIEB
NOTARY PUBLIC
STATE OF WYOMING
COMMISSION ID: 157864
MY COMMISSION EXPIRES: 05/21/2029

_____
Notary Public

My commission expires: May 21, 2029