UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | |
| RYAN DAVIS, an individual, | ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| THE CITY OF POWELL, WYOMING, and | ) | |
| ROY ECKERDT, CHIEF OF POLICE, | ) | Case No. 23-CV-230-S |
| In his official capacity as such and in his individual | ) | |
| capacity, and | ) | |
| MATT MCCASLIN, POLICE LIEUTENANT, | ) | |
| In his official capacity as such and in his individual | ) | |
| capacity, and | ) | |
| TIFFANY BRANDO, HUMAN RESOURCE DIRECTOR | ) | |
| AND CITY CLERK, | ) | |
| In her official capacity as such and in her individual | ) | |
| capacity, and | ) | |
| ZACK THORINGTON, CITY ADMINISTRATOR, | ) | |
| In his official capacity as such and in his individual | ) | |
| capacity, and | ) | |
| JOHN DOE(S) 1-10 | ) | |

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITION OF CITY DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) AND IN OPPOSITION OF INDIVIDUAL DEFENDANTS ECKERDT AND MCCASLIN'S MOTION TO DISMISS

---

Plaintiff, Officer Davis, respectfully submits this Memorandum in Opposition to (1) City Defendants' Motion to Dismiss submitted to the Court by Thomas Thompson, and (2) Individual Defendants Eckerdt and McCaslin Motion to Dismiss submitted to the Court by Debra Hulett, pursuant to Fed. R. Civ. P. 12(b)(6).

All facts alleged in the complaint of Officer Davis are hereby incorporated into this memorandum in opposition to the motions and memorandums of Defendants.

## I.      SUMMARY OF FACTS

Plaintiff, Officer Davis, filed his Verified Complaint ("Complaint") on December 5, 2023. The Complaint includes 13 claims for relief or causes action. These claims are related to Plaintiff's wrongful termination in January of 2022, when he was a police officer serving the City of Powell, Wyoming. Plaintiff, Officer Davis, was fired in violation of his rights under the Americans with Disabilities Act. Defendants violated his federal rights and state rights.

For purposes of this response and contrary to the conclusory statements of Counsel for the Defendants that somehow the pleadings do not demonstrate a claim upon which relief may be granted, the following allegations all must be considered true, and every allegation must be construed in the light most favorable to the Plaintiff.

The numbers set forth below correspond with the numbered paragraphs in the *Complaint*:

2. From his first day of work in March of 2021, Officer Davis was consistently given high praise in front of other officers and positive marks on his reports and evaluations. Around October 1, 2021, Officer Davis contracted COVID, which is presumed by Wyoming Statute to be a work-related injury. In addition to being diagnosed with Pneumonia and Tachycardia, he was diagnosed with Long COVID-19 or Chronic Post COVID-19—a disability, thus obligating the City of

Powell, Wyoming and its employees to protect Officer Davis's rights under the Americans with Disabilities Act. However, and to his shock and disbelief, Officer Davis was fired, even though he and his extended family had changed the course of their lives to serve the people of Powell. There was no reasonable explanation why he was fired, and there was no effort to offer him accommodations as the law requires.

3. This case is about Officer Davis's depravation of rights under federal and state law, but this case is also about the Defendants' efforts to wrongfully terminate Officer Davis's employment because they wanted him out, they wanted to shut him up, so that he would stop questioning policies, training, and policing actions.

4. Defendants have not only cost Officer Davis pay, benefits, and his job, which is bad enough, he has now found, to his horror, that Defendants have probably cost him his career in law enforcement. Due to Defendants' wrongful actions, Officer Davis cannot be hired as a law enforcement officer to any of the positions he has applied for.

23. Officer Davis started looking for work in Wyoming in 2020, and after communications and negotiations with The City of Powell Police Department, the department extended an offer of employment as a Police Officer I role, on December 11, 2020.  Officer Davis and his family took the difficult steps needed to wrap up their lives in Sacramento and spent many thousands of dollars to make the move. When his children's schooling ended for the year, Officer Davis's wife and two children joined him in Powell. His parents also moved to Powell to be with their grandchildren— his extended family made the major move.

