

# KOURTNEY LAYTON & ASSOCIATES, INC.

### Vocational Rehabilitation & Life Care Planning Consultants

Idaho Office
PO Box 187
Arco, ID 83213
(855) 831-8880

November 13, 2024

Daniel B. Wilkerson, Esq.
Wilkerson Law Group
PO Box 607
Gillette, WY 82717

Re: Ryan Davis v The City of Powell, Wyoming

Dear Mr. Wilkerson:

Thank you for the opportunity to serve as an expert on this matter.

As you know, I have provided direct vocational rehabilitation counseling and job placement services for persons with disabilities for over 18 years. I have been employed as a Vocational Expert since 2009 and have served on both plaintiff and defense cases. My credentials include Diplomate (ABVE/D) and International Psychometric Evaluation Certification (IPEC) with the American Board of Vocational Experts, as well as a Certified Rehabilitation Counselor (CRC) and Evaluator (CVE) with the Commission on Rehabilitation Counselor Certification.

Please find the enclosed Americans with Disability Act (ADA) report for Mr. Ryan Davis.

The projections in this report are based on information received to date and may be updated upon receipt of additional information.

Best regards,

*Kourtney Layton*

**Kourtney Layton MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A**
Vocational Rehabilitation Counselor · Vocational Analyst · Certified Life Care Planner · Certified Vocational Evaluator · Certified Idaho Workers Compensation Specialist-Advanced





*Celebrating 15 years of excellence in rehabilitation counseling and assessment.*

---

**Utah Office:** 5513 W. 11000 N. #443 * Highland, UT 84003 **Nevada Office:** 848 N. Rainbow Blvd. #3863 * Las Vegas, NV 89107



# Table of Contents

*Report*

Information Reviewed ................................................................1-2

Credentials ................................................................3-4

Methodology ................................................................5-7

Referral Information ................................................................8

Identifying Information................................................................8

Academics................................................................8

Military Service ................................................................9

Vocational History ................................................................9-10

Re-Entry Issues ................................................................11-17

Discussion of ADA Factors and Compliance ................................................................18-20

Summary and Conclusions ................................................................21-22

Closing ................................................................23


*Enclosures*

Medical Summary ................................................................Section One

Current CV & List of Cases. ................................................................Section Two

Fee Schedule ................................................................Section Three



# KOURTNEY LAYTON & ASSOCIATES, INC.

### Vocational Rehabilitation & Life Care Planning Consultants

Idaho Office
PO Box 187
Arco, ID 83213
(855) 831-8880

## AMERICANS WITH DISABILITIES ACT (ADA) REPORT
## FOR
## RYAN DAVIS

EVALUEE:          Ryan Davis

DATE OF BIRTH:    October 31, 1982 (42)

DATE OF TERM:     January 7, 2022 (39)

EVALUATED BY:     Kourtney Layton, MRC, CRC, ABVE/D, IPEC, CLCP,
                  CVE, CIWCS-A

REPORT DATE:      November 13, 2024

The case of Ryan Davis was referred for an Americans with Disabilities Act (ADA) evaluation in reference to his termination from The City of Powell, Wyoming on January 7, 2022.

In conducting the assessment, Mr. Davis was interviewed on November 12, 2024. The purpose of the evaluation was explained to him, as were the limits of confidentiality. The professional disclosure and informed consent form was also discussed.

No client-counselor relationship was established, nor sought at any time during the course of the assessment.

In conducting the assessment, the following documents were reviewed and considered.

INFORMATION REVIEWED
*Worker's Compensation Injury (COVID-19)*
Power Valley Healthcare                            10/5/2021-12/15/2021
Wyoming Department of Health                       10/8/2021

*Medical Bills*
Multiple Providers                                 Various

*(Continued on the following page)*

<u>INFORMATION REVIEWED</u> *(continued)*

*Employment*

| | |
|---|---|
| US Equal Employment Opportunity Commission: | 8/20/2022 |
| Charge of Discrimination | |
| Amended Charge of Discrimination | 1/25/2023 |
| Confidentiality Agreement | 2/8/2023 |
| Agreement to Mediate | 2/8/2023 |

*Court*

Ryan S. Davis, Complainant, v. City of Powell, Respondent

| | |
|---|---|
| Position Statement of Respondent and Response to Charge of Discrimination | 3/21/2023 |
| Ryan S. David's Response to the City of Powell's Position Statement | 5/5/2023 |
| Light Duty Work Assignment Witness List | 7/20/2023 |

Plaintiff, Ryan Davis, an individual, v. Defendants, The City of Powell, Wyoming et al., Defendants

| | |
|---|---|
| Amended Verified Complaint | 12/5/2023 |
| Defendant's Answer and Assertion of Affirmative Defenses | 5/29/2024 |
| Deposition of Ryan S. Davis | 10/1/2024 |
| Deposition of Roy S. Eckerdt | 10/1/2024 |
| Deposition of Tiffany Brando | 10/2/2024 |
| Deposition of Zachary M. Thorington | 10/2/2024 |
| Deposition of Matt J. McCaslin | 10/2/2024 |

*Miscellaneous*

| | |
|---|---|
| Dept. of Workforce Services – Workers' Compensation Report of Injury (10/1/2021) | 10/7/2021 |
| Letter from State of Wyoming Dept. of Workforce Services to R. Davis – Notice of Lack of Information | 10/18/2021 |
| Letter from State of Wyoming – Dept. of Workforce Services to R. Davis – Final Determination of Compensability | 10/22/2021 |
| Letter from State of Wyoming – Dept. of Workforce Services to R. Davis – Final Determination on TTD and Rate of Pay | 10/18/2021 10/25/2021 |
| Wyoming Workers' Compensation Division – Employee's Application for Temporary Total Disability Benefits | 12/15/2021 |
| Wrongful termination letter between City and Attorney for Davis | 5/3/2022 |
| Transcript of termination meeting | Not Dated |

*(Remaining page intentionally left blank)*

<u>CREDENTIALS</u>

All evaluations with Kourtney Layton & Associates are conducted by vocational experts who meet or exceed the standards for Vocational Expert testimony. The International Association of Rehabilitation Professionals (IARP) authored a White Paper in 2017[1] that reflects the necessary qualifications to testify as a Vocational Expert. These requirements were primarily adopted by the Social Security Administration, the largest disability court in the world, in 2019.

The following minimum standards are:

1. A Master's degree in Rehabilitation Counseling or other related Master's degrees such as Counseling, Psychology, Education, Human Services or another behavioral science.

2. At least five years of direct experience providing vocational rehabilitation services to individuals with disabilities. IARP recognizes that no one can be an expert without direct experience in the field.

3. Employment as a principal, employee or private consultant in vocational counseling, vocational assessment or job placement of people with disabilities including labor market research and communicating with employers regarding the physical and mental demands of occupations.

4. National certification including the Certified Rehabilitation Counselor (CRC), the American Board of Vocational Experts (ABVE) Fellow or Diplomate status, or the Certified Vocational Evaluator (CVE). National certification assures that one has met educational standards, passed an examination, and is bound to a scope of practice and ethical code.

5. An SSVE who is teaching in the vocational rehabilitation field at the university or college level or administrators in the field of rehabilitation should also possess the required credentials or qualifications.

6. IARP recommends ongoing membership in a professional organization that provides regular updates in the body of knowledge required of the Vocational Expert.

Kourtney Layton far exceeds these minimum standards. She has her Master's in Vocational Rehabilitation Counseling from Utah State University. For over 18 years, Ms. Layton has provided direct vocational rehabilitation counseling and job placement services for persons with disabilities.

*(Continued on the following page)*

---

[1] Aliff, M., & Jett, K. W. (2017). The White Paper: A Professional and Ethical Mandate for Professional Vocational Expert Services in SSA Determinations. *Rehabilitation Professional*, *25*(3).

<u>CREDENTIALS</u> *(continued)*

Additionally, Ms. Layton has been employed as a Vocational Expert since 2009 and has served on both plaintiff and defense cases. Her credentials include being a Diplomate (ABVE/D) and having the International Psychometric Evaluation Certification (IPEC) with the American Board of Vocational Experts, a Certified Rehabilitation Counselor (CRC) and Evaluator (CVE) with the Commission on Rehabilitation Counselor Certification, and a Certified Life Care Planner (CLCP) with the International Commission on Health Care Certification.

Possessing these numerous credentials involves meeting stringent eligibility requirements for the specific specialty, testing, and annual continuing education requirements. Credentials, in addition to professional associations, require the individual to uphold and be responsible to the Code of Ethics for each organization. Ms. Layton has been credentialed with all of these organizations for several years and remains in good standing.

In addition to working with transition-aged students and persons with disabilities to assist with workforce development and re-entry, Ms. Layton serves retired military, disabled military veterans and law enforcement personnel (retired, injured or re-entering) to overcome return-to-work barriers by performing vocational analyses, evaluating labor market access and disability issues, developing resumes and assisting with other population-specific re-entry issues. Ms. Layton has published multiple peer-reviewed articles about the impact of the COVID-19 pandemic upon persons with disabilities and the labor market. She is also sought out to perform analyses of compliance with the Americans with Disabilities Act (ADA) in regard to employment, housing and other issues.

Ms. Layton is also an instructor in the Vocational Rehabilitation Counseling graduate program at Utah State University. Her courses include vocational assessment in counseling.

Kourtney Layton has appeared in numerous jury and bench trials, arbitrations and hearings. To date, she has given testimony in over 70 depositions for various types of cases and a variety of venues.

Ms. Layton primarily serves Utah, Idaho and Nevada clientele, however, our firm also offers vocational rehabilitation and Life Care Planning services in other parts of the country.

*(Remaining page intentionally left blank)*

METHODOLOGY

The methodology for conducting vocational evaluations in employment analysis cases is similar to vocational evaluations in general rehabilitation case work and other litigated venues[2].

Tracy and Wallace[3] described five fundamental elements as key to completing a vocational examination within the context of marital dissolution law, including a forensic vocational interview, vocational testing (where applicable), assessment of abilities through transferable skills analysis and occupational research; research of the labor market to determine employment opportunities available and suited to the party and, finally, a comprehensive report.

This mirrors the steps contained with a RAPEL analysis:

Field[4] described RAPEL as one of the most comprehensive methods (models) as it considers resources and strategies from a variety of sources. In conceptualizing RAPEL, Weed and Field described the model as a "comprehensive approach which includes all elements needed to determine loss of access, loss of earnings capacity, future medical care, work life expectancy, rehabilitation plan, placeability and employability factors".[5]

RAPEL is a mnemonic designed to assist the rehabilitation expert with collecting the data for analysis:

• **R**ehabilitation Plan: Determine the rehabilitation plan based on the client's vocational and functional limitations, vocational strengths, emotional functioning, and cognitive capabilities. This may include testing, counseling, training fees, rehabilitation technology, job analysis, job coaching, placement, and other needs for increasing employment potential. Also consider reasonable accommodation. A life care plan may be needed for catastrophic injuries.

• **A**ccess to the labor market: Determine the evaluee's access to the labor market. Methods include computer programs, transferability of skills (or worker trait) analysis, disability statistics and experience. This may also represent the evaluee's loss of choice and is particularly relevant if earnings potential is based on very few positions.

*(Continued on the following page)*

---

[2] Robinson, R.H. (2014). *Foundations of Forensic Vocational Rehabilitation*, New York, NY: Springer Publishing Company.

[3] Tracy, L. and Wallace, A. (2010). The impact of case law on vocational expert examinations and opinions in marital dissolution. *The Rehabilitation Professional,* 18 (1), 19-30.

[4] Field, T.F. (2008). Estimating earning capacity: Venues, factors, and methods. Estimating Earning Capacity, 1(1), 5–40.

[5] Weed, R. O., & Field, T. F. (2012). Rehabilitation consultant's handbook (4th ed.). Athens, GA: Elliott & Fitzpatrick. (See also: Weed, R., & Field, T. (2001). Rehabilitation consultant's handbook (rev. ed.). Athens, GA: Elliott & Fitzpatrick.)

METHODOLOGY *(continued)*
• **P**laceability: This represents the likelihood that the client could be successfully placed in a job. This is where the "rubber meets the road". Consider the employment statistics, employment data for the evaluee's specific medical condition (where applicable), economic situation of the relevant labor market, as well as availability of jobs in identified occupations. The evaluee's attitude, personality and other factors may also influence the ultimate outcome.

• **E**arning Capacity: Based on the above, what is the capacity to earn? Specific considerations may apply to parties with children, women with limited or no work history, people who choose to work below their capacity (underemployed) and military trained.

• **L**abor Force Participation: This represents the evaluee's work life expectancy, or how long they are expected to participate in the labor market. Issues include longer time to find employment, part-time vs. full-time employment, medical treatment or follow up, earlier retirement, etc.

Subsequently, Dr. Field described a "practical approach" to earning capacity assessment which was intended to represent "a synthesis of the more useful concepts that have evolved over years."[6] It was suggested that this approach may serve as a foundation to augment the personal preferences and experiences of the vocational analyst utilizing the model.

