# Exhibit K

Ryan Davis Deposition Exhibit 1

Transcript of January 7, 2022 meeting

1

TRANSCRIPT OF AUDIO-RECORDED FILE LABELED

"Production No1a_Recording of Firing Meeting"



EXHIBIT

Davis

1          MR. DAVIS:  So I understand FMLA.  I

2    understand sick time and leave.  The State of

3    Wyoming considers COVID-19 to be presumptive in law

4    enforcement.  This has been treated since day one as

5    a presumptive issue.  Whether we agree with that or

6    not as a group, that's how it's been seen.

7          I'm currently on Workers' Compensation.

8          MS. BRANDO:  Uh-huh.

9          MR. DAVIS:  Obviously I'm being paid

10   through Workers' Compensation.

11         MS. BRANDO:  Uh-huh.

12         MR. DAVIS:  Being the fact that I am

13   on Workers' Compensation, I -- the termination of

14   employment is allowed so long as it's not in

15   reference to any way me being on disability.

16         The questions that I have is three weeks

17   ago I had a conversation with the lieutenant, who

18   made mention that -- that the department would

19   probably not be able to wait for me to be off

20   disability.  That started my search for a attorney,

21   because that implies that this termination of

22   employment is directly related to me being on

23   Workers' Compensation.

24         I understand that -- I don't want to wait

25   either.  And I've told the chief this.  I think it's

1  a disservice to the citizens of Powell who pay taxes

2  for a police officer who can do their job.  It's a

3  disservice to my coworkers.  I admit that.  I -- no

4  one is more frustrated than I am not working than

5  me.

6      That being said, the fact that FMLA has run

7  out or the fact that sick leave or -- or vacation

8  time has run out has no bearing on the fact that I

9  am on disability for what the State considers to be

10 an on-the-job related issue.

11     So, you know, if -- if termination is

12 the -- is the direction we're going, just between,

13 you know, this recorded conversation and the four of

14 us in this room, I have a hard time, after the

15 conversation I had with the lieutenant, being --

16 directly after I told him that it would be March

17 before I had another CT, have a hard time

18 understanding that this has nothing to do with the

19 fact that I'm currently not working.

20     I would assume if I were working, I would

21 still have a job if I wasn't on disability.  I had a

22 satisfactory review six months --

23          MALE SPEAKER:  Absolutely.  This has

24 nothing to do with -- yeah.  No.

25          MR. DAVIS:  Correct.

1            MALE SPEAKER:  This --

2            MR. DAVIS:  So we can --

3            MS. BRANDO:  It puts an undue hardship

4  on the department.

5            MR. DAVIS:  Abs- --

6            MS. BRANDO:  After that 12 weeks has

7  expired, it's -- it's an undue hardship on the whole

8  department, being a probationary employee.  And

9  that's where it's at.

10            MR. DAVIS:  Yeah.  We're in

11  agreement --

12            MS. BRANDO:  It's not because you're

13  on a disability.

14            MR. DAVIS:  We're in agreement that

15  it's -- that it's a hardship.  There's no doubt

16  about that.  And I will even sit here and agree,

17  yes, I am a probationary employee.  We are an

18  at-will state here in Wyoming.  That, I understand.

19            That being said, regardless of probationary

20  status and regardless of at-will employment, there

21  are exceptions of the at-will employment and to --

22  up to and including probationary employees for

23  termination.  One of those is considered

24  retaliation.

25            I would make the argument that being

1  terminated in the middle, right now, three months

2  after being on disability, for no other reason that

3  I can see than that I'm not working -- because a

4  hardship, unfortunately, that doesn't play in.  The

5  hardship to the department doesn't matter.  If my

6  leg were to get chopped off, now we'd be talking

7  about something different.  We would be talking

8  about medical retirement.

9         You and I did discuss a medical retirement,

10  which you believed I wasn't qualified for.  I called

11  WRS.  I do qualify.  However, in order for me to

12  qualify that, their doctors and my doctor have to

13  agree that that's a long-term thing.  So that's on

14  the table if -- if in fact the doctors determine,

15  hey, you can't ever go back to do the work -- to go

16  to work again.  The problem is we're not at that

17  point, because they haven't been able to make a

18  determination.  They're sitting in the center of

19  this.