24. Around October 1, 2021, Officer Davis contracted COVID-19. He received formal confirmation of the diagnosis on October 7, 2021, from Powell Valley Healthcare. Then on

October 15, 2021, Defendant Eckerdt granted benefits to Officer Davis under the Family Medical Leave Act (FMLA). He also received Workers' Compensation benefits beginning in October of 2021. Wyoming Statutes establish that COVID-19 is presumed to be a work-related injury.

25. During October, November, and December of 2021, Officer Davis was not able to perform the normal job functions of a patrolling police officer. However, during this time period, he requested other work, including light work.

26. On December 9, 2021, Officer Davis was diagnosed with Long COVID-19, Pneumonia, and Tachycardia. His personal physician, Dr. Kelly Christiansen, MD, examined Officer Davis and then referred him to Dr. Brian Kelly, MD, a cardiologist. Dr. Kelly diagnosed Officer Davis with Post COVID-19, Pneumonia, and Tachycardia. Dr. Kelly did not release Officer Davis to return to work due to this condition. Officer Davis was to return to his doctor in three months to be reevaluated for his return to work. These diagnoses rendered Officer Davis unable to be physically cleared to return to normal police officer duties.

27. On January 7, 2022, Defendants Chief of Police Roy Eckerdt, Human Resources Manager Tiffany Brando, and City Administrator Zack Thorington called Officer Davis to a meeting. He was still on Workers' Compensation and Family Medical Leave Act at that time, as well as protected by the Americans with Disabilities Act (ADA). At the end of the meeting, Officer Davis was terminated with no reasonable explanation. It was obvious that the Defendants had planned and conspired, prior to the meeting, that they were going to terminate him. That very same day, Lieutenant Matt McCaslin told several employees that Officer Davis was fired because he was sick.

28. During the firing meeting, the Defendants used legal jargon that his "illness was a hardship to the department," but they gave no legally appropriate reason for his wrongful termination. Rather, they simply stated that Officer Davis was a financial hardship to the budget. He became unemployed without insurance and was labeled disloyal, unprofessional, and a burden. The Defendants did not, at any point, engage in an interactive process with Officer Davis involving accommodations as required by the Americans with Disabilities Act. Shockingly, when the Defendants were asked what it would do if an officer was injured in a car accident in the line of duty, they answered that they would fire him.

29. In 2022, the United States Equal Employment Opportunity Commission investigated the termination of Officer Ryan Davis. The EEOC found and determined that The City of Powell, Wyoming failed to provide Officer Davis with additional leave as required by the Americans with Disabilities Act, and the Defendants terminated him based on his disability in violation of federal law.

30. Because of Officer Davis's wrongful termination, he has now had to sell the home he had just purchased in Powell, his parents have had to leave Powell and find a new home in California, Officer Davis has had to purchase a new home in California, and the Davis Family have had to uproot their children from school in Powell, and get them back into another school in California within a short time period. And all this is in spite of the fact that the Davis Family wanted to make Powell, Wyoming their future.

31. Because of Officer Davis's wrongful termination, he has now had to move back to California seeking other employment. However, Officer Davis cannot now obtain a law enforcement job in California as he has applied to at least three different law enforcement agencies,

Page 5 of 22
Davis v City of Powell Wyoming *et al.*
Plaintiff's Memorandum in Opposition of City Defendants' Motion to Dismiss Pursuant to Fed. R. Civ.
P. 12(b)(6) and in Opposition of Individual Defendants Eckerdt and McCaslin's Motion to Dismiss

and he has been frozen out each time. He has been informed that he is essentially not hirable as an employee in the State of California as a law enforcement employee directly due to his wrongful termination by the City of Powell, Wyoming. Sadly, his law enforcement career has possibly ended regardless of the determination of this case. Officer Davis's desires to keep working in law enforcement, and his years of training in law enforcement and the military in order to be employed in his chosen profession of serving in law enforcement, has been ruined by the Defendants wrongful actions.