Farnsworth, Field, Field, Griffin, Jayne, Johnson et al[7] specifies that the process of a vocational evaluation draws upon clinical skills from the fields of psychology, counseling and education. Specific steps of the vocational evaluation may include a file review, diagnostic interviewing, vocational testing (where appropriate), clinical observation and data interpretation. As such, these factors are also incorporated into my analysis in this case.

As such, the following steps were completed to perform this analysis:

1. Interview to obtain background information;
2. Review of supporting documentation;
3. Identification of Mr. Davis's reported medical conditions; and,
4. Review of ADA Policy/ies.

*(Continued on the following page)*

---

[6] Field, T.F. (2008). Estimating earning capacity: Venues, factors, and methods. Estimating Earning Capacity, 1(1), 5–40.

[7] Farnsworth, K., Field, J., Field, Tl, Griffin, S., Jayne, K., Johnson, C., et al. (Eds.). (2005). The quick desk reference for forensic rehabilitation consultants. Athens, GA: Elliott & Fitzpatrick.

METHODOLOGY *(continued)*

Additionally, this analysis was performed within the context of the Americans with Disabilities Act (ADA), which requires employers to make reasonable accommodations for employees who become disabled.

According to the ADA, a person with a disability is someone who:

- has a physical or mental impairment that substantially limits one or more major life activities,
- has a history or record of such an impairment, or;
- is perceived by others as having such an impairment.

In this regard, the following elements are considered:

*Interactive Process*

- The ADA encourages an "interactive process" between the employer and the employee. This involves discussing the employee's limitations, the impact on their job duties, and possible accommodations.

- The goal is to find a solution that enables the employee to perform their essential job functions without placing excessive burden on the employer.

*Reasonable Accommodations*

- Definition: A reasonable accommodation is any modification or adjustment that enables a person with a disability to perform the essential functions of their job. Examples include:

  o Modifying work schedules or allowing flexible hours.

  o Altering workstations, equipment or facilities to be accessible.

  o Providing assistive technology, such as screen readers or modified computers.

  o Reassigning the employee to a vacant position if they cannot perform their current role-- even with accommodations.

- Scope: Employers are not required to lower job standards, change essential job functions or provide accommodations that would impose undue hardship—meaning significant difficulty or expense.

In addition to the aforementioned methodologies, the fundamental concepts regarding clinical judgment have also been applied in this evaluation[8]. Clinical judgment is defined as the final opinion that is predicated on valid, reliable and relevant foundation information and data that are scientifically established and generally accepted within the professional community[9].

---

[8] Field, T.F., Choppa, A.J., and Weed, R. O. (2009), Clinical Judgment: A Working Definition for the Rehabilitation Professional, *The Rehabilitation Professional*, 17(4), 185-194.

[9] Johnson, C. B., Layton, K., Weiss, M. M., & Taylor, D. (2022). Admissibility: Federal Rules of Evidence 702 Revisited. *Rehabilitation Professional*, 30(3).

REFERRAL INFORMATION

Ryan Davis was referred for a review in accordance with the Americans with Disabilities Act (ADA) subsequent to his termination from The City of Powell, Wyoming on January 7, 2022.

Information for this analysis was obtained through an interview with Mr. Davis, examination of supporting documentation, an analysis of his skills and abilities, review of his job search efforts and research of the local labor market he is most likely to participate in.

IDENTIFYING INFORMATION

Ryan Davis is a now 42-year-old man who currently resides in El Dorado Hills, California. He was born on October 31, 1982[10].

ACADEMICS

Mr. Davis graduated from Oak Ridge High School in 2001[11].

He attended Folsom Lake Community College and Simpson University, where he took general education courses[12]. He graduated from Brandman University with a Bachelor's degree in Criminal Justice in approximately 2013[13].

Mr. Davis is currently working on an MBA and studying Industrial Organization Psychology[14], with an estimated graduation date of June, 2025[15].

Mr. Davis is also currently certified with California POST, which expires in January 2025[16] unless he secures a law enforcement placement.

*(Remaining page intentionally left blank)*

---

[10] Interview with Mr. Ryan Davis.
[11] Deposition of Mr. Ryan Davis: page 20, lines 21-25.
[12] Deposition of Mr. Ryan Davis: pages 21-22.
[13] Deposition of Mr. Ryan Davis: page 22, lines 3-14.
[14] Deposition of Mr. Ryan Davis: page 78, lines 12-15.
[15] Deposition of Mr. Ryan Davis: page 75, line 25.
[16] Deposition of Mr. Ryan Davis: page 26, lines 2-8.

MILITARY SERVICE

Mr. Davis served in the Army[17] National Guard[18] where he entered service as an E-3[19]. He had at least 8 years of direct service[20] with approximately 11 years of cumulative service if his IRR (Inactive Ready Reserve) status is considered[21]. His contract formally ended in 2021[22].

He was honorably discharged[23], with awards of ARCOM and Purple Heart[24].

VOCATIONAL HISTORY

At the time of the termination, Mr. Davis was working as a Police Officer I for The City of Powell. Reported earnings were $4,462.81 per month[25], which correlates with annual earnings of $53,553.72.
*SOC: 33-3051 (Police and Sheriff's Patrol Officers)*

Prior to being sworn with the City of Powell Police Department (PPD), Mr. Davis worked as a Sheriff's Deputy for the Amador County Sheriff's Office. He held this position for 7 years. He left because he moved to Powell. Reported earnings were approximately $100,000 per year[26].
*SOC: 33-3051 (Police and Sheriff's Patrol Officers)*

Before he went to work for the Amador County Sherriff's Office, Mr. Davis was active military[27].

Prior to enlisting, Mr. Davis worked as the Owner of ServPro of El Dorado Foothills. He established the business in 2005 and ended it when he enlisted in the Army in 2009. Job duties included water and fire restoration, billing, bookkeeping and supervising 10-12 employees. Reported earnings were $70,000 - $80,000 annually[28].
*SOC: 37-2011 (Janitors and Cleaners, Except Maids and Housekeeping Cleaners)*

*(Continued on the following page)*

---

[17] Deposition of Mr. Ryan Davis: page 78, line 21.
[18] Deposition of Mr. Ryan Davis: page 80, line 1.
[19] Deposition of Mr. Ryan Davis: page 8, lines 6-7.
[20] Deposition of Mr. Ryan Davis: page 81, line 10.
[21] Interview with Mr. Ryan Davis.
[22] Deposition of Mr. Ryan Davis: page 81, lines 15-18.
[23] Deposition of Mr. Ryan Davis: page 82, lines 3-4.
[24] Deposition of Mr. Ryan Davis: page 82, lines 5-7.
[25] Workers' Compensation File.pdf page 8.
[26] Interview with Mr. Ryan Davis.
[27] Interview with Mr. Ryan Davis.
[28] Interview with Mr. Ryan Davis.

<u>VOCATIONAL HISTORY</u>, *(continued)*

Prior to leaving for base, Mr. Davis worked odd jobs such as checking ID's at a sports bar and installing cubicles and other furnishings in offices[29].

***SOC: 33-9032 (Bouncer)***
***SOC: 53-3032 (Furniture Delivery)***

From 2003 to 2005, Mr. Davis worked as the Owner/Operator of P&R Distributors. Job duties included contracting with furniture and exercise equipment companies to deliver products. He performed all duties himself with the help of 2 employees. The business closed because he was having difficulty staying open due to the cost of insurance premiums. He does not recall his earnings[30].

***SOC: 53-3032 (Furniture Delivery)***

When Mr. Davis was in high school, he worked in retail sales[31].

***SOC: 41-2031 (Sales Clerk)***

*(Remaining page intentionally left blank)*

---

[29] Interview with Mr. Ryan Davis.
[30] Interview with Mr. Ryan Davis.
[31] Interview with Mr. Ryan Davis.

<u>RE-ENTRY ISSUES</u>
Law enforcement officers who attempt to re-enter the labor market after termination can face a range of significant barriers. These challenges can affect both their professional and personal lives, limiting job opportunities and impacting career trajectories.

**Stigma and Reputation Concerns**
- **Public Perception**: Being terminated, especially under controversial circumstances, can tarnish an officer's reputation. This negative public perception can follow them throughout their job search.
- **Background Checks**: Potential employers, particularly in related fields such as security or other law enforcement agencies, may view a termination record as a red flag, limiting trust and willingness to hire.

**Loss of Professional Certifications**
- **Certification Revocation**: Termination can sometimes lead to the loss or suspension of necessary certifications and licenses. Reinstating these can be a time-consuming and uncertain process.
- **Regulatory Barriers**: Different states and agencies may have strict guidelines that make re-qualification difficult or impossible after a termination.

**Skill Transferability Issues**
- **Narrow Skillset Perception**: Some officers may be perceived as having a highly specialized skill set tied solely to law enforcement, which can make it challenging to transition into other sectors.
- **Limited Civilian Experience**: If an officer's career has been exclusively in law enforcement, demonstrating adaptability and relevant experience in non-law enforcement roles may be difficult.

**Legal and Financial Consequences**
- **Pending Legal Matters**: If the termination was related to misconduct or legal infractions, unresolved legal issues could deter potential employers. This can be a barrier even if this is not the cause of the dismissal, as employers are reluctant to hire LEO's with any type of potential "background issues" (perceived or otherwise).
- **Financial Pressures**: The need for immediate income can pressure officers to accept roles below their experience level or outside their field, affecting long-term career development.

**Psychological and Emotional Impact**
- **Loss of Identity**: For many law enforcement professionals, their career is tied closely to their identity. Termination can lead to a profound loss of purpose, affecting confidence and motivation during the job search.

<u>RE-ENTRY ISSUES</u> *(continued)*

**Networking Challenges**

- **Erosion of Professional Network**: Termination, particularly under contentious circumstances, can strain or sever connections within the law enforcement community, which is often a key source of job leads and recommendations.
- **Reluctance to Provide References**: Former colleagues or supervisors may be hesitant to act as references, particularly if the termination was controversial or reflects poorly on the agency.

**Changes in the Job Market**

- **Evolving Industry Standards**: The law enforcement field, like many industries, evolves over time. Officers who have been out of the workforce for even a short period may find that policies, technologies and best practices have changed.
- **Increased Competition**: Re-entering officers may face competition from a younger, often better-trained cohort of candidates who are up-to-date with the latest training and certifications.

**Potential Bias and Discrimination**

- **Bias Against Former Law Enforcement**: In some sectors, there can be a negative bias toward hiring former officers due to associations with perceived aggression, rigid authority, "difficulty to train" concerns or other stereotypes.
- **Discrimination Due to Termination Reason**: If termination was related to misconduct, a legal dispute or a controversial public incident, implicit or explicit discrimination can occur during the hiring process.

**Requalification and Training Needs**

- **Mandatory Retraining**: If an officer seeks to return to a similar position, requalification and training may be required, depending on the length of time out of the job and reason for termination.
- **Continuing Education**: For roles outside of law enforcement, retraining or additional education might be necessary to bridge skill gaps and demonstrate readiness for new responsibilities.

**Strategies to Overcome Barriers:**

- **Rebranding and Skill Highlighting**: Focusing on transferrable skills such as leadership, crisis management and conflict resolution can help former officers market themselves effectively in different industries.
- **Support Services**: Utilizing career counseling, mental health support and job placement services specifically designed for former law enforcement personnel can provide essential guidance and resources.

<u>RE-ENTRY ISSUES</u> *(continued)*
- **Networking in New Circles**: Building professional relationships in industries outside of law enforcement can open up unexpected opportunities and lessen reliance on former networks.

Addressing these barriers requires strategic preparation and support systems to ensure a successful transition back into the workforce.

When a law enforcement officer attempts to re-enter the labor market after leaving a position they held for only a short period, they may encounter a unique set of barriers. These challenges stem from the perception of job instability, questions regarding professional commitment, and potential skill gaps. Here are the primary barriers they may face:

**Perception of Job Instability**
- **Employer Concerns About Reliability**: Holding a position for a short period can raise questions about an officer's reliability and commitment. Prospective employers may worry that the individual is prone to job-hopping or may leave their new position prematurely.
- **Red Flag in Resume Screening**: Hiring managers often see short tenures as red flags, leading them to question the circumstances behind the departure, whether it was voluntary or due to performance issues.

**Explaining the Short Tenure**
- **Lack of Clear Explanation**: If the reason for the short tenure was complex or negative (e.g., mismatched job expectations, conflicts with management), explaining this to future employers can be difficult without casting oneself in an unfavorable light.
- **Perception of Poor Fit**: Short periods in a role may signal to potential employers that the officer struggled to fit into the position or organization, which could suggest challenges in adaptability or teamwork.

**Limited Skill Acquisition**
- **Insufficient Time for Skill Development**: Short employment durations often mean the officer may not have had enough time to develop or refine key skills that would have made them more competitive in the labor market.
- **Gaps in Training**: If the role involved specific training or specialized duties, a short tenure may indicate incomplete or minimal hands-on experience with critical tasks.