20         So I think the -- I think the main point

21  I'm walking away from here is when you have a

22  supervisor at the lieutenant level tell you in a

23  meeting, after you're discussing how long it's going

24  to be on -- on Workers' Compensation, say, well,

25  we -- I don't think the department's going to be

1  able to wait that long, to me, directly implies that

2  the reason for this termination is the length of

3  time that I'm on disability.

4          Unfortunately, like I said, the hardship to

5  the department, as much as I disagree with it as

6  well, it's not really my problem.  This is an

7  on-the-job issue, and we are dead center in the

8  middle of -- of disability.

9          So -- so like I said, it's required me to

10  seek legal counsel, because I don't feel like this

11  termination has anything to do with anything other

12  than I'm not working.  Yes, it's a hardship, but I'm

13  not working.  I'm on disability, so now I'm being

14  terminated.  We're not giving it a chance -- I know

15  that it's long and difficult, but we're not giving

16  it a chance to allow the doctors to make a

17  definitive determination.  So you know what?  And

18  I -- I wish that determination was made a month ago,

19  a week ago, whatever it is, but it's not.

20  Unfortunately, it isn't.  So we're all sitting in

21  this boat.  So --

22          MALE SPEAKER:  I think because we play

23  semantics and it comes up, we should probably ask

24  the question, at what point did disability start?

25          MR. DAVIS:  Say it again.

1      MALE SPEAKER:  At what point did

2  disability start?

3      MR. DAVIS:  What do you mean?

4      MALE SPEAKER:  That's exactly what I

5  mean.  I don't think you're on disability, are you?

6  You're on Workmen's Comp.

7      MR. DAVIS:  Workers' Compensation.

8  Excuse me.  Sorry.  But my --

9      MALE SPEAKER:  For clarification --

10      MR. DAVIS:  You're right.  Correct.

11  Workers' Compensation.  I -- I -- yes.  I am not on

12  disability.  Sorry.  My mistake.

13      MALE SPEAKER:  Just -- just for

14  clarification.

15      MR. DAVIS:  Correct.  Of course.  Of

16  course.  Yes.  You -- you are correct.  So -- yeah.

17  I'm on Workers' Compensation based upon what the

18  State determines to be an on-the-job injury.  So --

19  and I -- I don't know.  I had no intention for any

20  of this --

21      MALE SPEAKER:  Oh, we -- I understand

22  that, yeah.

23      MR. DAVIS:  I moved my family out to

24  Wyoming, you know.

25      MALE SPEAKER:  It's -- it's

```
 1   unfortunate for both sides, I feel, because -- and
 2   that's why I'm -- I'm letting you know that, you
 3   know, you have -- you have something in March.  We
 4   can move on.  And if you get cleared, you can
 5   definitely, you know, come back and try to, you
 6   know, apply or whatever and -- and have the ability
 7   to be on the force again.  That gives you more time.
 8   But you may end up on disability, too.  We don't
 9   know where it's going to -- that's where we're at.
10   We're at a hardship.  We're --
11                   MR. DAVIS:  Sure.
12                   MALE SPEAKER:  -- we're at a
13   standstill.  We -- we're not getting a service out
14   of something, you know.
15                   MR. DAVIS:  Understood.
16                   MALE SPEAKER:  Yeah.  And -- and --
17   and you don't have that buildup.  You don't even
18   have -- you know, once you get past probation, you
19   have the ability to buy into our sick leave bank.
20   We don't have that.  You don't have that.  You
21   haven't even passed the probationary, so...
22                   MR. DAVIS:  I bought into sick leave
23   bank.
24                   MALE SPEAKER:  Did you?
25                   MR. DAVIS:  Absolutely.
```

1           MALE SPEAKER:  Okay.

2           MS. BRANDO:  No.  He's actually --

3           MR. DAVIS:  It's six months.

4           MALE SPEAKER:  Oh.

5           MS. BRANDO:  He's using the sick leave

6  bank --

7           MALE SPEAKER:  Oh, he's using the --

8           MS. BRANDO:  -- right now.

9           MALE SPEAKER:  -- sick leave.  Okay.

10  Yeah.

11          MR. DAVIS:  Yeah.  I bought into sick

12  leave bank and I qualified for that.