37. The following events describe some of Officer Davis's experiences in attempting to improve policing in the City of Powell, Wyoming and the opposition he faced, in his own words:

(a) During my field training program in the Spring of 2021, I was to be trained by Officer Reece McLain on the use and deployment of less-lethal shotgun and flash-bang devices.  Upon attending the training, Officer Reese informed me that his certification to teach the course of instruction had lapsed several months prior, and he could not provide me with a certification.  I was not administered the necessary written examination. Additionally, the practical use portion of the training, which involves discharging the weapon system, was not consistent with the state and manufacturer qualifications standards.  Officer Reese informed me that he had sent Chief Eckerdt and Lieutenant McCaslin several emails regarding the problems with certifying officers to use less-lethal weapons. The response from Eckerdt and McCaslin was that the correct certification was not important and that there was not enough in the budget to comply with the proper certification. I made all of my sergeants and the

lieutenant aware I would not be utilizing the weapon system under any circumstances due to the lack of proper certification.  Eckerdt, McCaslin, and my superiors treated my response with indifference and anger. I was labeled as unwilling to go with the program.  I was concerned that officers were being sent out with these systems without proper certification, which could lead to civil liability for both the officer and the department.  More importantly, my concern was also that a citizen could be injured by improper training and knowledge. There is a reason these weapons are called "less lethal." You can absolutely kill someone with the weapon if you are not trained properly. Chief Eckerdt, Lieutenant McCaslin, Sergeant Brilakis, and the totality of patrol staff knew of this incident and my refusal to carry a weapon system that they refused to lawfully train me on. There was no further training or explanation.

(b) I voiced concerns as to how Sergeant Brilakis of the Powell Police Department was policing. While doing business "security checks" on the night shift, he would enter buildings if the door was unlocked. Rather than looking for reasonable suspicion of criminality such as broken glass, damaged doors, persons in areas they shouldn't be after hours, or ringing alarms, as any properly trained police officer would do; he would enter a building on the grounds that the door was unlocked. His approach was that the door being unlocked gave him, a government officer, sufficient suspicion that there might be a crime occurring inside.  I openly challenged this as a blatant 4th Amendment violation. No police training, or academy, that I am aware of, would ever train

to police like this, in fact, training on the 4th Amendment would expressly forbid it. Sergeant Brilakis argued that since the door was unlocked it's possible there could be a crime occurring.  I stated that without corroborating evidence to support criminality, an unlocked door on its own is not sufficient reasonable suspicion to enter a business without the consent of the owner especially since business owners could have multiple reasons for having one of the business doors unlocked. I advised Sergeant Brilakis that he must make a reasonable effort to contact the business owner or responsible party to obtain permission to enter the closed business prior to entering.  He strongly disagreed because it would reduce his pro-active statistics drastically if he ceased the behavior. It became apparent that padding numbers or statistics was more important to him than a correct understanding of Constitutional requirements.  I had conversations with him over several days in the Summer of 2021 in the presence of numerous employees.   Ultimately Sergeant Brilakis called a former supervisor he worked with in Florida, to check what I was saying, and that supervisor echoed my statements, saying an officer must obtain permission from the owner in the absence of obvious criminality afoot.  Other supervisors including Chief Eckerdt and Lieutenant McCaslin were clearly aware of my voiced concerns, and aware of the activity that had been happening for years, and they did nothing to curb the wrongful activity and wrongful policing.

(c) In May of 2021, after I had completed field training and was on my own, Sergeant Brilakis was my supervisor on several shifts.  A dispatcher informed

me that Sergeant Brilakis was claiming I did not do thorough enough security checks because I did not try to open unlocked doors around town even if there was no suspicious activity. Additionally, Sergeant Brilakis verbally reprimanded my field training officers for not training me to enter into, with no justification, buildings and residences if the door was unlocked. This was after we had already discussed the legality of his searching unlocked businesses. Sergeant Brilakis even cornered me one day in the ShopKo parking lot while not on duty and informed me I was not doing thorough police work because I was not checking for unlocked doors and walking into buildings. I reminded Sergeant Brilakis of our many conversations, and of our requirements under the Constitution, at which time Sergeant Brilakis became irate, got into his car, and sped away. He later apologized for getting angry but would not change his stance on opening unlocked doors. He made it known, and I learned, that he would enter houses and private residences on many occasions through open roll-up garage doors or unlocked doors. Again, Chief Eckerdt, Lieutenant McCaslin and all staff were aware of this wrongful activity, but there was no training and no addressing the issues.