*(Continued on the following page)*

RE-ENTRY ISSUES *(continued)*

**Questioning Professional Commitment**

- **Doubt About Long-Term Goals**: Employers may question whether the officer is committed to a law enforcement career or related fields, leading to doubts about their dedication and career stability.
- **Motivation Concerns**: A short stay in a previous role can create the perception that the officer lacked motivation or faced difficulties meeting job demands.

**Impact on Networking and References**

- **Limited Professional Network**: A brief stint in a position can result in fewer professional connections or colleagues willing to vouch for the officer's skills and character.
- **Lack of References**: Short tenures often mean fewer opportunities to establish relationships strong enough to garner quality references from that role, which can be crucial in the law enforcement field where trust and credibility are highly valued.

**Interview Challenges**

- **Defending the Short Tenure**: Addressing questions about why the officer left their last position so quickly can be difficult during interviews. Without a compelling explanation, it can leave a negative impression.
- **Demonstrating Continuity**: Convincing employers that the short duration was an exception rather than a pattern can be tough, especially if other similar periods exist in the job history.

**Reputation and Professional Image**

- **Speculative Rumors**: In tight-knit law enforcement circles, word of a short tenure can spread, leading to speculation about the reasons behind the departure. This can impact future job opportunities, even if the rumors are baseless or inaccurate.
- **Challenges in Upholding a Positive Image**: Ensuring that the officer's professional reputation remains intact can be difficult if the previous employer shares or implies negative feedback.

**Competition with Candidates with Stable Histories**

- **Preference for Long-Term Employees**: Employers often favor candidates with stable, long-term job histories who are seen as less risky and more likely to stay in the role.
- **Stronger Comparisons**: Competing against applicants with more consistent employment records or longer tenures can make it harder for the officer to stand out positively.

**Potential Skill Misalignment**

- **Skills Mismatch**: If the officer moved to a position with different responsibilities or a non-standard law enforcement role and only stayed for a short time, it might lead to perceived skill misalignment when applying for traditional roles again.

<u>RE-ENTRY ISSUES</u> *(continued)*
**Strategies to Overcome These Barriers:**

- **Crafting a Strong Narrative**: Prepare a concise and positive explanation for the short tenure, focusing on what was learned and how it has prepared them for future roles.
- **Highlighting Transferable Skills**: Emphasize the skills and experiences gained during that time, even if the role was brief, and demonstrate how these skills can benefit the next employer.
- **Building a Strong Network**: Engage with professional law enforcement associations and career counseling services to strengthen networking opportunities.
- **Securing Reliable References**: Seek references from other roles or colleagues who can attest to long-term work ethic and capabilities.
- **Showcasing Commitment**: Demonstrate commitment by highlighting other long-term roles or continuous professional development efforts that showcase dedication to the field.

Further, when a law enforcement officer is involved in discrimination litigation with their former employer and attempts to re-enter the labor market, they may face significant and unique barriers. These challenges stem from the sensitive nature of the litigation, potential stigmatization, and the complex interplay between legal proceedings and career prospects. Below are some key barriers they may experience:

**Stigma and Negative Perception**

- **Employer Hesitation**: Prospective employers may be wary of hiring an individual who is currently involved in litigation, fearing potential legal or reputational risks. This can lead to reluctance to engage, regardless of the merits of the officer's case.
- **Perceived "Troublemaker" Label**: Even if an officer's discrimination claim is valid, some employers may view any litigation against a prior employer as a sign of being contentious or problematic.

**Potential Blacklisting**

- **Industry Blackballing**: Within law enforcement and related fields, word can spread quickly, and officers involved in lawsuits—especially those related to discrimination—can face informal blacklisting, making it difficult to secure new roles.
- **Negative References**: The former employer involved in the litigation may provide unflattering or neutral references, potentially influencing other employers' hiring decisions.

**Impact on Professional Reputation**

- **Doubts About Professionalism**: Discrimination litigation can raise questions, however unfair, about the officer's ability to integrate into and work within a team environment.
- **Community Perception**: In tightly connected law enforcement communities, an officer's involvement in litigation can become a widely known issue, affecting their professional image and opportunities for future employment.

<u>RE-ENTRY ISSUES</u> *(continued)*

**Interview Challenges**
- **Awkward Questioning**: Officers may face uncomfortable questions during interviews about why they left their last position and the ongoing litigation, creating additional stress and potential for misinterpretation.
- **Difficult Narrative to Control**: Framing the reason for departure and the litigation in a balanced way during interviews can be challenging, especially when trying to remain professional and not appear combative.

**Legal Constraints and Disclosure Issues**
- **Disclosure Limitations**: Depending on the stage of litigation and legal advice, an officer may be limited in what they can disclose about the case to potential employers. This can lead to vagueness that is perceived negatively.
- **Perceived Distraction**: Employers might fear that ongoing litigation could distract the officer or affect their focus and availability.

**Psychological and Emotional Toll**
- **Stress and Anxiety**: Ongoing litigation can have a profound impact on an officer's mental health, potentially affecting their confidence and performance during the job search and interviews.
- **Loss of Trust**: Litigation can erode trust in institutions, making it difficult for the officer to approach new employers with optimism and openness.

**Limitations in Available Opportunities**
- **Restricted Job Pool**: Depending on the size of the law enforcement community in a given area, opportunities may be limited, and the officer's involvement in litigation could further narrow the pool of potential employers willing to consider them.
- **Private Sector Hesitation**: Non-law enforcement jobs in related fields (e.g., security consulting, public safety roles) may also hesitate to hire someone involved in a legal dispute due to concerns about reliability or disruption.

**Delayed Career Progression**
- **Stalled Advancement**: The litigation process can be lengthy, potentially causing delays in the officer's ability to find a job or advance their career, leading to gaps in employment history that must be explained.
- **Missed Opportunities**: Litigation can overshadow potential opportunities for lateral moves or advancements due to the perceived complexity of hiring someone in the middle of a lawsuit.

*(Continued on the following page)*

<u>RE-ENTRY ISSUES</u> *(continued)*

**Economic Impact**

- **Financial Strain**: Legal proceedings can be expensive, and an officer may need to take a job outside their career path for immediate financial relief, which can disrupt their career trajectory.
- **Limited Leverage for Salary Negotiation**: Officers involved in litigation may feel pressured to accept lower salaries or positions below their qualifications due to limited options.

**Employer Risk Assessment**

- **Perception of Legal Risk**: Employers may fear that hiring someone involved in discrimination litigation could increase their exposure to potential lawsuits or scrutiny, even if unrelated to their organization.
- **Internal Policy Concerns**: Some organizations may have policies that preclude hiring individuals currently involved in legal disputes, regardless of the nature or validity of the claim.

**Strategies for Mitigating These Barriers:**

- **Emphasizing Skills and Experience**: Highlighting professional achievements and core competencies that demonstrate value independent of the litigation can shift focus to the officer's qualifications.
- **Networking and Relationships**: Leveraging personal and professional connections who can vouch for the officer's character and professionalism may help bypass formal screening concerns.
- **Crafting a Positive Narrative**: Preparing a balanced explanation that acknowledges the situation without focusing on negative aspects can be crucial in interviews.
- **Seeking Legal and Career Counseling**: Engaging both legal and career professionals can provide the best approach for navigating the job search while in litigation.
- **Focusing on Growth and Adaptability**: Showcasing continuous professional development and willingness to adapt can help emphasize resilience and commitment.

*(Remaining page intentionally left blank)*

DISCUSSION OF ADA FACTORS AND COMPLIANCE

As mentioned previously, this analysis was performed within the context of the Americans with Disabilities Act (ADA), which requires employers to make reasonable accommodations for employees who become disabled.

According to the ADA, a person with a disability is someone who:

- has a physical or mental impairment that substantially limits one or more major life activities,
- has a history or record of such an impairment, or;
- is perceived by others as having such an impairment.

In this regard, the following elements are considered:

*Interactive Process*

- The ADA encourages an "interactive process" between the employer and the employee. This involves discussing the employee's limitations, the impact on their job duties and possible accommodations.

- The goal is to find a solution that enables the employee to perform their essential job functions without placing excessive burden on the employer.

*Reasonable Accommodations*

- Definition: A reasonable accommodation is any modification or adjustment that enables a person with a disability to perform the essential functions of their job. Examples include:

  o Modifying work schedules or allowing flexible hours.

  o Altering workstations, equipment or facilities to be accessible.

  o Providing assistive technology, such as screen readers or modified computers.

  o Reassigning the employee to a vacant position if they cannot perform their current role-- even with accommodations.

- Scope: Employers are not required to lower job standards, change essential job functions or provide accommodations that would impose undue hardship—meaning significant difficulty or expense.

*(Continued on the following page)*

<u>DISCUSSION OF ADA FACTORS AND COMPLIANCE</u> *(continued)*

Mr. Davis was off work as a result of COVID-19 starting on approximately October 3, 2021[32]. At the time he was terminated in January of 2022, he had not yet been medically cleared to return to work.

Under the Americans with Disabilities Act (ADA), an individual can be classified as a person with a disability if they meet one of the following criteria:

1. They have a physical or mental impairment that substantially limits one or more major life activities.
2. They have a record of such an impairment.
3. They are regarded as having such an impairment, even if it does not substantially limit a major life activity.

For individuals whose ability to work is impacted by COVID-19, their classification as a person with a disability under the ADA depends on whether their symptoms and long-term effects meet these criteria, as follows:

- Substantial Limitation: If an individual experiences long-term effects of COVID-19 (such as difficulty breathing, fatigue, neurological complications, or other post-COVID conditions) that substantially limit major life activities like breathing, concentrating or working, they may be regarded as having a disability under the ADA.

- Long COVID: The U.S. Department of Health and Human Services (HHS) and the Department of Justice (DOJ) have acknowledged that "long COVID" can be a disability under the ADA if it substantially limits one or more major life activities.

Based upon the above, Mr. Davis met the definition of a person with a disability according to the Americans with Disabilities Act (ADA) because his condition substantially limited his employment (which is considered to be "one or more major life activities"). It is also arguable, based upon a review of the medical record, that his cardiopulmonary symptoms would have further ensured he met this definition.

Regardless of the specific "substantial limitation", this meeting of the definition of disability would have pre-dated the termination date of January 7, 2022 which assures Mr. Davis should have been afforded the protections outlined within the Act.

*(Continued on the following page)*

---

[32] See page 2 of the EEOC "Amended Charge of Discrimination".

<u>DISCUSSION OF ADA FACTORS AND COMPLIANCE</u> *(continued)*

Next, there is no evidence in the file that the City of Powell participated in the *Interactive Process,* which involves discussing the employee's limitations, the impact on their job duties and possible accommodations[33]. There is also no evidence that the City of Powell worked with Mr. Davis to find a solution to enable him to perform his essential job functions, regardless of any potential burden on the employer.

There is also no evidence that the City of Powell participated in or even discussed *Reasonable Accommodations* for Mr. Davis[34].

Further, there seems to have been no discussion about "light duty", "extra duties"[35] or any short-term reassignment while Mr. Davis was waiting for full duty medical clearance.

Although medical records after December 15, 2021 were not available for review, Mr. Davis asserts that he obtained full medical clearance (return-to-work without restrictions) from both Dr. Christensen (his Primary Care Physician) and Dr. Kelly (his pulmonologist) in March of 2022[36], just two months after his termination from the City of Powell.

*(Remaining page intentionally left blank)*

---

[33] See deposition of Matt J. McCaslin page 26, lines 19-25; page 27, lines 1-25; page 29, lines 4-10; deposition of Zachary M. Thorington, page 15, lines 12-24; page 29, lines 13-24; page 30, lines 1-17; Deposition of Roy S. Eckerdt, page 61, lines 10-25; page 62, lines 1-9.

[34] See deposition of Matt J. McCaslin page 26, lines 19-25; page 27, lines 1-25; page 29, lines 4-10; deposition of Zachary M. Thorington, page 15, lines 12-24; page 29, lines 13-24; page 30, lines 1-17; Deposition of Roy S. Eckerdt, page 61, lines 10-25; page 62, lines 1-9.

[35] See deposition of Matt J. McCaslin page 28.

[36] Interview with Mr. Ryan Davis.

SUMMARY AND CONCLUSIONS

Based upon my review of the record, The City of Powell did not meet the employer obligations outlined by the Americans with Disabilities Act (ADA).

Mr. Davis was terminated from The City of Powell in January of 202. His monthly wage at termination was $$4,462.81[37] with additional fringe benefits.

For individuals whose ability to work is impacted by COVID-19, their classification as a person with a disability under the ADA depends on whether their symptoms and long-term effects meet these criteria, as follows:

- Substantial Limitation: If an individual experiences long-term effects of COVID-19 (such as difficulty breathing, fatigue, neurological complications, or other post-COVID conditions) that substantially limit major life activities like breathing, concentrating or working, they may be regarded as having a disability under the ADA.

- Long COVID: The U.S. Department of Health and Human Services (HHS) and the Department of Justice (DOJ) have acknowledged that "long COVID" can be a disability under the ADA if it substantially limits one or more major life activities.

Based upon the above, Mr. Davis met the definition of a person with a disability according to the Americans with Disabilities Act (ADA) because his condition substantially limited his employment (which is considered to be "one or more major life activities").