13          MALE SPEAKER:  (Inaudible.)

14          MS. BRANDO:  Yeah.

15          MALE SPEAKER:  Okay.

16          MR. DAVIS:  Sure.

17          MS. BRANDO:  Yeah.  He's currently

18  using that.

19          MALE SPEAKER:  But, again, I mean, how

20  long, I mean, are we -- you know, obviously

21  there's -- how long do we go on with this?  And

22  that -- that's the question I have.  So, to me,

23  it's -- it's a bad situation for both of us.

24          MR. DAVIS:  Sure.  Understood.

25          MALE SPEAKER:  You know, and a

1   hardship -- I do feel it is a hardship for the City

2   and --

3                   MR. DAVIS:  It is.

4                   MALE SPEAKER:  -- and the --

5                   MR. DAVIS:  We -- we agree on that.

6   I've agreed on that since the day I went out.

7                   MALE SPEAKER:  Yeah.

8                   MR. DAVIS:  A hardship to the City.  A

9   hardship to the -- to my coworkers.

10                  MALE SPEAKER:  Yeah.

11                  MR. DAVIS:  You know, fact of the

12  matter is unfortunately at this point in time the

13  department's down, with me gone, three people.  You

14  know, I get that.

15                  MALE SPEAKER:  Yeah.

16                  MR. DAVIS:  I totally understand that.

17  From a perspec- -- from my perspective, you know,

18  just outside of all of this, when we're looking at

19  something where I believe this to be -- you know,

20  did I want to be out of work and be sick and be

21  dealing with the fact that walking a mile gets me

22  150 beats a minute on my heart rate?  No.  I don't

23  want to be dealing with that at all.  I would rather

24  be back in uniform and doing my job as -- as

25  prescribed.  You know, that being said, you know, I

```
 1   can't at this point in time.
 2              MALE SPEAKER:  Yeah.
 3              MR. DAVIS:  We know this.  And I
 4   can't, you know, based upon the fact that I
 5   contracted COVID, I'm having long-term issues with
 6   it, and the State determines that to be an
 7   on-the-job thing.  So if I were to be -- if I were
 8   to have been T-boned out here on Coulter and broke a
 9   hip and been out for a year, it's the same thing.
10   Would you terminate somebody that's going to be out
11   for a year --
12              MS. BRANDO:  Uh-huh.
13              MR. DAVIS:  -- here?  Okay.  Because I
14   don't see how you can't correlate that to Workers'
15   Compensation and the ability to work.
16              MS. BRANDO:  Workers' Compensation
17   will still apply.
18              MR. DAVIS:  I understand that.
19              MS. BRANDO:  You receive that.  It
20   would just be like -- so, for instance, the
21   termination would just be termination of employment.
22   Insurance would terminate and -- and those things.
23              MR. DAVIS:  Sure.
24              MALE SPEAKER:  Your insurance, though,
25   my understanding, would not terminate until the end
```

1   of the month.

2              MS. BRANDO:   And you would qualify for

3   COBRA insurance.

4              MALE SPEAKER:   Yeah.   COBRA insurance.

5              MR. DAVIS:   Sure.

6              MS. BRANDO:   Yeah.

7              MR. DAVIS:   I'm less concerned with --

8   the insurance and the Hartford policy, the long-term

9   disability, you know, those kind of things, I'm less

10  concerned with that and more concerned with labor

11  law states that I cannot be terminated based upon

12  being on Workers' Compensation.