(d) One day while I was on duty, I received a call informing me that the Trading Post, a pawn shop, had purchased a stolen firearm. Per law and policy, I determined where the firearm had been stolen from and contacted the local jurisdiction to see if they wanted it returned as evidence of their reported crime. The jurisdiction stated they did want it returned. I was informed by Sergeant

Alquist and Lieutenant McCaslin that I must inform the appropriate jurisdiction that they must obtain a search warrant to have the stolen firearm collected. As this was incorrect, I explained to Sergeant Alquist and Lieutenant McCaslin that the owner of the shop was in possession of known stolen property and must relinquish it without a warrant or be subject to criminal penalty himself.  When I informed Lieutenant McCaslin I would not be requesting a warrant as there was no legal ground for one nor was it required, he became visibly upset. I explained I was going to go to the shop and demand the firearm be turned over—which was the correct lawful action. Lieutenant McCaslin again became visibly upset and stated he did not want me to do that. Ultimately, I politely asked the store owner for the firearm which he turned over without incident. Chief Eckerdt, Lieutenant McCaslin, and the totality of patrol staff knew of this incident and my reasoning for the actions I took.  Ultimately, it was decided that the needs of local businesses superseded the correct law enforcement action and I was not sent to any more calls regarding stolen firearms at this business. The incorrect policies concerning these types of situations was never discussed. No memos, no emails, no follow up training, and no correction of training or procedures.

(e) In March of 2021, in reviewing policy on arrests with Officer Schmidt, while Sergeant Brilakis was present, I was reviewing the statute which states a peace officer may break a door or window of a structure in the event probable cause existed that a person to be arrested was inside.  As I discussed this Sergeant

Brilakis screamed "You will not do that!" so loud that dispatchers heard in the front of the building. Meaning, Seargeant Brilakis was telling me that I will not force entry under any circumstance to effect an arrest, even if probable cause exists and there is imminent danger and risk to the citizens of Powell. I asked him to please show me the policy that forbade it, as the law clearly allows it, and he continued to yell and stomp around the room shouting that I can't do it—and the only reason he gave was "Because I said so!" Sergeant Brilakis never produced any policy or law justifying his position, and he left the room in a fury stating he wouldn't allow anyone to make a forced entry under any circumstance. I addressed the policy and statute with my field training officer and we determined Sergeant Brilakis had no authority to make a lawful command regarding this policy and his statements were not based in fact or law. It was my understanding that leadership was made aware of the incident and failed to correct the behavior of Sergeant Brilakis. Leadership never had a meeting nor sent a memo correcting this incorrect training. There was no follow up or correction to these issues of training and policy.

(f) The Powell Police Department utilizes a Computer Assisted Dispatch System (CAD) which was routinely misused and manipulated. Powell Police Department Officers were not permitted to enter their own CAD notes despite this being the standard for all modern police agencies. CAD incidents are legal documents, which are publicly discoverable and can be subpoenaed in criminal and civil cases. The notes added by officers should be a direct summary of

actions taken on a call for service when the call does not warrant a case.  The CAD files are routinely reviewed by Dispatch Supervisor Bobby Colvin, who has no legal training, and she adds and deletes information to suit her reporting purposes. She also makes changes to the call classification to fit what she believes the crime occurring to be, despite what the facts articulate once an officer is on scene. Not only is this a misuse of the system, it corrupts the statements made as they do not come from the officer.  I explained to all three sergeants and Lieutenant McCaslin that I would not be able to testify to anything related to the CAD in court because it isn't my words, I would have to testify if asked that the CAD had been manipulated.  Additionally, the dispatchers are routinely taught to "pack the incident" which involves adding individuals who are associates of the persons involved in the calls to increase known associates.  I informed Ms. Colvin she could not add persons to a call who were not involved, and she justified it by saying they are relatives who we may need to contact in the future. Ms. Colvin would go so far as to email myself and other officers concerning calls we handled and tell us how we miss-handled calls based upon the notes she read.  I've brought this to the attention of Sergeant Alquist and Sergeant DelBiaggio only to be told to route the incident to them and they were "documenting" it.  Sergeant Alquist ultimately admitted that Chief Eckerdt will not address the misuse of CAD by Ms. Colvin because she would be too difficult to deal with.  Chief Eckerdt and Lieutenant McCaslin

are aware the CAD System is being manipulated. These issues were never fixed nor addressed.