There is no evidence in the file that the City of Powell participated in the *Interactive Process,* which involves discussing the employee's limitations, the impact on their job duties and possible accommodations[38].

There is also no evidence that the City of Powell worked with Mr. Davis to find a solution to enable him to perform his essential job functions, regardless of any potential burden on the employer.

Further, there is no evidence that the City of Powell participated in or even discussed *Reasonable Accommodations* for Mr. Davis[39].

---

[37] See Worker's Compensation claim documents.

[38] See deposition of Matt J. McCaslin page 26, lines 19-25; page 27, lines 1-25; page 29, lines 4-10; deposition of Zachary M. Thorington, page 15, lines 12-24; page 29, lines 13-24; page 30, lines 1-17; Deposition of Roy S. Eckerdt, page 61, lines 10-25; page 62, lines 1-9.

[39] See deposition of Matt J. McCaslin page 26, lines 19-25; page 27, lines 1-25; page 29, lines 4-10; deposition of Zachary M. Thorington, page 15, lines 12-24; page 29, lines 13-24; page 30, lines 1-17; Deposition of Roy S. Eckerdt, page 61, lines 10-25; page 62, lines 1-9.

<u>SUMMARY AND CONCLUSIONS</u> *(continued)*

Further, there seems to have been no discussion about "light duty" or "extra duties"[40], or any short-term reassignment while Mr. Davis was waiting for full duty medical clearance.

Although medical records after December 15, 2021 were not available for review, Mr. Davis asserts that he obtained full medical clearance (return-to-work without restrictions) from both Dr. Christensen (his Primary Care Physician) and Dr. Kelly (his pulmonologist) in March of 2022[41], just two months after his termination.

Based upon my education, training and experience, it is more likely than not that Mr. Davis would not be considered a "good candidate" for any law enforcement position due to his termination from the City of Powell. Please see the "Re-Entry Issues" discussion on pages 10-16 for further discussion.

Mr. Davis has not worked since the date of his termination, despite participating in an ongoing job search[42]. In the interim, he has been participating in self-improvement and educational development to further his employment prospects and ensure his re-entry to the labor market. Since it is more likely than not that he would not have re-entered the labor market in a law enforcement position, these steps will likely produce the highest probability of mitigation.

*(Remaining page intentionally left blank)*

---

[40] See deposition of Matt J. McCaslin page 28.

[41] Interview with Mr. Ryan Davis.

[42] Interview with Mr. Ryan Davis.

CLOSING

The conclusions detailed above are based on methodology used and accepted within the general Rehabilitation community and are considered reliable pursuant to *Daubert v. Merrell Dow Pharmaceuticals* and *Kumho Tire v. Carmichael*.

Further, these opinions are based on what is more probable than not in the rehabilitation profession, using the most objective criteria available and are based on methodology used and accepted within the general Rehabilitation community. This analysis is presented with a reasonable degree of vocational and professional probability and represents conclusions based upon information provided during the course of the case.

Due to the unprecedented era in which we are still experiencing the after-effects of COVID-19, and particularly in terms of the often fluctuating labor market situation, this analysis is provided considering a hypothetically-normal labor market[43].

The findings and conclusions are based on the information reviewed at the time the report was prepared. An update to this report may be required at a later date dependent on labor market circumstances in the post-COVID-19 era, the passage of time, in response to any changes in the evaluee's work status or relevant vocational factors or to prepare updated numbers in advance of trial.

Respectfully submitted,

*Kourtney Layton*

Kourtney Layton MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A

Vocational Rehabilitation Counselor · Vocational Analyst · Certified Life Care Planner ·Certified Vocational Evaluator · Certified Idaho Workers Compensation Specialist-Advanced

   

Kourtney Layton
AND ASSOCIATES
*Celebrating 15 years of excellence in rehabilitation counseling and assessment.*

*Enclosures*

| | | |
|---|---|---|
| Section One | - | Medical Summary |
| Section Two | - | Current CV & List of Cases |
| Section Three | - | Fee Schedule |

---

[43] Cary, J., Choppa, N., Johnson, C.B., Layton, K., Taylor, D.B. & Weiss, M. *Considerations for vocational assessments in the era of COVID-19.* The Rehabilitation Professional and Journal of Life Care Planning: A Year in Review. Vol. 1, No. 1, 9-22. See also: Cary, J., Choppa, N., Johnson, C.B., Layton, K., Taylor, D.B. & Weiss, M. *Considerations for vocational assessments in the era of COVID-19.* The Rehabilitation Professional, 29 (2), 57-70; and Cary, J., Choppa, N. & Layton, K. (2021). *Vocational, Economic and Life Care Planning in the Era of COVID-19.* Journal of Life Care Planning. Vol.19, No. 1, 3-17.

# SECTION ONE

# MEDICAL SUMMARY



<u>MEDICAL SUMMARY</u>
*Worker's Compensation Injury (COVID-19)*

**October 5, 2021.   Powell Valley Healthcare:   Sheryl J. Praska, MD.   Emergency Department:** The patient presented with complaints of a headache, body aches, shortness of breath since Wednesday.  He received a positive COVID test at home on Thursday.  He has more weakness today.  His wife was positive for COVID and then he started noting increasing fatigue on September 30th, with a dry cough and some nausea on October 1.  He had diarrhea the first 2 days, but has had no bowel movement since then.  His cough is dry and he feels extremely fatigued.  He has not had any fever.  He has a sat. meter at home which showed the lungs in the upper 80 percentile today and was told by the clinic to come here.  He is not a smoker and has no underlying lung disease.

The diagnosis was COVID-19 symptomatic care.

His lungs were clear with good breath sounds. There were no rales or wheezes. There was scattered bibasilar fine rhonchi.  His heart was a regular rhythm without murmurs, rubs or gallops.  His extremities were without edema.  He was later discharged home.

**October 6, 2021.   Power Valley Healthcare:   Mark Wurzel, MD.   Clinic Notes:** The patient started having symptoms on 9/29, tested on 9/30 at home and the test showed he was positive for COVID.  He was seen at the ER yesterday and today he was feeling worse than before.   All of his family tested positive for COVID.  He has no fever but his O2 sats are in the 80s.  He has no chronic disease but he has shortness of breath, headache and has been vomiting.  He has been quite concerned that his oxygen gets down in the 80s.  He has not been vaccinated but his wife had it before him.  His fever was 101 the first day but has had no fever since then.

The diagnosis was COVID-19.

He was given medication to help with symptoms.  A note was sent to his work which stated Ryan Davis was unable to return to work at this time as he was found to be positive for COVID and was to quarantine until symptoms subside.

*(Remaining page intentionally left blank)*

MEDICAL SUMMARY *(continued)*

**October 7, 2021.  Powell Valley Healthcare:  Lance Petersen, MD.  Emergency Department:** The patient has been symptomatic with COVID since September 30th, first with fatigue then a cough, as well as body aches and shortness of breath.  Diarrhea was present when he ate.  The patient reported that he has been very nauseated and vomits when he eats.  This has caused him to eat and drink very little the past 2 days.

The diagnosis was COVID-19.

He was given dexamethasone, 12 mg in the IV and 1 g of acetaminophen.  The patient was then able to eat and drink in the emergency room.  He was discharged home with oxygen and Zofran.

**October 7, 2021.  Power Valley Healthcare: Sarah E. Durney, MD.  EK Electrocardiogram:** An EK Electrocardiogram was conducted due to chest pain.

The impression was a normal echocardiogram.

**October 7, 2021.  Power Valley Healthcare:    Filip Turcer, MD.    Radiology:**  The patient had a chest radiograph, single AP view.  The x-ray was needed due to shortness of breath and COVID positive.

The impressions were:
1. Lung volumes are mildly reduced.  There are patchy airspace opacities most prominent in the right lung.  These are nonspecific but given the provided clinical history could represent an underlying infectious or inflammatory process.
2. No large pleural effusion.  No pneumothorax.
3. Englard cardiac silhouette could be partially accentuated by reduced lung volumes.  Mediastinal contour is normal.
4. Visualized soft tissue and osseous structures are normal.

A Computed Tomography (CT) was performed.

The impressions were:
1. No evidence of acute pulmonary embolism.
2. Bilateral multifocal areas of airspace consolidation.  Given the provided clinical history, these findings are most consistent with multifocal pneumonia including but not limited to COVID-19 pneumonia.

*(Remaining page intentionally left blank)*

MEDICAL SUMMARY *(continued)*

**October 8, 2021.  Wyoming Department of Health:  Alexia Harrist, MD, PhD, State Health Officer:**    A letter was sent to Ryan Davis notifying him they received a laboratory confirmed result of a communicable disease that affects the public health: 2019-nCoV.  He was to be in isolation at his home and was given a quarantine order.  It was anticipated the order would be effective until 10/16/2021.

**October 11, 2021.    Power Valley Healthcare:  Deana L. O'Brien, RN.   Work Note:** This note was to excuse Ryan Davis from work as he is unable to return to work and will have another evaluation sometime this week.

**October 13, 2021.   Power Valley Healthcare:    Valerie J. Lengfelder, MD.   Clinic Notes:** The patient presented to follow up on COVID.  He was diagnosed on 9/30/2021.  He was still having shortness of breath.  He was afebrile and still had a cough, but that was getting better.  The patient endorses significant fatigue, lightheadedness, shortness of breath, chest pain and feeling like he is going to faint.

The diagnoses were:
1. COVID-19
2. Tachypnea
3. Shortness of breath
4. Chest pain
5. Hypotension

He was unable to use his albuterol inhaler due to taking a deep breath to use the inhaler causes violent coughing.  The patient was taken to the emergency room.

**October 13, 2021.   Powell Valley Healthcare:   Kendra M. Smith, MD/Adam W. Childers, DO.   Emergency Department/Hospital Admittance:** The patient presented to the emergency room with difficulty breathing and weakness.  He was sent to the emergency room from the clinic for low oxygen and low blood pressure per Dr. Lang Felder.  He has been sick with COVID-19 since September 30th  This is day 14 of the illness.  The patient has been using home oxygen at 2 L and taking 6 mg of Decadron and a full aspirin daily.  He has been able to eat.  He was having nausea and diarrhea and body aches and headaches for the first week or so, but that has resolved.  His primary symptoms now are the shortness of breath, cough and weakness.  He says he gets dizzy when he tries to stand.  He is not able to take a shower without the oxygen.  He denied any history of DVT (deep vein thrombosis) or PE (pulmonary embolism).  No history of elevated blood pressure or diabetes or heart problems.  He has not been vaccinated for COVID-19.

*(Continued on the following page)*

MEDICAL SUMMARY *(continued)*
**October 13, 2021.   Powell Valley Healthcare:   Kendra M. Smith, MD/Adam W. Childers, DO.  Emergency Department/Hospital Admittance:** *(continued)*
The diagnoses were:
1.  Hypotension
2.  Respiratory failure, acute
3.  EKG abnormalities

Radiology said he had no PE and bilateral infiltrates.  Cardiology said he had myocarditis less likely 14 days after the infection and to consider sepsis.  We will get him in for an Echocardiogram tomorrow.  Antibiotics were ordered for possible bacterial pneumonia.  He was admitted and labs were ordered.

**October 13, 2021.  Power Valley Healthcare:  Filip Turcer, MD.  Imaging:** The patient had a CT of his chest Angio with contrast, PE protocol.  He was a concern for COVID, hypoxia and hypotension.

The impressions were:
1.  No evidence of acute pulmonary embolism.
2.  Bilateral multifocal areas of airspace consolidation.  Given the provided clinical history, these findings are most consistent with multifocal pneumonia including but not limited to COVID-19 pneumonia.

**October 14, 2021.  Power Valley Healthcare:   Adam W. Childers, DO.  Hospital Progress Notes:**  Ryan reported that he was able to ambulate to the bathroom this morning feeling better than he did yesterday norming.  He will has some tachypnea and tachycardia, however, while he feels tired he does not have the same overwhelming weakness.

The diagnoses were:
1.  COVID-19
2.  Respiratory failure, acute
3.  Hypotension
4.  EKG abnormalities

The hypotension has fully resolved.  He continues to receive oxygen supplementation at 2 L.  He continues to take the budesonide for his mild to moderate intermittent cough.  The majority of his weakness seems to be secondary to the dexamethasone. He continues to have inverted T waves on his telemetry.  The echocardiogram was delayed from this morning to this afternoon.  We will be unable to get a read on the echocardiogram until tomorrow morning.

*(Remaining page intentionally left blank)*

<u>MEDICAL SUMMARY</u> *(continued)*

**October 14, 2021.    Power Valley Healthcare:    Filip Turcer, MD/Brooke Grubb, Tech.**
**Ultrasound:**  An ultrasound was performed on his venous doppler left lower extremity.  The patient had left thigh pain/discomfort and a history of COVID.

The impression was negative on his left lower extremity venous duplex examination without evidence of deep venous thrombosis.

**October 14, 2021.    Power Valley Healthcare:    Emily L. Hanson, MD.    Cardiology:**  The patient presented for an EC echocardiogram.  He had COVID and possible cardiomyopathy.