13             My argument is that while you tell me

14  that's not the case, that's not what it looks like

15  on the outset.   That's not what it looks like based

16  upon what the lieutenant told me four weeks ago,

17  because he told me that the department couldn't

18  wait.   Couldn't wait means you can't wait for me to

19  come back.   The only reason I am not back is because

20  I am on Workers' Compensation.   And my doctor, per

21  City policy, will not sign the form releasing me to

22  go back.

23             That -- the City states that the doctor has

24  to sign this form.   I've presented that form to the

25  doctors at every appointment that I've had.   They

1  have refused to sign it.

2          That being said, if I could have got them

3  to sign it, we wouldn't have this issue.  I would be

4  inside policy and I would be rehireable again.  But

5  you have a -- an employee of the City and

6  department, one of my supervisors, tell me in a

7  meeting that the department can't wait, while we're

8  discussing the duration of Workers' Compensation,

9  that it's going to be March before my next

10  evaluation.

11          My argument is -- my -- my belief is -- my

12  belief is that I can sit in this room and we can

13  terminate employment and you can tell me it's

14  because of, you know, probationary employee, you can

15  tell me because it's of a hardship.  I think my

16  argument is that's not how it's perceived.  That's

17  not how it was brought up to me in a meeting four

18  weeks ago when I discussed how long this process is

19  going to be.

20          And while I sit in the middle of not being

21  able to return to work and I'm terminated now, had I

22  been -- had I gotten a review and been terminated,

23  you know, a week after the review off of probation,

24  yeah, we're at-will, you can terminate me for

25  whatever reason you want.  I'm not making that

1    argument.  But that didn't happen.  It didn't happen

2    until I went on probation -- or sorry -- excuse

3    me -- until I went on Workers' Comp and had been on

4    Workers' Comp for three months with another possible

5    three month window before I could --

6                    MALE SPEAKER:  And -- and -- and --

7                    MR. DAVIS:  -- come back.  It appears

8    to me to be retaliatory, so -- and fall under the

9    statute of retaliatory as it relates to federal and

10   state labor law.

11         So that is why I have retained counsel.

12   Mostly because I just want to know what my rights

13   are.  I came from a different state.  I know exactly

14   what my rights are there.

15                    MALE SPEAKER:  Sure.

16                    MR. DAVIS:  I don't -- didn't know

17   anything.  It required me to do some research and

18   seek counsel and determine if I have recourse.

19   Based upon the information that I have been provided

20   thus far, I believe that I do.  Do I want to deal

21   with any of that?  No, I don't.  Do -- but, you

22   know, we're also in a -- and I will admit, do I want

23   to sit at home and do nothing either?  No.  But I

24   believe I'm entitled to the ability to figure out

25   where this thing is going to go.  We have a set date

1   paperwork.  It's just a matter of I'll discuss that

2   with my doctor when I meet with him this week.

3   While I'm still an employee, that's an option.  Once

4   I've been terminated, then I can't go back and say,

5   hey, I need medical retirement, I can't be a cop

6   anymore, because I'm no longer employed as a law

7   enforcement officer.

8          Currently, right now, even though in the

9   status I am, I'm still obviously currently employed

10  as I look at it, you know, from their perspective.

11  That's why.

12         So -- so I cannot -- yeah.  It's either --

13  if that -- if that's the case, if that's the case

14  that they tell me I can't be a cop anymore, there's

15  a process and procedure to go through.  Again, I've

16  already started it, at least -- I mean, I don't know

17  if the doctors -- what they're going to say this

18  week or next week or what the WRS doctors are going

19  to say, but it's -- but the door's been open.  It

20  will be immediately closed the second my employment

21  with the City of Powell ends, because there -- they

22  won't -- they're not going to seek that process

23  unless I'm employed.

24         So, you know, that's that option.  I don't

25  think that this long-term disability plan will ever

1    be a factor.  It's nice to have the paperwork filled

2    out.  But I did speak with Workers' Compensation.  I

3    called them as well.  And to my surprise, which is

4    actually good, you were correct in that -- not that

5    you're wrong.  No.  That came out wrong.  To my

6    surprise, I was actually happy, because I didn't

7    think that it would carry over, you know, once I was

8    no longer employed.  So that -- that is a factor

9    that carries over.  I don't think that -- but

10   because I have that, the Hartford doesn't factor in.