(g) At the Powell Police Department, field training officer positions are filled by any officer expressing interest in becoming a trainer. There is no interview, no specific training, and no records review. The field training officers, by no fault of their own, are undertrained, inexperienced, and non-standardized.  Much of the information and training I was given came from word of mouth from one training officer to another and not directly from policy or law.  As documented in my daily observation reports I directly questioned the "this is how we do it" attitude on numerous occasions and based upon a legal review, I was found to be correct. There was no basic program based on policy and statute. The field training officers were teaching things totally differently from each other and what they were teaching could change day to day. Whenever asking a training officer why are you training me this way, the response was, "well that's the way we do it." I brought these serious training issues up to my supervisors. The issues were not addressed, nothing was fixed, there was not corrective training. Statute and case law was not the basis of training.

(h) One day on duty, I was called to a residence because the electrical company was performing work and stated there was a car in their way.  Upon arrival, I noted the car was legally parked in front of the residence it was registered to, and I made numerous efforts to locate the owner.  No signage had been posted about work in the area and the electric company had a second gate they could

have utilized.   Ultimately, I informed the electric company I had no legal authority to tow the vehicle and left the area.   Dispatch Supervisor Bobby Colvin sent me an internal email stating I mishandled the call and sent me a copy of city policy stating the city reserved the right to tow vehicles if they impeded city business.   I made Sergeant Alquist aware of the email as he had been on the scene of the applicable call.   I informed Sergeant Alquist that despite city policy it expanded the scope of law enforcement authority inside the city limits and was not constitutional.   Without posted signage or permanent no parking signs the owner would have no knowledge there was city work and therefore no knowledge they needed to move the vehicle.   If I, as a peace officer were to tow the vehicle without probable cause to do so, it would be an unlawful seizure and a 4th Amendment violation.   I made Lieutenant McCaslin aware of this and he simply said the City Attorney signed off on the policy so it must be legal.   I refused to comply as I stated I would not knowingly tow a vehicle under the color of authority without probable cause.   This was not well received by the Lieutenant McCaslin or Ms. Colvin. There was no follow up and no training on this issue.

38. Officer Davis was obviously fired because he was a pain to the police department administration. He was fired in retaliation because he pointed out policy and training issues. He was fired because the department administration wanted to do things their way without any concern to the right or wrong of "their way." Defendants chose to use Officer Davis's sickness as a pretext for the real reason they fired Officer Davis. His rights as a disabled person were not even

considered nor dealt with because Defendants felt they had found a substitute, or proxy reason, to terminate Officer Davis and get rid of him, because he wanted to clean up what was going on at the department.

## II.      LEGAL STANDARD

Under the Federal Rules of Civil Procedure 12(b)(6), a party may assert failure to state a claim upon which relief can be granted as a defense. To defeat a motion to dismiss filed pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim meets the "plausibility test: when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

While a complaint need not contain detailed factual allegations, it cannot only set forth labels and conclusions and only set forth formulaic recitations of the elements of a cause of action. *Twombly*, 550 U.S. at 555. In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The ultimate question in a 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002).

### III.    ARGUMENT

**A. Plaintiff's notice of claim under the Wyoming Government Claim Act is in compliance with Wyo. Stat. § 1-39-113(a).**

The December 27, 2023, City Defendants' Memorandum in Support of 12(b)(6) Motion to Dismiss Complaint claims that Plaintiff's notice under the Wyoming Government Claims Act, which was served up the City of Powell, Wyoming on October 18, 2023, was not in compliance with the Act due to the fact that the claim requests compensation of $1,100,000 without any itemization or categorization of the alleged damages.

However, the Wyoming Supreme Court has found that the purpose of the claim notice is served, and the statutory and constitutional itemization requirements are met, when the claimant simply specifies a dollar amount of damages being demanded. *Excel Const., Inc. v. Town of Lovell, Wyoming*, 269 P.3 238, 241 (Wyo. 2011). The categorization of the specific damages is not required. *Id.* Furthermore, the notice of claim is required to state the time, place, and circumstances of the alleged loss of injury and the amount of compensation demanded. *Id at 241-242.*

In accordance with the Wyoming Government Claims Act, Wyo. Stat. § 1-39-113(a)-(b), Plaintiff's four-page claim lists and itemizes:

> (a) the time, place, and circumstances of the alleged loss or injury to Officer Davis, including the names of known public employees;
>
> (b) the name, address, and residence of Officer Davis and his attorney; and
>
> (c) the amount of compensation demanded.