The impression was a normal echocardiogram.

**October 15, 2021.    Power Valley Healthcare:    Aida R. Polson, MD.    Discharge:**  The patient had labs, an echocardiogram, a CT chest Angio PE protocol and an ultrasound of the venous doppler left lower extremity performed while here.  He is doing better and being discharged.  He went home on oxygen.

**October 19, 2021.    Power Valley Healthcare:    Kelly E. Christensen, MD.    Clinic Notes:**
The patient presented as a follow up from his hospital stay.  He is currently on 2 L of oxygen.  He was diagnosed and doing okay, then he relapsed and was hospitalized.  He will need to follow up with cardiology on his flipped T waves.  As for COVID, he remains a little bit hypoxic and stays on oxygen.  His heart rate is okay when he is not active, but when he is up and moving at all his heart rate will jump up into the 120s to 130s.  He was started on metoprolol succinate 25 mg once daily and it has helped a little bit.  I do not know that anything is going to really resolve that issue for a while.

The diagnosis was COVID-19.

The hospitalist wants him to see the cardiologist.  He was asking about his testosterone and with the recent diagnosis of COVID, I am reticent to do that because I do not want him getting a blood clot.  We will follow him along.

**December 9, 2021.    Powell Valley Healthcare:    Brian D. Kelly, DO.    Clinic Notes:**  The patient is a local law enforcement officer for Powell Police Department.  He was admitted to the hospital in mid-October 2021 with a COVID-19 infection.  He developed severe hypoxia and was on oxygen 24/7 at that time.   He underwent cardiac testing which was negative for myocarditis/cardiomyopathy.  He had a high heart rate and low pulse oxygen.  He was discharged on portable oxygen as well as an oxygen concentrator for his nocturnal use.  He has been undergoing pulmonary rehab and noted that his heart rate goes up to the 140s much quicker than it used to.

<u>MEDICAL SUMMARY</u> *(continued)*
**December 9, 2021.   Powell Valley Healthcare:    Brian D. Kelly, DO.   Clinic Notes:** *(continued)*
Since his discharge, his oxygenation has improved and he stated that it was usually 97%. He was not using the oxygen anymore. He continues to use metoprolol 25 mg daily and his heart rate remains elevated. He had a chest CT performed on December 6th which demonstrated ground glass opacities in the lower lobes consistent with a prior COVID-19 infection. He has less exercise tolerance than previously. His heart rate is elevated as well.

The diagnosis was chronic post COVID-19 syndrome.

He's been instructed to stay on the metoprolol 25 mg daily. We will have another cardiology follow up visit in 3 months. We will check on a CT of the chest prior to that visit to hopefully document completed healing of his pneumonitis.

**December 15, 2021.  Powell Valley Healthcare:   Jana Keeler, PA.  Clinic Notes:** The patient presented for a post COVID follow up. He saw Dr. Kelly last week due to tachycardia with a CT complete. He has not been cleared to go back to work yet. He has been doing pulmonary rehab currently. He would like to know get more information on when he can return to work and testosterone treatments. Generally, at rest his heart rate is in the low 100s, occasionally in the high 90s but this will jump to the 120s or higher range with just a short walk (to the bathroom from the couch, etc.) Ryan is being followed by cardiology and he is careful to monitor his pulse rate several times a day by oximeter.

Ryan has been on supplemental testosterone for many years. He has been holding on this for a couple of months due to the risk of blood clots with the COVID virus. He is now having a return of symptoms such as sexual dysfunction, fluctuating moods, etc. and he is wondering when it will be safe to restart this.

The diagnoses were:
1. COVID-19
2. Testosterone deficiency in male

We discussed this as being a long-term process over the next couple of months at least. He should not be cleared to return to work as a police officer until his heart rate has dropped significantly and he can tolerate fairly intense activity without severe tachycardia.

We cannot find a specific recommendation on when to restart hormone therapy in a patient with prolonged post COVID syndrome so he has been asked to hold off on this for now. He will return to the clinic in one month for further evaluation and consideration of the treatment.

# SECTION TWO

# CURRENT CV &
# LIST OF CASES





**KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A**

Vocational Rehabilitation Counselor, Vocational Analyst, Certified Life Care Planner

Telephone/facsimile: 855-831-8880
E-mail: kourtney@kourtneylayton.com

Vocational Analyst, Vocational Rehabilitation Counselor, Case Manager, Certified Life Care Planner

*Kourtney Layton & Associates*                                                    *June, 2009 – present*

Provide job placement, medical and vocational case management, vocational evaluation, marriage dissolution evaluations, analyses of loss of earning capacity, life care planning assessments, transition planning services and litigation support through:

- Identification of transferable skills to determine vocational options.

- Counseling individuals to develop and achieve job goals.

- Providing job placement assistance and post-placement follow up.

- Conducting job and labor market analyses in the local, regional and national labor markets using ONET, the Dictionary of Occupational Titles, data from the Bureau of Labor Statistics, direct employer contacts and data from the Department of Workforce Services.

- Administering vocational testing and assessments to evaluate aptitudes, abilities and interests in relation to career planning and job placement.

- Management of medical and vocational case activities for persons with disabilities, including injured workers covered by Worker's Compensation.

- Experience in the use of reference sources in developing information about the duties, skills, physical demands and working conditions of jobs.

- Evaluating potential for successful rehabilitation considering age, education, work skills and residual functional capacity.

- Developing rehabilitation plans based on individual aptitudes, education levels, physical abilities, job skills and career goals.

- Transition planning services for clients with disabilities ranging in age from 14-22 in both the special education and traditional school settings, specializing in assisting transitions from the education system to the competitive workplace.

- Provide return to work services for disability insurance beneficiaries to achieve a successful transition from benefits to gainful employment.

- Perform ergonomic assessments to plan workplace accommodations, maximize productivity and prevent workplace injuries.

---

**Utah Office:** 5513 W. 11000 N. #443 * Highland, UT 84003 * **Idaho Office:** PO Box 187 Arco, ID 83213
**Nevada Office:** 848 N. Rainbow Blvd. #3863 * Las Vegas, NV 89107

Instructor/Lecturer *(by invitation)*                                          *October 2022 – present*
*Utah State University*

Select textbooks and course materials, formulate syllabus, instruct graduate students on rehabilitation assessment principles, direct graduate student research and learning; implement grading and testing procedures. Plan, organize and prepare lessons, direct student discussions and plan assignments to correspond with course learning objectives, certifying body code of ethics and university standards.

Chief Creative Officer (CCO)                                          *March 2021 – present*
*LCP Builder*

Life care planning subject matter expert and Chief Creative Officer (CCO) for LCP Builder, a cloud-based software program for building Life Care Plans. Job duties include working with the development team to roll out software; designing and implement marketing strategies to bring a new product to market; interfacing with users to collaborate on solutions and working with the development team to update the interface with suggested changes from users. Manage day-to-day operations and interface with customers and tech support staff to facilitate onboarding, training and implement solution-based strategies for expansion and customer retention. Duties also included implementing and managing the beta testing program prior to formal product launch.

Vocational Analyst                                          *August 2012 – September 2017*
*Vocational Economics, Inc.*

Conduct vocational assessments to analyze earning capacity of persons with a disability. Assess loss of earning capacity utilizing clinical judgment, work life expectancy data from government sources including the American Community Survey and Current Population Survey, and utilizing knowledge of economic principles in relation to vocational aspects of the labor market.

Supervising Counselor                                          *May 2008-August 2010*
*State of Utah Department of Rehabilitation Services*

In addition to carrying an active general caseload, supervised three vocational rehabilitation counselors covering general, transition and corrections caseloads. Facilitated the YPREP program through Utah Department of Corrections to assist female offenders with re-entering the workforce. Held team meetings, completed file reviews, provided coaching and mentoring to counselors, performed ongoing evaluations of staff, completed performance reviews, acted as interim District Director as needed.

*(Continued on the following page)*



Vocational Rehabilitation Counselor                                      *August 2006-May 2008*
*State of Utah Department of Rehabilitation Services*

Provided services to persons with disabilities to maximize independence and employability. Assessed client needs, designed and implemented rehabilitation programs, provided personal and vocational counseling and job placement assistance.

Specialized in persons with disabilities under the age of 22 who were transitioning from the education system to the workplace. Primary duties included career counseling, assessment, vocational guidance, job placement and attending IEP (Individual Education Plan) meetings. Also coordinated resources to help with guardianship, Social Security, benefits planning, service brokering, supported employment grants, navigating the human services wait lists, setting up accommodations in college, and negotiating customized employment placements. Although a large majority of clients were within the special education system, services were also provided for students with other disabilities (such as learning disabilities, depression, behavioral issues and other diagnoses not covered under the special education system) in the traditional school system to do career planning, vocational assessments, counseling and job placement. Ensured that State rehab and my assigned school districts were conforming to IDEA (Individuals with Disabilities Education Act) statutes so the transitioning students received the support and guidance they needed to make a successful transition from the highly supportive special education system to the real world.

## EDUCATION
Life Care Planning Certificate – University of Florida (2016)

Master of Science, Rehabilitation Counseling – Utah State University (2009)

Bachelor of Science, Psychology – University of Utah (2005)

## MEMBERSHIPS
American Board of Vocational Experts (ABVE)

International Psychometric Evaluation Certification (IPEC)

International Commission on Health Care Certification (ICHCC)

International Association of Rehabilitation Professionals (IARP)

*(Continued on the following page)*



## CERTIFICATIONS and LICENSURE
Certified Vocational Rehabilitation Counselor (CRC)
　　　CRC #00111008 exp 3/31/2029

Licensed Rehabilitation Counselor (LVRC), State of Utah
　　　LVRC #7454699-6101 exp 5/1/2024[1] (originally issued 1/4/2010)

Qualified Vocational Expert: Social Security Administration
　　　2009-present

Fellow, American Board of Vocational Experts (ABVE/F)
　　　April, 2013 – January, 2022

Diplomate, American Board of Vocational Experts (ABVE/D)
　　　February, 2022 – Present

International Psychometric Evaluation Certification (IPEC)
　　　January, 2015 – present

Certified Life Care Planner (CLCP); June, 2016 - present
　　　CLCP #1363, exp 6/30/2026

Certified Vocational Evaluator (CVE): December, 2020 – present
　　　CVE #11008, Exp 9/30/2025

Certified Idaho Worker's Compensation Specialist (CIWCS-A): July, 2021– present

## RECOGNITION
Presidential Citation, American Board of Vocational Experts: April 7, 2018

## PROFESSIONAL SERVICE
IARP Young Professionals Committee
February, 2014 – December, 2017

ABVE Board of Directors
Secretary (2015-2018), Editor of *The Vocational Expert*
2018 Conference Chair

ABVE/IPEC Peer Evaluator
March, 2015-present

*(Continued on the following page)*

---

[1] The Vocational Rehabilitation Counselor Licensing Act was repealed May 1, 2024.



## PUBLICATIONS

Sprong, et al. Optimizing Cost Estimation: Analyzing Allison et al's 50th Percentile Model and the Strategic Application of Percentiles. Manuscript submitted for publication.

Johnson, C.B., Layton, K., Weiss, M., Taylor, T. (2022). Admissibility: Federal Rules of Evidence 702 Revisited. *The Rehabilitation Professional*, 30 (3), 13-21.

Cary, J., Choppa, N., Johnson, C.B., Layton, K., Taylor, D.B. & Weiss, M. *Considerations for vocational assessments in the era of COVID-19.* The Rehabilitation Professional and Journal of Life Care Planning: A Year in Review. Vol. 1, No. 1, 9-22.

Cary, J., Choppa, N., Johnson, C.B., Layton, K., Taylor, D.B. & Weiss, M. *Considerations for vocational assessments in the era of COVID-19.* The Rehabilitation Professional, 29 (2)*, 57-70.

Cary, J., Choppa, N. & Layton, K. (2021). *Vocational, Economic and Life Care Planning in the Era of COVID-19.* Journal of Life Care Planning. Vol.19, No. 1, 3-17.

*Changes in the Brain and Behavior Resulting from the Use of Technology: Are There Vocational Implications?* Manuscript in preparation for publication.

Layton, K. (2016). Analysis of employability of Generic A. Client.  In T. Field & J. Field (Eds.), *Forensic Casebook: Vocational and Economic Reports* (3rd ed.). Athens, GA: Elliott & Fitzpatrick, Inc.

Layton, K. (2012) "Evaluating Underemployment: Contributing Factors". *Utah Journal of Family Law.* Spring/Summer 2012: Vol. 3 No. 1.

Layton, K. "Coming Full Circle". *The Vocational Expert.* Fall 2011: Vol. 26, No. 3.

## PRESENTATIONS

*Utah's HB-45 SWI (Support Work Independence) Program.* National Association of Persons in Supported Employment Conference. Louisville, KY. July, 2008. Co-presenter.

*The Conundrum of Cooperation: How to Help Your Students Navigate the VR Program.* Conference on Effective Practices in Special Education and Rehabilitation. Utah State University: June 18, 2009.