11                  MALE SPEAKER:  Factor in.

12                  MR. DAVIS:  So that is a positive.

13   There's no doubt that that's a positive.  And they

14   stated they'll pay regardless of employment status,

15   whether I'm employed by the City or not, through the

16   duration.  The questions that they bring up is how

17   do we determine employability when the City sets the

18   standard for employability based upon the form that

19   the doctor fills out.

20                  Workers' Comp is different.  So they --

21   trying to -- they could say, well, you're

22   employable, you know, as a -- you know, whatever, a

23   cook or whatever that may be, so we're going to

24   terminate Workers' Compensation.  So it could in

25   theory be terminated within the first day or week of

1  being let go from the department, because they can

2  change the standard of what employability is.

3        So whilst that's positive that I have it,

4  there's no guarantee that it lasts any longer than,

5  you know, the termination of employment based upon a

6  different set of standards for employability.

7        Ultimately, you know, I'm just trying to --

8  I -- ultimately, I'm just trying to figure out what

9  my rights as an employee are.  And then all said and

10 done, you know, at the end of the day, while I feel

11 bad for my coworkers and the citizens of Powell, I

12 also have a family and -- and a life to -- to take

13 care of.

14        What I'm going to go do the second I'm

15 terminated from law enforcement, I don't know.  I

16 have no idea.  I've had this conversation many

17 times.  If people were to come to me and say, hey,

18 you can't be a cop anymore, I have no idea where I'd

19 go and what I'd do.

20        Law enforcement has its frustrations and

21 its difficulties, as -- and its stigmas, as we can

22 see why -- you know, with the difficulty of getting

23 new people hired.  People don't want to do this job

24 anymore.  Whether it's in a small city like Powell

25 or a big city like LA, we're -- people don't want to

1  work in general, and they definitely don't want to

2  work in a situation where they're scrutinized like

3  we are in law enforcement.  I do.  I'm still

4  passionate about it.  I still enjoy it.  I wish I

5  could get a letter that says, hey, come back to

6  work.

7          That being said, if I'm terminated, what's

8  my motivation to reapply at a department that let me

9  go after I was unable to work for, again, what the

10 State determined to be an on-the-job deal?  So --

11         MALE SPEAKER:  I struggle with it.  I

12 see both sides.

13         MR. DAVIS:  Yes.

14         MALE SPEAKER:  I -- I definitely don't

15 appreciate the venom that comes with that.  And I

16 think the City has done very well to take care of

17 you.

18         MR. DAVIS:  I agree.  That, we agree

19 with.

20         MALE SPEAKER:  The only reason it's a

21 Workmen's Comp issue is because Tiffany caught wind

22 of that and put it all into play.

23         MR. DAVIS:  Uh-huh.

24         MALE SPEAKER:  There's -- there's

25 nobody, yourself included, that believes you caught

1  it at work.  It came from home.  But the State took

2  the stand that they did, and Tiffany acknowledged

3  that, so --

4              MR. DAVIS:  Yep.

5              MALE SPEAKER:  -- I think -- I think

6  the City's done a good job.

7              MALE SPEAKER:  And to me, that's

8  another point of what the City's done good for you.

9              MR. DAVIS:  Yep.  I agree with -- I --

10  we're in no disagreement over that.

11              MALE SPEAKER:  Okay.

12              MR. DAVIS:  And I'm not sitting here

13  saying you guys are terrible, how could -- you know,

14  that's not what I'm saying by any means whatsoever.