(ECF No.1 Exhibit A).

Thus, the Claims Act Notice Plaintiff served upon the City of Powell, Wyoming is in compliance with the law.

**B. Claims 1 and 2 are plausible claims for relief under the Americans with Disabilities Act.**

Both memorandums in support of motions to dismiss brought on behalf of Defendants claim that actions under the Americans with Disabilities Act cannot be brought under Section 42 U.S.C. § 1983. Additionally, the motions to dismiss state that the Tenth Circuit Court of Appeals has found the ADA precludes personal capacity suits against individuals.

Accordingly, Plaintiff is willing to amend his complaint after conferring with Defendants' counsel. Plaintiff will not bring the actions under Section 42 U.S.C. § 1983, rather under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act, 42 U.SC. Sections §§ 12101 *et al.* Plaintiff is bringing these actions against Defendants Eckerdt, McCaslin, Brando, and Thorington in their official capacities only. Notwithstanding, claims brought against Defendants alleging violations of the Americans with Disabilities Act are correct allegations and statements.

**C. Claims 5 and 6 state plausible claims predicated on the denial of substantive and procedural due process. And claims 8 and 9 state plausible claims for breach of contract and promissory estoppel.**

As part of his procedural due process claim, and as part of his breach of contract claim, Officer Davis has plead facts showing an implied contract in promise of continued employment, promises that his reviews secured him continued employment, and no indication to the contrary. (ECF No. 1 at ¶¶ 2, 23, 33-36). Officer Davis has alleged in his complaint that communications

between himself and the City, along with the Cities' own expressed policies and procedures, which were relied upon by Officer Davis, evidence a contract for employment between the parties. *Id.*

Furthermore, as part of the discovery process in this case, Plaintiff will request a copy of the City of Powell's Employment Manual. The Wyoming Supreme Court has been liberal in holding that an employee handbook can create a contract which will eliminate the at-will status between an employee and employer: (a) *Alexander v. Phillips Oil Co.,* , 1388 (Wyo.1985); (b) *Leithead v. American Colloid Co.,* 1063 (Wyo.1986); (c) *Mobil Coal Producing, Inc. v. Parks,* 708 (Wyo.1985); (d) *McDonald v. Mobil Coal Producing, Inc.,* 870 (Wyo.1990), *reh'g granted* , 990 (Wyo.1991). The City of Powell's Employment Manual will most likely buttress claims of an implied contract of employment between Officer Davis and the City of Powell, Wyoming, which employment manual the City has withheld from Plaintiff.

Defendants claim that Officer Davis fails to assert facts plausibly showing he had a right to a hearing or process, "procedural due process". This is simply false. The facts clearly allege Officer Davis's rights were violated and that he had virtually no process nor fundamental fairness in protecting his rights. (*See* ECF No. 1 ¶¶ 2-4, 24-30, 40-41, 44-45. The Americans with Disabilities Act requires a process. In fact, it requires an interactive process, and it requires the employer providing reasonable accommodations. The Defendants never called Officer Davis into a meeting to actually discuss his rights, rather the January 7, 2022, a meeting was planned by the Defendants with the sole purpose of firing Officer Davis. Defendants did not discuss any of his rights to employment nor his federal rights under the Americans with Disabilities Act.

As part of Officer Davis's substantive due process claim, and in reviewing the facts of this case, a reasonable person can easily infer that the termination of Officer Davis is "conscience

shocking" and a substantive due process violation. The fact that Officer Davis was called to a meeting, represented to be a discussion on his employment circumstances, while he was on Wyoming Workers Compensation coverage, and while he was covered by the Family Medical Leave Act, and while he was disabled with Long-term COVID, is conscious shocking, and add to those facts that he was terminated with no process, no hearing, and no discussion of his rights under the law. *Id.*

As part of his claim for promissory estoppel, Officer Davis has alleged numerous facts that show his reliance, to his detriment, on the promise of employment, and continued employment by the City of Powell, Wyoming. He brought his family and extended family along. He bought a new home in Powell, Wyoming. He did nothing in his employment to terminate that relationship. He received high marks on his employment reviews and did nothing to jeopardize his job. Due to his wrongful termination, he has suffered many costs that would not have happened but for the Defendants violating his rights. (*See* ECF No. 1 ¶¶ 1-2, 4, 21-23, 28-31).