*Employment Analysis in a Tough Economy.* Utah Bar Association Spring Convention. St. George, UT: March 2, 2010. Co-presenter.

*Measuring Earning Capacity Loss.* CLE seminar approved by Utah State Bar. Salt Lake City Sheraton Hotel: April 26, 2013. Co-presenter.

*(Continued on the following page)*

**PRESENTATIONS (continued)**

*Complications in Assessments of Lost Earnings.* CLE seminar approved by Utah State Bar. Salt Lake City Marriott Downtown Hotel: July 18, 2014. Co-presenter.

*Ethics in Private Rehabilitation Practice.* Presentation by invitation at the Utah Rehabilitation Association (URA) Annual Conference. Karen Gail Miller Conference Center at the Salt Lake Community College Larry Miller Campus: October 27, 2014.

*Amplifying the Effectiveness of Your Vocational Expert.* Presentation by invitation to the Utah Association for Justice (UAJ): August 28, 2015.

*Analysis of Non-Complaint Parties in Family Law.* Presentation by invitation to the Idaho State Bar  (ISB): June 10, 2016.

*Vocational Rehabilitation, A Fresh Look at Vocational Issues: Your Questions Answered.* Presentation by invitation to the Idaho Trial Lawyers Association (ITLA): February 24, 2017. Co-presenter.

*Vocational Analysis in Social Security Cases.* Presentation by invitation to the Utah Association for Justice (UAJ): May 19, 2017. Co-presenter.

*Advancing Your Practice with Technology: An Exploration of Resources for Rehabilitation Professionals.* Pre-conference workshop at the International Association for Rehabilitation Professionals (IARP) Annual Conference: October 12, 2017. Co-presenter.

*A Vocational Expert's View from the Trenches: War Stories and Battle Strategies for Claimant Representatives.* Presentation by invitation to the Utah Association for Justice (UAJ): December 1, 2017.

*Trial Preparation for Vocational Experts: A Defense Perspective.* American Board of Vocational Experts (ABVE) Annual Conference: April 7, 2018. Co-presenter.

*Advancing Your Practice with Technology: Resources for Busy Professionals.* American Board of Vocational Experts (ABVE) Annual Conference: April 7, 2018. Co-presenter.

*Earning Capacity Assessment for the Self-Employed.* American Board of Vocational Experts (ABVE) Annual Conference: April 8, 2018. Co-presenter.

*Evolution of the DOT: O\*NET, ORS and the New Vocational Expert Requirements.* Presentation by invitation to the Utah Association for Justice (UAJ): December 5, 2019.

*The Workforce and the Future: How a Forensic Vocational Evaluation Can Add Value to Your Case.* Presentation by invitation to the Idaho State Bar (ISB) Worker's Compensation Division: August 14, 2020.

*Mentor and Protégé: Starting an Expert Witness Practice.* Presentation by invitation to the International Association of Rehabilitation Professionals: November 10, 2021.

*Safety and Security for Vocational Experts.* American Board of Vocational Experts (ABVE) Annual Conference: March 25, 2022. Co-presenter.

Updated May 1, 2024



# KOURTNEY LAYTON & ASSOCIATES, INC.




**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|---|---|---|---|
| Vanderzon v Vanderzon, Case #114500013<br>    Third District Court, Salt Lake City<br>    Trial testimony: April 26, 2012; April 18, 2014 | 2011/2012/2014 | David Dolowitz/James Hunnicutt<br>Dolowitz Hunnicutt | Respondent |
| Paloukos v OWCP, Case # 120137825<br>    Utah Worker's Compensation Fund<br>    Hearing testimony: June 13, 2012 | 2012 | Ray Barrios<br>Law Office of Ray Barrios | Claimant/<br>Injured Worker |
| Lamadeleine v Ogden City Corp, Case #120904439<br>    Deposition: February 4, 2014 | 2013 | Jim Hasenyager<br>Hasenyager & Summerhill | Plaintiff |
| Busche v Busche, Case # 044400503<br>    Utah Fourth District Court<br>    Trial testimony: April 29, 2014 | 2013/2014 | Douglas Thayer<br>Durham, Jones & Pinegar | Respondent |
| Hollingsworth v Paul F. McClure, Case #120701121<br>    Utah Second District Court<br>    Deposition: September 29, 2014 | 2013 | Leonard McGee<br>Robert J. Debry & Associates | Plaintiff |
| Mathews, Morris, Case #12-010840 (12)<br>    Circuit Court, Seventeenth Judicial Circuit<br>    Boward Co, FL<br>    Deposition: February 17, 2014 | 2013 | Y. Drake Buckman II<br>Buckman & Buckman | Plaintiff |

*(Continued on the following page)*

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A**
**(CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|---|---|---|---|
| Dole v. Dole,  Case No#124905567<br>　　Third District Court, Salt Lake City<br>　　Trial testimony: August 11, 2015 | 2013 | Michelle Christensen/Al Pranno<br>Pranno Law | Petitioner |
| Turrell v Turrell, Case #114904123<br>　　Third District Court, Salt Lake City<br>　　Trial testimony: February 25, 2014 | 2014 | Remote (information not available) | |
| Millar v Philadelphia Insurance<br>　　Arbitration testimony: August 26, 2014 | 2014 | Patrick Burt<br>Kipp & Christian, P.C. | Defense |
| Williams v FedEx Co. Services, et al., Case #2:13-CV-0037-TS<br>　　U.S. District Court, District of Utah, Central Division<br>　　Deposition: February 10, 2015 | 2014/2015 | Scott Crook<br>Crook & Taylor Law | Plaintiff |
| Schowengerdt v Joann J. Smith<br>　　Case #130904175, Utah Third District Court<br>　　Deposition: May 28, 2015 | 2015 | Ray Martineau<br>Law Offices of Ray G. Martineau | Plaintiff |
| Hashemian v Techtronic Industries North America, Inc.,<br>Milwaukee Electric Tool Corp., R&B Sales and Marketing, Inc.<br>& Corey J. Talbert, Case # 14EV000352A<br>　　State Court, Fulton County, State of GA<br>　　Deposition: February 15, 2016 | 2015/2016 | Chloe Dallaire<br>Hornsby Law Group | Plaintiff |

*(Continued on the following page)*

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A (CONTINUED)**

| **CASE** | **YEAR** | **RETAINING ATTORNEY** | **PARTY** |
|---|---|---|---|
| Anderson v Anderson<br>　　Utah First District Court (Logan), Case #104100075<br>　　Trial testimony: April 28, 2016 | 2016 | Ashley Bown<br>Hillyard, Anderson, Olsen | Respondent |
| Freitas v Allstate Fire & Casualty<br>　　Case # 031387136<br>　　Deposition: May 3, 2016 | 2016 | Brian Hills<br>Brian Hills Law | Plaintiff |
| Bradshaw v Charles Chad Fisher<br>　　Case # 140902891, Utah Second District Court<br>　　Trial testimony: May 10, 2016 | 2016 | Brandon Baxter<br>Peck, Hadfield, Baxter & Moore | Plaintiff |
| Amidon v Shopko<br>　　Case # 140906132, Utah Third District Court<br>　　Deposition: June 13, 2016; August 2, 2016 | 2016 | Ralph C. Petty<br>Law Office of Ralph C. Petty | Plaintiff |
| Weeks v Estate of Cleo G. Stott<br>　　Case #140600068. Utah Sixth District Court<br>　　Deposition: June 22, 2016 | 2016 | Jordan Christianson<br>Ray Quinney & Nebeker | Plaintiff |
| Hadley v Spade Excavating, at al<br>　　Case # 140901402, Utah Third District Court<br>　　Deposition: June 20, 2016 | 2016 | Martin Denney<br>Callister Nebeker & McCullough | Plaintiff |
| Wilburn v Dumbravicean<br>　　Case # 15-A-06468-2. Superior Court of Gwinnett County, GA<br>　　Deposition: September 26, 2016 | 2016 | Charles Allen<br>Allen & Scofield Injury Lawyers, LLC | Plaintiff |

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A (CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|---|---|---|---|
| Rozzelle v Century Link/Qwest/Philadelphia Insurance<br>Case #13-0579, Utah Labor Commission<br>Hearing testimony: January 30, 2017 | 2017 | Scott Lythgoe<br>Mountain View Law Group | Claimant/<br>Injured Worker |
| Seidel v Big Sur Waterbeds, Inc.<br>Case #2:14-cv-00069-BSJ, United States District<br>Court for the District of Utah, Central Division<br>Deposition: April 14, 2017 | 2017 | Steve M. Lau<br>Holland & Hart LLP | Defense |
| Elder v Elder<br>Case # 114100288, Utah First District Court<br>Trial testimony: April 20, 2017 | 2017 | Ashley Bown<br>Hillyard, Anderson, Olsen | Petitioner |
| Choquette v Williams<br>Case # 2:17-cv-00043-DAK, United States District<br>Court for the District of Utah, Central Division<br>Deposition: November 21, 2017 | 2017 | Eric Olsen<br>Eisenberg, Gilchrist & Cutt | Plaintiff |
| Mower v Mower<br>Case # 124100133, Utah Fourth Judicial District Court<br>Trial testimony: May 24, 2018 | 2018 | Mark R. Nelson<br>Durham, Jones & Pinger | Petitioner |
| Phillips v Amara Day Spa Salon & Britney Ford<br>Case #150401970, Utah Fourth Judicial District Court<br>Deposition: November 13, 2018 | 2018 | Jared Bramwell<br>Kelly & Bramwell | Plaintiff |

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A (CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|------|------|--------------------|-------|
| Schrock v Allstate<br>    Case #170906535, Utah Third District Judicial Court<br>    Deposition: February 7, 2019 | 2019 | Travis Robertson<br>Shumway Van | Plaintiff |
| Augustin Aquino v City Cab Company & Claude Rasmussen<br>    Case #180901203, Utah Third Judicial District Court<br>    Deposition: March 11, 2019 | 2019 | Ky Papke/Alta Legal<br>Jordan Kendell/ECKO Law | Plaintiff |
| Griffiths v Griffiths<br>    Case # CV-2013-6737, Kootenai County District Court (Idaho)<br>    Trial testimony: April 23, 2019 | 2019 | Melanie Baillie<br>James, Vernon and Weeks | Respondent |
| Lisa Caruso v PBR Rock, LLC; Fine Entertainment Management, LLC;<br>    Three Amigos Restaurant Group, LLC and Ceasars Linq, LLC<br>    Case #A-17-766385-C, Clark County District Court (Nevada)<br>    Deposition: May 17, 2019 | 2019 | Jason Close<br>Close Law | Plaintiff |
| Kim Tucker and Fred Tucker v Mallary Marx and Zachary Allen<br>    Case #170902400, Utah Second Judicial District Court<br>    Deposition: August 30, 2019 | 2019 | Mike Haddock<br>Office of Greg Wilder | Plaintiff |
| Strong v Little<br>    Case #180400987, Utah Fourth District Court<br>    (Utah County, Provo Division)<br>    Deposition: September 26, 2019 | 2019 | Kara North<br>Fillmore Spencer | Plaintiff |

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A (CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|------|------|--------------------|----|
| Jones v Howard, et al<br>Case #CV-2018-3094-PI, Bannock County (Idaho)<br>Deposition: December 19, 2019 | 2019 | Reed W. Larsen<br>Cooper & Larsen | Plaintiff |
| Bird v Donati<br>Case #2:17-Cv-01300-DAK, U.S. District Court<br>District of Utah, Central Division<br>Deposition: January 16, 2020 | 2020 | George Waddoups<br>Robert J DeBry & Associates | Plaintiff |
| Mikels, Joshua (expert on behalf of Claimant)<br>Social Security Disability proceeding, Salt Lake City<br>Hearing testimony: February 12, 2020 | 2020 | Jack Hollingsworth<br>Rudd Law Firm | Claimant |
| O'Kelley v Jeffrey Peterson, J & J Excavating LLC, et al<br>Case # 180901283, Utah Third District Judicial Court<br>Deposition: February 13, 2020 | 2020 | James Jackson<br>Lowe Law Group | Plaintiff |
| Allt v TA Operating LLC<br>Case #CV-98-M-DLC, United States District Court, Missoula Div.<br>Deposition: June 16, 2020 | 2020 | Craig Daue<br>Buxbaume Daue | Plaintiff |
| Jeffrey Kody Jacobs v Alpine Gas Fireplaces and/or Utah WCF<br>Case #19-0663<br>Deposition by video: July 7, 2020 | 2020 | David Head<br>Head Law | Claimant/<br>Injured Worker |