15  To be honest, if I didn't care about -- if I didn't

16  care about working for the City of Powell, I didn't

17  care about the City of Powell, the citizens or the

18  people or any of that, it would have been a total

19  waste of my time to even deal with that.  I would

20  have taken the termination and walked away, because

21  I don't -- I don't -- you know, what's it matter?

22              To be honest with you, you know, I -- like

23  I said, I like the job, but I am employable.  Do I

24  know what I'm going to do?  No, I don't.  But I'm

25  employable somewhere else.  I'm not -- you know,

1    it's not like I can't work and do things again.  The
2    problem --
3                    MALE SPEAKER:  And we did, just so you
4    know, we did look at, you know, possible transfers
5    to something less, but we don't have anything open.
6                    MR. DAVIS:  Sure.
7                    MALE SPEAKER:  You know what I mean,
8    is something else that -- because -- because that's
9    always a possibility.  But we don't have that at
10   this -- we're full and --
11                   MR. DAVIS:  Yeah.
12                   MALE SPEAKER:  -- with general fund
13   always be an issue, you know, we just can't make --
14   create a new position, you know --
15                   MR. DAVIS:  Sure.
16                   MALE SPEAKER:  -- so --
17                   MR. DAVIS:  Sure.  Totally understood.
18   That -- like I said, that, I get.  And I'm not --
19   I'm not sitting here upset about any of the things
20   that have transpired before --
21                   MALE SPEAKER:  And I --
22                   MR. DAVIS:  -- today.
23                   MALE SPEAKER:  -- I get it.  You
24   don't -- you wish this wouldn't have happened
25   either.

1      MR. DAVIS: Correct.

2      MALE SPEAKER: I mean, you wish you

3 could come back, put that badge on, and go to work.

4      MR. DAVIS: Sure, you know.

5      MALE SPEAKER: We would like that,

6 too, at this point. But, you know, we're -- we're

7 hearing March and stuff, so that's why we had to

8 have this conversation and present this to you,

9 so --

10      MR. DAVIS: Uh-huh.

11      MALE SPEAKER: Another challenge we'll

12 find -- we'll face come March is going to be your

13 temporary peace officer certification.

14      MR. DAVIS: Sure. That, I understand

15 as well.

16      MALE SPEAKER: I was just getting

17 ready to look. And I know --

18      MR. DAVIS: Because March was when

19 it's -- it was sometime early or mid March was when

20 they had extended it.

21      MALE SPEAKER: Was that extended?

22      MR. DAVIS: Yep. It was extended. I

23 don't know when exactly, but I want to say -- was

24 that what it was, March sometime, so in there. So,

25 yeah, sure.

1    So, you know, ultimately the City's got to
2  do what the City's got to do.  So if that's
3  termination, that's termination.  I can't say, you
4  know, what my next recourse will be.  It could be
5  nothing.  I could just -- you know, it could be,
6  okay, thank you very much, I'll continue with
7  Workers' Comp.
8    I -- I don't -- I do think that, you know,
9  if the doctors come back to me in March and tell me,
10  hey, guess what?  You can't be a cop again.  Now
11  I've lost the opportunity for, you know -- sorry --
12  the Wyoming medical retirement, which, to me, still
13  sounds ridiculous, but it is what -- we're facing
14  this.  But, you know, I've lost that ability.  Then,
15  you know, my --
16    MALE SPEAKER:  My question is, do you
17  qualify for that being in Wyoming not that long?  I
18  mean, how long do you have to be invested?
19    MR. DAVIS:  One day.
20    MALE SPEAKER:  One day.
21    MR. DAVIS:  If I -- if I put on the
22  badge --
23    MALE SPEAKER:  Must be different from
24  City employees versus --
25    MS. BRANDO:  Yeah.

24

1            MR. DAVIS:  Because it's for peace

2    officers.

3            MS. BRANDO:  They said it wasn't

4    vested and they wouldn't qualify.

5            MR. DAVIS:  City -- City employees do

6    not qualify.

7            MS. BRANDO:  Oh, no.  I -- I was

8    asking about the law enforcement one.

9            MR. DAVIS:  Yep.  I -- I spoke with

10   the person that handles that.

11                (Inaudible crosstalk.)

12            MR. DAVIS:  Yep.  I spoke with --

13   yeah.  Actually, they initially told me no.  And I

14   explained to them, I said, so you're telling me that

15   if a law enforcement officer goes out on day one and

16   gets shot, there's no recourse?  So they went in and

17   then they gave me to the person that actually deals

18   with law enforcement medical retirement.  And she

19   submitted an e-mail to me the requirements along

20   with all necessary paperwork.