**D. Claims 7 and 11 state plausible claims for negligence, gross negligence, or willful and wonton misconduct.**

There are plausible facts pointing towards negligence, gross negligence, and willful or wonton misconduct that a fact finder should be able to make a determination on. (*See* ECF No. 1 ¶¶ 2-3, 24-29). Officer Davis has stated sufficient facts that are plausible to show that Defendants breached their duty of care, the duty that reasonable city administrators would owe to employees they are making decisions over. Not only has Officer Davis claimed negligence on behalf of, but he has also made specific claims of a conspiracy amongst Defendants to deprive him of contractual rights and federal rights.

Plausible and adequate facts are alleged in Officer Davis's complaint that should allow these matters to proceed to discovery and a trial.

**E.  Claim 10 states a plausible claim for breach of the implied covenant of good faith and fair dealing.**

The facts asserted by Officer Davis plausibly show there is a special relationship between the City of Powell, Wyoming and its police officers. As soon as Officer Davis's employment started, he had special training, constant reviews, and feedback that he was deemed an officer in good standing. (*See* ECF No. 1 ¶¶ 2, 32-36). It is plausible to assert that Officer Davis never felt he was in a tenable situation, the exact opposite is true. He trusted in the city to operate in good faith and fair dealing in all their interactions. A police officer is given great trust from a city from the moment employment commences—he is the face of the city carrying a gun. There was a special relationship in this case.

**F.  Claim 12 states a plausible claim for intentional infliction of emotional distress.**

Officer Davis's complaint, and a reasonable person's inferences after reading the alleged facts, show that the Defendants' actions were extreme. Defendants knew, or should have known, the cost and sacrifice to Officer Davis to give up his job in California, sell his home in California, move his family and extended family over 1500 miles, buy a home in Powell, Wyoming, and take a job for less money so that he could plan a future for his long term in Wyoming. Defendants knew, or should have known, Officer Davis's federal rights and contractual rights, which they intentionally ignored even though they were in a position of trust and management. Calling Officer to a meeting and firing him, when Defendants failed to protect his rights, and in fact violate his rights, under the law is plausibly shocking and plausibly beyond the pale.

**G. Claim 13 states a plausible claim for civil conspiracy.**

From the facts alleged in Officer Davis's complaint, there had to be, and was, conspiring and planning that took place prior to the January 7, 2022, meeting wherein Officer Davis's rights were violated by the Defendants. (*See* ECF No. 1 ¶¶ 27-29). Defendants represented the meeting was called for one purpose, whereas it become clear that the Defendants purpose for the meeting was to terminate Officer Davis without any determination or discussion concerning his federal and state rights. Given the facts, it is plausible that there must have been an agreement and concerted action amongst the Defendants. A fact finder can easily infer that there was prior conspiring on part of the Defendants to violate Officer Davis's rights.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff, Officer Davis, respectfully requests that the Court Deny Defendants' Motion to Dismiss. If the Court considers dismissing any causes of action the Plaintiff does not agree to dismiss or amend on his own, Plaintiff respectfully requests a hearing in front this Court prior to granting any of Defendants' Motions.


DATED this 10th day of January 2024.

/s/ Daniel B. Wilkerson_____
Daniel B. Wilkerson, Bar No. 7-6415

## **CERTIFICATE OF SERVICE**

I hereby certify that I have electronically filed the foregoing with the Clerk of Court and the foregoing was served this 10th day of January 2024, by the following means:

Debra L. Hulett                                          [X] EMAIL
Senior Assistant Attorney General
Wyoming Attorney General's Office
Debra.hulett@wyo.gov

Prentice B. Olive                                        [X] EMAIL
Assistant Attorney General
Wyoming Attorney General's Office
prentice.olive@wyo.gov

Thomas A. Thompson                                       [X] EMAIL
Wyoming Local Government Liability Pool
tthompson@lglp.net

/s/ Jennifer M. Hieb_____
Jennifer M. Hieb, Paralegal
Wilkerson Law Group