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A**
**(CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|------|------|--------------------|-------|
| Marti Cauble v Flamingo Las Vegas<br>    Case #A-17-761238-C, District Court (Clark County, NV)<br>    Deposition by video: August 24, 2020 | 2020 | Brook Hammond<br>Hammond & Hammond, LLP | Plaintiff |
| Barrett v Barrett (Balser)<br>Case #094701758, Utah Second District Court (Davis County)<br>    Bench trial by video: August 28, 2020 | 2020 | Shawn Barrett<br>Pro Se | Respondent |
| Espinosa v Espinosa<br>    Case # 194702100, Second Judicial District, Davis County<br>    Farmington (Utah)<br>    Evidentiary hearing by video: September 16, 2020 | 2020 | Will Fontenot, Cobie Spevak<br>Fontenot Law P.C. | Petitioner |
| Gary Capps v UPS<br>    Case # 20-0159, Utah Labor Commission<br>    Evidentiary hearing by video: September 21, 2020 | 2020 | Scott Lythgoe<br>Mountain View Law Group | Claimant/<br>Injured Worker |
| Mary Elizabeth Higginbotham Roland v Crystal Bay Casinos, et al<br>    Case #CV17-01344, Second Judicial Court (County of Washoe, NV)<br>    Deposition by video: December 10, 2020 | 2020 | Kyle Hoyt<br>Wood, Smith, Henning & Berman | Defense |
| Hampton v State of Utah Department of Corrections<br>    Case # 1:18-CV-00079-CMR<br>    Deposition by video: February 18, 2021 | 2021 | Aaron Bergman/Aubri Thomas<br>Bearnson Law | Plaintiff |

September 5, 2024

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A (CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|------|------|--------------------|-------|
| Michael Crookston v Allied/Nationwide Insurance<br>　　Arbitration (Utah)<br>　　Deposition by video: May 3, 2021 | 2021 | Mike Banks<br>Adams Davis | Plaintiff |
| Jordan Sutherland v Tim Allen Trucking<br>　　Case #CV03-19-03137, Sixth District Court<br>　　State of Idaho (Bannock County)<br>　　Deposition: May 19, 2021 | 2021 | Brandon Baxter<br>Peck, Hadfield, Baxter & Moore | Plaintiff |
| Juana Patricia Gonzalez v Martha Galvan and Does I-X<br>　　Case # 200903752, Third District Court<br>　　State of Utah (Salt Lake County)<br>　　Deposition by video: June 28, 2021 | 2021 | Timothy Pettitt/Rick Lundell<br>Lowrance, Lundell & Lofgren | Plaintiff |
| Jon Hill and Shawna Hill v Emergency Medicine of Idaho, P.A.<br>　　Case # CV01-19-09736, CV01-19-13795, Fourth District Court<br>　　State of Idaho (Ada County)<br>　　Deposition by video: July 27, 2021 | 2021 | Jarom A. Whitehead<br>Michael J. Hanby, II<br>Pedersen Whitehead & Handby | Plaintiff |
| Donald Knight v Sid Tool Co., Inc., dba MSC Industrial Supply Co.<br>　　Case # A-19-796399-C, District Court<br>　　State of Nevada (Clark County)<br>　　Deposition by video: July 29, 2021 | 2021 | Zachariah B. Parry<br>Matthew G. Pfau<br>Parry & Pfau | Plaintiff |

*(Continued on the following page)*

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A**
**(CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|------|------|-------------------|-------|
| Kristin Hilton Timms v Robert MacKinlay Timms<br>Case # 194401791, Fourth District Court<br>State of Utah (Utah County)<br>Bench trial by video: August 13, 2021 | 2021 | Ron Haycock<br>Strong & Hanni | Respondent |
| Daniel Hardy v Jesses Rogers, et al<br>Case # 180401429, Fourth District Court<br>State of Utah (Utah County)<br>Deposition by video: August 18, 2021 | 2021 | Brittany L. Thompson<br>McKell Thomson Hunter<br>Kipp Muir<br>Smith LC | Plaintiff |
| Mitchell Ron Hedin v Brandon Zaragoza; CC Dream Works, Inc., et al<br>Case # 200100035, First District Court<br>State of Utah (Box Elder County)<br>Deposition by video: August 30, 2021 | 2021 | Shaun L. Peck<br>Loren K. Peck<br>Peck, Hadfield, Baxter & Moore | Plaintiff |
| Ana Quorp aka Ana DeQuorp v Utah Department of Transportation, et al<br>Case # 200900866, Third District Court<br>State of Utah (Salt Lake County)<br>Deposition by video: August 31, 2021 | 2021 | Nathan S. Morris<br>Eisenberg, Cutt, Kendell & Olson | Plaintiff |
| Metcalf v Metcalf<br>Case # 194402440, Fourth District Court<br>State of Utah (Utah County)<br>Bench trial by video: September 21, 2021 | 2021 | Aaron Harris<br>Smith LC | Respondent |

*(Continued on the following page)*

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A (CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|------|------|--------------------|-------|
| Michelle Walker, Nicole Simonich, Dan Statts v Kirk Chugg, Jane Doe<br>    Case # 190907254, Second District Court<br>    State of Utah (Weber County)<br>    Deposition by video: September 3, 2021 | 2021 | Damian Kidd<br>Christopher Thresher<br>Driggs, Bills & Day, P.C. | Plaintiff |
| Susan M. Watson v IHC Health Services, Inc. dba Intermountain Medical Center; Mark B. Shah, M.D., et al<br>    Case # 170906233, Third District Court<br>    State of Utah (Salt Lake County County)<br>    Deposition by video: September 29, 2021 | 2021 | Chelsey Phippen<br>Ricky Shelton<br>Shawn McGarry<br>Kipp and Christian, P.C. | Defense |
| Bradley James Furniss v Blaine Larsen Farms, Inc., Employer, and Liberty Northwest Insurance Corporation, Surety and State of Idaho Industrial Special Indemnity Fund<br>    I.C. Case # 2011-026179, Industrial Commission<br>    State of Idaho<br>    Deposition by video: November 15, 2021 | 2021 | Mathew Pappas<br>Anderson, Julian & Hull | Defense |
| Darren W. Hardman v Tammy B. Hardman<br>    Case # 084402017, Fourth District Court<br>    State of Utah (Utah County)<br>    Bench trial by video: November 8, 2021 | 2021 | Cory Hundley<br>Hundley & Harrison | Petitioner |
| Brent E. Hilliard v Twin Falls County Sheriff's Office and Twin Falls County<br>    Case # 1:18-cv-00550-CWD, U.S. District Court<br>    State of Idaho<br>    Jury trial by video: November 17, 2021 | 2021 | Pam S. Howland<br>Jennifer Walrath<br>Idaho Employment Lawyers, PLLC | Defense |

*(Continued on the following page)*

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A (CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|------|------|--------------------|-------|
| Victor Grice v Rigoberto Badilla, et al<br>Case # CV-214F, U.S. District Court<br>State of Wyoming<br>Deposition by video: December 6, 2021 | 2021 | Eric Hinckley<br>James Jackson<br>Christopher O'Shea<br>Lowe Law Group | Plaintiff |
| Jared Anderson v Wendy Dang, New Image Vans, and Does I-V<br>Case # 180905610 Fourth District Court<br>State of Utah (Salt Lake County)<br>Deposition by video: December 6, 2021 | 2021 | Lindy W. Hamilton<br>Robert W. Gibbons<br>Gridley, Ward & Hamilton | Plaintiff |
| Robert Wade Fulfer v Ruan Logistics Corporation<br>Case # I.C. 2018-010978 Industrial Commission<br>State of Idaho<br>Deposition by video: January 24, 2022 | 2022 | Matthew O. Pappas<br>Anderson, Julian & Hull, LLP | Defense |
| Michelle Walker, Nicole Simonich, Dan Staats v Kirk Chugg, Jane Doe<br>Case # 190907254, Second Judicial District Court<br>State of Utah (Weber County)<br>Deposition by video: February 2, 2022 | 2022 | Christopher Thresher<br>Damian W. Kidd<br>Driggs, Bills & Day | Plaintiff |
| Jodie Levitt v Drew Stuart<br>Case # 2:20-cv-00144-TS-CM<br>United States District Court (Utah)<br>Deposition by video: February 7, 2022 | 2022 | Stephen Farr<br>Christian Burridge<br>*(Joint counsel)*<br>Farr, Cragun & Berube<br>Christian Burridge Law Firm | Plaintiff |

*(Continued on the following page)*

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A (CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|------|------|--------------------|-------|
| Isaac Thayne Patterson v Kersti Laurel Lane<br>Case # 204401384, Fourth Judicial District Court<br>State of Utah (Utah County)<br>Deposition by video: February 15, 2022 | 2022 | Aaron R. Harris<br>Smith LC | Respondent |
| Jennifer Rebecca Rowser v Brian Wayne Rowser<br>Case # 194500006, Fourth District Court<br>State of Utah (Utah County)<br>Bench trial by video: March 18, 2022 | 2022 | Marilyn Moody Brown<br>Moody Brown Law | Respondent |
| Jennifer Hedrick v Mark Hedrick<br>Case # 214400396, Fourth Judicial District Court<br>State of Utah (Utah County)<br>Bench trial by video: April 27, 2022 | 2022 | Laura D. Johnson<br>Dean C. Andreasen<br>Clyde Snow & Sessions | Respondent |
| Joseph Andrew Custer v Raquel Custer<br>Case # 214400045, Fourth Judicial District Court<br>State of Utah (Utah County)<br>Bench trial by video: May 9, 2022 | 2022 | Scott Weight<br>Esplin Weight | Petitioner |
| Marty Jones v Jason Kutnyak Werner Enterprises, Inc., Does 1-X<br>Case # 21-CV-000074-J, United States District Court<br>District of Wyoming<br>Deposition by video: June 20, 2022 | 2022 | Eric Hinkley<br>Christopher O'Shea<br>Lowe Law Group | Plaintiff |
| Nancy Casias  and Robert Casias v Smithfield Station, LLC, et al<br>Case # 200100131, First Judicial District Court<br>State of Utah (Cache County)<br>Deposition by video: July 25, 2022 | 2022 | Brandon Baxter<br>Peck Hadfield Baxter<br>& Moore, LLC | Plaintiff |

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A (CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|------|------|--------------------|-------|
| Issa A. Hamud v Kaleb Rex Pugsley<br>    Case # 210100042 First Judicial District Court<br>    State of Utah (Cache County)<br>    Deposition by video: July 28, 2022 | 2022 | Brandon Baxter<br>D. Cole Fronk<br>Peck Baxter Watkins<br>& Bailey, LLC | Plaintiff |
| Ivoneide Colipi v Ross Dress for Less, Inc., a Utah Corporation<br>    Case # 190907376 Third Judicial District Court<br>    State of Utah (Salt Lake City County)<br>    Deposition: August 15, 2022 | 2022 | Darren Davis<br>Ricky Shelton<br>Adams Davis, P.C. | Plaintiff |
| Jon Hill and Shawna Hill, et al v Emergency Medicine of Idaho, et al<br>    Case # CV01-19-09736; CV01-19-13795 Fourth Judicial District Court<br>    State of Idaho (Ada County)<br>    Jury Trial: August 31, 2022 | 2022 | Jarom A. Whitehead<br>Michael J. Hanby, II<br>Pedersen, Whitehead & Hanby | Plaintiff |
| Lucia Cortez v Ashley Whiting, et al<br>    Case # 200904906 Seventh Judicial District Court<br>    State of Idaho (Bonneville County)<br>    Deposition by video: September 27, 2022 | 2022 | Jean B. Jorgenson<br>Wilkerson Law Group | Plaintiff |
| Lizzette Medina v Mary C. Arola, et al<br>    Case # 200902545 Third Judicial District Court<br>    State of Utah (Salt Lake County)<br>    Deposition by video: October 3, 2022 | 2022 | Rick S. Lundell<br>John P. Lowrance<br>Lowrance Lowell Lofgren | Plaintiff |

*(Continued on the following page)*

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A (CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|------|------|--------------------|-------|
| Tesch v Emergency Medicine of Bonneville Investment, LLC et al<br>　　　Case # 200904906 Second Judicial District Court<br>　　　State of Utah (Weber County)<br>　　　Deposition by video: October 4, 2022 | 2022 | Lindy W. Hamilton<br>Robert W. Gibbons<br>Gridley, Ward & Hamilton | Plaintiff |
| Merilee Heckel v Dirtstone Landscaping & Murdock Trucking, Inc et al<br>　　　Case # 200400692 Fourth Judicial District Court<br>　　　State of Utah (Utah County)<br>　　　Deposition by video: October 25, 2022 | 2022 | Rick S. Lundell<br>Lowrance Lowell Lofgren | Plaintiff |
| Tanyia Negale (guardian for D.K., a minor) v Amber King<br>　　　Case # CV21210070 Sixth District Court<br>　　　State of Idaho (Franklin County)<br>　　　Pre-Trial deposition by video: November 11, 2022 | 2022 | Brandon J. Baxter<br>Peck, Baxter, Watkins & Bailey<br>W. Scott Lythgoe<br>Mountain View Law Group | Plaintiff |
| Liliana E. Trani v Wade B. French<br>　　　Case # 200901465 Third District Court<br>　　　State of Utah (Salt Lake County)<br>　　　Deposition by video: December 13, 2022 | 2022 | Rick S. Lundell<br>Lowrance Lowell Lofgren | Plaintiff |
| Lucia Cortez v Ashley Whiting, Carl Whiting, Margie Whiting<br>　　　Case #  CV10-21-6293 Seventh Judicial District<br>　　　State of Idaho (Bonneville County)<br>　　　Jury Trial: December 14, 2022; December 16, 2022 | 2022 | Jean B. Jorgensen<br>Wilkerson Law Group | Plaintiff |