21        So I do in fact qualify.  There's no

22   vesting period.  Now, there is a vesting period if I

23   were to be injured and let's say I could do the job

24   but didn't want to.  If you're vested, you can --

25   there is options to take a lesser, you know,

```
 1   retirement.  But I -- that, I wouldn't qualify for.
 2                MS. BRANDO:  Uh-huh.
 3                MR. DAVIS:  And, again, all that to
 4   say in order to actually get qualification, my
 5   doctor and their doctor have to agree.  They have to
 6   say, yeah, we looked at this information and we
 7   agree.  So I'm not saying -- when I say I qualify, I
 8   mean just I -- I -- if those two things happened, I
 9   could obtain it regardless of vesting status.
10           So when I say qualify, I don't mean like I
11   can go today and get --
12                MS. BRANDO:  Right.
13                MR. DAVIS:  -- get a signature.  But
14   all that thing -- again, that all hinges on
15   employment, you know, with the department.
16           So -- but, again, like I said, if -- if,
17   you know, termination is the -- or a separation,
18   whatever we want to call it, is the route that the
19   City goes, I --
20                MALE SPEAKER:  I definitely like the
21   word separation better.  I hate --
22                MR. DAVIS:  Sure.
23                MALE SPEAKER:  -- using the word
24   terminate.  Again, this is not a disciplinary thing
25   at all, yeah.
```

1        MR. DAVIS:  Sure.

2        MALE SPEAKER:  So --

3        MR. DAVIS:  Sure.  I -- yeah.  And I'm

4   not making the argument that it's disciplinary.  If

5   it were disciplinary, it would have been done when I

6   was still working or for whatever it is.  I -- I

7   have not -- I'm ack- -- excuse me.  I acknowledge

8   that as a probationary employee, I can be let go.  I

9   even acknowledge that I can be let go while on

10  Workers' Comp.  My argument is -- is the previous

11  conversations with superior -- with superiors based

12  upon the timing makes it highly suspect that it is

13  in fact because I'm not working on Workers' Comp,

14  which is what is creating this situation today.

15        MALE SPEAKER:  This is the first I've

16  heard of that, so --

17        MS. BRANDO:  Yeah.

18        MALE SPEAKER:  -- I don't know.

19        MR. DAVIS:  As it is creates a

20  hardship for the City and the department.  So -- but

21  like I said, you know, I'm not -- you're not going

22  to have to drag me out of the office.  So if that's

23  the -- if that's the route that we're going today,

24  then so be it.  We'll take care of that and then I

25  will figure out what the department gear and

1   everything else and we'll go from there.  So --
2               MALE SPEAKER:  Yeah.  I guess talk to
3   chief and whatever we need to do there, so that's --
4   that's where we're going to go, so --
5               MR. DAVIS:  Sounds good.
6               MALE SPEAKER:  Okay.  Thanks for
7   coming in.  Sorry it had to come to this.
8               MR. DAVIS:  Okay.  What do you need
9   from me?
10              MALE SPEAKER:  Tiffany, does he need
11  to sign anything or documentation?
12              MS. BRANDO:  No.  I just have some
13  paperwork that you'll need to do for like Aflac, it
14  will have COBRA stuff on it, (inaudible) if you want
15  it.
16              MR. DAVIS:  Sure.
17              MS. BRANDO:  So this is just
18  information for you to take.  And the contact for
19  (inaudible) is down there.  And then this is
20  (inaudible) --
21              MR. DAVIS:  Oh, yeah, yeah.
22              MS. BRANDO:  -- information.  And then
23  just to make sure you contact Aflac to do your
24  direct bill with them.
25              MR. DAVIS:  Oh, got it.  Okay.  So

```
 1   there's no paperwork, no nothing?  No memorandum, no
 2   letter, no -- nothing that states I'm no longer
 3   employed --
 4                 MALE SPEAKER:  Well, we can do a
 5   memorandum --
 6                 MR. DAVIS:  -- with the City, though?
 7                 MALE SPEAKER:  -- and, yeah, put it
 8   in -- in the file, basically.
 9                 MS. BRANDO:  We can give you a copy of
10   it.
11                 MALE SPEAKER:  Yeah.  We'll give --
12                 MR. DAVIS:  Okay.
13                 MALE SPEAKER:  -- you a copy.
14                 MS. BRANDO:  Yeah.
15                 MALE SPEAKER:  Yep.
16                 MR. DAVIS:  All right.  I figured
17   there's got to be something.
18                 MS. BRANDO:  Yeah.
19                 MALE SPEAKER:  No, we will.
20                 MR. DAVIS:  Okay.  Well, we'll take
21   care of that.  Chief, however you guys want to set
22   up -- do you want me to bring it in or --
23                 MALE SPEAKER:  Do you want to wrangle
24   it all up and bring it in this afternoon?
25                 MR. DAVIS:  I can -- this aft- --
```