*(Continued on the following page)*

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A (CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|---|---|---|---|
| Lori Chadwick v Badger Daylighting Mountain States, Inc., Elliot Workgroup Architecture, LLC and University of Utah/State of Utah<br>    Case # 210900680 Third Judicial Court<br>    State of Utah, (Salt Lake County)<br>    Deposition by video: December 15, 2022 | 2022 | Dennis James<br>Morgan, Minnock, Rice and Miner | Defense |
| Emily Holmes and Rylle Holmes v Catherine B. Smith<br>    Case # 210700347 Second Judicial Court<br>    State of Utah (Davis County)<br>    Deposition by video: January 30, 2023 | 2023 | Shaun L. Peck<br>Loren K. Peck<br>Peck, Baxter, Watkins & Bailey | Plaintiff |
| Charles Bennett, et al v Keystone Aviation, LLC et al<br>    Case # 200906442 Third District Court<br>    State of Utah (Salt Lake County)<br>    Deposition by video: February 28, 2023 | 2023 | Eric S. Olsen<br>Eisenberg, Cutt, Kendell & Olsen<br>(ECKO Law) | Plaintiff |
| Michael G. Hughes, Jr. v Michelle Y. Santiago; Las Vegas Pizza, LLC dba Pizza Hut et al.<br>    Case # A-21-837881-C District Court<br>    State of Nevada (Clark County)<br>    Deposition by video: March 7, 2023 | 2023 | Brian Holthus<br>Jolley Urga Woodbury & Holthus | Defense |
| Joann Carter Stevenson v Adam Ivan Stevenson<br>    Case # 224400087 Fourth District Court<br>    State of Utah (Utah County)<br>    Deposition by video: March 28, 2023 | 2023 | Aaron R. Harris<br>Smith LC | Petitioner |

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A (CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|------|------|--------------------|-------|
| Sharee Petrie & Cody Petrie v Gateway Medical Center, et al<br>Case # CV2021-004872 Superior Court<br>State of Arizona (Maricopa County)<br>Deposition by video: April 11, 2023 | 2023 | Sigurds M. Krolls<br>Rachel DaPena<br>Campbell, Yost, Clare & Norell, PC | Defense |
| Macklin J. Stokes v Union Pacific Railroad Company<br>Case # 220900301 Third Judicial District Court<br>State of Utah (Salt Lake County)<br>Deposition by video: May 9, 2023 | 2023 | C.N. Coby Cohen<br>Jim Vucinovich<br>Rossi Vucinovich, PC | Plaintiff |
| David Payne v University of Utah<br>Case #190901591<br>State of Utah (Salt Lake County)<br>Arbitration by video: May 10, 2023 | 2023 | Mike Banks<br>Robert J. Debry & Associates | Plaintiff |
| Kristine Taylor v Enumclaw Property and Casualty Insurance Company<br>and Does 1-10, inclusive<br>Case # 2:21-cv-00165-JNP-DAO United States District Court<br>District of Utah – Central Division<br>Deposition: May 12, 2023 | 2023 | Alyssa Wood<br>Steele Adams Hosman | Plaintiff |
| Jackson Cruz v LVN Foods, LLC d/b/a Kentucky Fried Chicken,<br>a foreign LLC, et al<br>Case # A-21-840480-C District Court<br>State of Nevada (Clark County)<br>Deposition by video: May 16, 2023 | 2023 | Patrick W. Kang<br>Kyle R. Tatum<br>Tiffany S. Yang<br>Kang & Associates, ACE Law Group | Plaintiff |

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A**
(CONTINUED)

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|------|------|--------------------|----|
| Juana Patricia Gonzalez v Martha Galvan and Does I-X | 2023 | Rick Lundell | Plaintiff |
|     Case # 200903752, Third District Court | | Lowrance, Lundell & Lofgren | |
|     State of Utah (Salt Lake County) | | | |
|     Pre-Trial Deposition by video: July 17, 2023 | | | |
| | | | |
| Ethan Durocher v Shelli Diane Atkinson | 2023 | Shaun Peck | Plaintiff |
|     Case # 210100046, First Judicial District Court | | Peck, Baxter, Watkins & Bailey | |
|     State of Utah (Cache County) | | | |
|     Deposition by video: August 16, 2023 | | | |
| | | | |
| Robert Wade Fulfer v Ruan Logistics Corporation | 2023 | Matthew O. Pappas | Defense |
|     Case # I.C. 2018-010978 Industrial Commission | | Anderson, Julian & Hull, LLP | |
|     State of Idaho | | | |
|     Deposition by video: September 12, 2023 | | | |
| | | | |
| Kristi Ketchum v High Country Beverage | 2023 | Joshua Stoll | Plaintiff |
|     Case #2022CV30609 | | Rebecca Albano | |
|     State of Colorado (Larimer County) | | Stoll Law Firm | |
|     Deposition by video: September 13, 2023 | | | |
| | | | |
| Mark Ledward v Hub Group | 2023 | Scott Lythgoe | Claimant |
|     Case # 23-0230 Utah Labor Commission | | Mountain View Law Group | |
|     State of Utah | | | |
|     Hearing by video: November 7, 2023 | | | |

*(Continued on the following page)*

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A**
**(CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|---|---|---|---|
| Roberto Hernandez/Cynthia Hernandez v Golden Entertainment dba Golden Casino Group<br>　　　Case # A-20-818765-C<br>　　　District Court, Clark County Nevada<br>　　　Deposition by video: November 14, 2023 | 2023 | Brian Blankenship<br>Claggett & Sykes | Plaintiff |
| Stephanie S. Ferguson v Personal Representative of the Estate of Ricardo Murillo<br>　　　Case #210100186, First Judicial District Court<br>　　　State of Utah (Cache County)<br>　　　Deposition by video: November 28, 2023 | 2023 | Brandon Baxter<br>Peck, Baxter, Watkins & Bailey | Plaintiff |
| Julian Hodgson v Kier Construction Corporation et al<br>　　　Case #200906761, Third Judicial District Court<br>　　　State of Utah (Salt Lake County)<br>　　　Deposition by video: December 13, 2023 | 2023 | Jordan Christianson<br>Ray Quinney & Nebeker, P.C. | Plaintiff |
| Emily Holmes and Rylle Holmes v Catherine B. Smith<br>　　　Case # 210700347 Second Judicial Court<br>　　　State of Utah (Davis County)<br>　　　Jury trial: February 1, 2024 | 2024 | Shaun L. Peck<br>Loren K. Peck<br>Peck, Baxter, Watkins & Bailey | Plaintiff |
| Michael Heebner v Samuel Miller, et al<br>　　　Case # A-22-851350-C District Court<br>　　　State of Nevada (Clark County)<br>　　　Deposition by video: February 12, 2024 | 2024 | Sean K. Claggett<br>Brian Blankenship<br>Joseph N. Mott<br>Claggett & Sykes law Firm | Plaintiff |

*(Continued on the following page)*

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A**
(CONTINUED)

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|------|------|--------------------|-------|
| Melissa DeMartini v Bryan DeMartini | 2024 | Tim K. Brown | Respondent |
| Case # 224402668 | | Moody Brown Law | |
| State of Utah (Utah County): Utah 4th District Court (Provo) | | | |
| Trial Appearance by video: February 29, 2024 | | | |
| | | | |
| Tara Cornaby-Perreca, et al v Mauna Kea Resort | 2024 | Michael R. Cruise | Plaintiff |
| Case #3CCV-20-0000304 | | Leavitt, Yamane & Soldner | |
| State of Hawaii: 3rd Circuit Court | | | |
| Deposition by video: March 12, 2024 | | | |
| | | | |
| Scott Hughes v Natalie Hughes | 2024 | Mark R. Nelson | Petitioner |
| Case # 214401657 | | Douglas Thayer | |
| State of Utah: 4th Judicial District Court | | Denton's \| Durham, Jones, Pinegar | |
| Trial Appearance by video: April 30, 2024 | | | |
| | | | |
| Brendan Brown v Cook Sautter Foot & Ankle | 2024 | Wayman Stodart | Plaintiff |
| Case # 210300372 | | Bearnson & Caldwell | |
| State of Utah: 1st District Court (Cache County) | | | |
| Deposition by video: May 24, 2024 | | | |
| | | | |
| Gerald Smith v Francisco Creech and Walter Creech | 2024 | Loren Peck | Plaintiff |
| Case # 210100100 | | Brandon Baxter | |
| State of Utah: 1st District Court (Cache County) | | Peck, Baxter, Watkins & Bailey | |
| Trial Appearance (Jury): June 6, 2024 | | | |

*(Continued on the following page)*

**LIST OF CASES FOR KOURTNEY LAYTON MRC, CRC, ABVE/D, IPEC, CLCP, CVE, CIWCS-A**
**(CONTINUED)**

| CASE | YEAR | RETAINING ATTORNEY | PARTY |
|---|---|---|---|
| Brendan Brown v Cook Sautter Foot & Ankle | 2024 | Wayman Stodart | Plaintiff |
| Case # 210300372 | | Bearnson & Caldwell | |
| State of Utah: 1st District Court (Cache County) | | | |
| Deposition by video (continued): July 30, 2024 | | | |
| | | | |
| JoAnn Stevenson v Adam Stevenson | 2024 | Aaron Harris | Petitioner |
| Case # 224100007 | | Smith LC | |
| State of Utah:  Fourth District Court (Utah County) | | | |
| Bench trial: August 7, 2024 | | | |
| | | | |
| Jessica Carter v Rodney Carter | 2024 | Tim K. Brown | Petitioner |
| Case # 234100287 | | Moody Brown Law | |
| State of Utah: 4th Judicial District Court (American Fork) | | | |
| Hearing by video: September 4, 2024 | | | |

*(Remaining page intentionally left blank)*

September 5, 2024

# SECTION THREE

# FEE SCHEDULE





## KOURTNEY LAYTON & ASSOCIATES, INC.

Vocational Rehabilitation & Life Care Planning Consultants

Utah Office
5513 W. 11000 N. #443
Highland, UT 84003
(855) 831-8880

**Updated 15-January 2024**

## FEE SCHEDULE
### ~EMPLOYMENT & EARNING CAPACITY ANALYSIS~

**RECORDS**

**Upon receipt of the retainer agreement and retainer fee, a secure shared file link will be provided. Please upload all records and information as outlined in the retainer agreement, organized by the following categories: medical records, medical bills, expert reports, employment, education, wage verification, police reports, photos, court and miscellaneous. This will help us minimize billing and expedite the completion of our work. Please do not send imaging files.**

RETAINER FEE
Minimum non-refundable retainer fee is $1,500.00.

LOSS OF EARNING CAPACITY ANALYSES & LABOR MARKET EVALUATIONS
The hourly rate for these analyses is $285.00. The evaluation can include: review of referral information, client interview, vocational testing, labor market evaluation, research and preparation of a written report. Expedited reports or testimony (within 6 weeks) are billed at double the regular hourly rate.

DEPOSITION/TESTIMONY
Deposition/testimony minimum fee is $1,000.00. This includes up to two hours of testimony (2- hour minimum). Additional preparation/file study, wait time, travel time and any other time is billed at the current deposition rate of $500.00.

<u>All outstanding invoices must be paid prior to court appearance/testimony.</u>
**Deposition/testimony fee is payable <u>10 business days</u> in advance of any scheduled appearance.**

PROFESSIONAL TIME/ ADMINISTRATIVE TIME
Professional time is billed monthly at an hourly rate of $285.00.    Administrative time is billed monthly at an hourly rate of $85.00.

CANCELLATION POLICY
Missed appointments will result in a fee equivalent to 1 (one) hour at the regular professional rate.





### KOURTNEY LAYTON & ASSOCIATES, INC.

Vocational Rehabilitation & Life Care Planning Consultants

Utah Office
5513 W. 11000 N. #443
Highland, UT 84003
(855) 831-8880

**Updated 15-January 2024**

## FEE SCHEDULE
### ~EMPLOYMENT & EARNING CAPACITY ANALYSIS~
(Continued)

<u>AFTER HOURS/PREMIUM TIME</u>
When deadlines necessitate completion of work outside normal work hours or on weekends or holidays, a premium rate equal to twice the hourly rate will be assessed.

Terms: Net ten days. Fees are totaled and billed every thirty (30) days and are payable upon receipt. An interest charge of 18% is assessed every thirty days on past due amounts.

<u>Payment in full is required prior to release of the written report.</u>

<u>TRAVEL</u>
Professional rate, pro-rated when appropriate.
Mileage........................................................................$.625 (or current IRS rate)
Other travel expenses .............................................. Actual

<u>ADDITIONAL EXPENSES</u>
Actual costs are billed as additional expenses. Examples of these expenses include overnight mail, fax/telephone, parking, copy expenses, film development, courier, postage, secretarial, express mail and research/data/spreadsheets obtained from private sources.

Fees and rates subject to change without notice.