1    MALE SPEAKER:  What works?

2    MR. DAVIS:  Yeah.  Let me see what I

3 can do.  I got my -- I pick up my kids at noon.

4    MALE SPEAKER:  Or this morning or --

5    MR. DAVIS:  So let me -- yeah, let me

6 see what I can grab.  But I -- I don't have much.

7    MALE SPEAKER:  (Inaudible.)

8    MR. DAVIS:  Yeah.  I don't have much

9 anymore, because I just have, you know --

10    MALE SPEAKER:  Is your car still at

11 your house?

12    MR. DAVIS:  No.

13    MALE SPEAKER:  No.  Okay.

14    MR. DAVIS:  No.  I -- I don't know why

15 it was ever there.  I kept telling them.  Dave's,

16 like, well -- Lieutenant called me.  He's, like, oh,

17 well, I want to know if we can borrow your car.

18 I'm, like, Borrow my car?  It's your car.  Come get

19 it.  It's doing no good in my driveway, so let

20 somebody drive it.  So, no, that's not a problem.

21    I think my heavy vest was still in the car,

22 I'm almost positive.  So it should just be uniforms

23 and duty gear, service pistol, things like that.  So

24 that's at the house.  Flat badge is there.  I just

25 checked, because I had to get some paperwork.  I

1   checked.  I don't think I have anything that's of

2   personal value in the drawers except for the case

3   for the flat badge is in my office drawer.  So we'll

4   get that.  And then should be it.  So, yeah, let

5   me --

6                MALE SPEAKER:  Maybe on the way to

7   school.

8                MR. DAVIS:  Okay.  Yeah.  That should

9   be fine.

10                MALE SPEAKER:  11 or 11:30 or --

11                MR. DAVIS:  That should be fine.  I'll

12   bring it in.

13                MALE SPEAKER:  It's 9:30 now.

14                MR. DAVIS:  Yep.  Shouldn't be a

15   problem.  It's sitting in a -- it's just sitting

16   there, so I think that's it.  So, yeah, let me

17   gather that up and then we'll go from there.

18                MALE SPEAKER:  And do you want to

19   write the memo and then at some point, we can get

20   him a copy or do you want me to write the memo?

21                MS. BRANDO:  Uh-huh.  I do have --

22                     (End of audio-recorded file.)

23

24

25

C E R T I F I C A T E

1

2          I, SABRINA TREVATHAN, a Registered

3   Diplomate Reporter, do hereby certify that I

4   transcribed the audio-recorded proceedings contained

5   herein and that the foregoing 30 pages constitutes a

6   full, true, and correct transcript, to the best of

7   my ability.

8          I further certify that I am not related in

9   any manner to any party, witness, or counsel, and

10  have no financial or other interest in the outcome

11  of the above-entitled cause.

12          Dated this 25th day of September, 2024.

13

14                          _____

15                            SABRINA TREVATHAN
                            Registered Diplomate Reporter

16

17

18

19

20

21

22

23

24

25