# Exhibit R

Roy Eckherdt Deposition Excerpts

```
                                                              1

           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF WYOMING


RYAN DAVIS, an individual,) Case No.:  23-CV-230-S
                          )
          Plaintiff,      )
                          )
vs.                       )
                          )
THE CITY OF POWELL,       )
WYOMING, ET AL.,          )
                          )
          Defendants.     )
_____)




           DEPOSITION OF ROY S. ECKERDT

         TAKEN ON BEHALF OF THE PLAINTIFF

               AT POWELL, WYOMING

           OCTOBER 1, 2024 AT 3:03 P.M.




REPORTED BY:

JOAN F. MARSHALL, C.S.R.
Notary Public
```

1  come back to the basin.
2      Q.   And when you came back, it sounds like
3  you went from a chief of police in Nebraska, and
4  you came to Powell as a lower position, right?
5      A.   As a patrolman.
6      Q.   As a patrolman.  And then did you move
7  up -- how was your progression from patrolman?
8      A.   Tested for sergeant and was promoted to
9  sergeant within the first year of being here, and
10 then I was a sergeant until I was promoted to
11 chief.
12     Q.   In 2011?
13     A.   Correct.
14     Q.   As chief of police, so from 2011 until
15 2023, can you explain, at least summarize, your
16 involvement in the hiring and firing of police
17 officers on the force.
18     A.   Well, I established the process, our
19 hiring process.  My role within that process is I
20 don't have contact with the candidates until the
21 final phase of our hiring process, which is a
22 command staff interview.
23     Q.   Explain to me when and how you
24 established the process.
25     A.   Part of which -- the majority of which I

60

1   happened prior to that determination, the process
2   Officer Davis went through?  Do you know anything
3   about it?
4        A.    No.
5        Q.    What was the determination from the U.S.
6   Equal Employment Opportunity Commission?  We refer
7   to it as the EEOC, easier to refer to it that way.
8   What was their determination in Officer Davis's
9   case?
10            MR. THOMPSON:  Objection as to form.
11  BY MR. DANIEL WILKERSON:
12       Q.    Looking at the letter, what was their
13  determination?
14            MR. THOMPSON:  Same objection.
15  BY MR. DANIEL WILKERSON:
16       Q.    Go ahead and read the first two
17  paragraphs.
18       A.    "Under the authority vested in me by the
19  Commission, I issue the following documentation as
20  to the merits of the subject charge filed under the
21  Americans with Disability Act of 1990, as amended,
22  hereinafter ADA.  All requirements for coverage
23  have been met.
24            "Charging party alleges that respondent
25  failed to provide a reasonable accomodation for his

61

1  disability on or about January 7, 2022.  Charging
2  party also alleges respondent terminated him on or
3  about January 7th, 2022 based on his disability and
4  in retaliation for his accommodation requests."
5       Q.    Thank you.
6             When did you first see or hear about that
7  letter?
8       A.    I don't recall.
9       Q.    What was your reaction to it?
10      A.    I was not aware of a request ever being
11 made.
12      Q.    What kind of request?
13      A.    Accomodation.
14      Q.    An accomodation request from whom?
15      A.    From Ryan.
16      Q.    Is it your understanding that Ryan should
17 have made that request?
18            MR. THOMPSON:  Objection as to form,
19 calls for a legal conclusion, foundation.
20      A.    I'm not sure who would make the request
21 if Ryan did not.
22 BY MR. DANIEL WILKERSON:
23      Q.    Did Zack Thorington ever say, we as the
24 City need to make that request?
25      A.    No.

62

1    Q.   Did Zack Thorington ever say, we need to
2  engage in an interactive process?
3    A.   I don't recall the term "interactive
4  process" ever being used.
5    Q.   Did Zack Thorington ever tell you that it
6  was the City's duty to discuss accomodation?
7         MR. THOMPSON:  Objection as to form,
8  legal conclusion, foundation.
9    A.   No.
10 BY MR. DANIEL WILKERSON:
11   Q.   Okay.  We've covered this, but just to be
12 clear, your records from when you were police chief
13 regarding Ryan Davis's matter, everything is kept
14 digitally; is that right?
15   A.   With the exception of the correspondence
16 I received from you.
17   Q.   Everything here, though, at City Hall or
18 the police, the police department, would be
19 digital, not in a filing cabinet, correct?
20   A.   No.
21   Q.   Okay.
22   A.   The P file is -- the personnel file is
23 not digital.
24   Q.   Okay.
25   A.   That I'm aware of unless something has

70

1      I'd like to discuss again the time period
2  when Officer Davis was sick prior to the
3  January 7th meeting.  Prior to that meeting -- and
4  let me say this if I may.  You stated that the
5  final decision on his firing was Zack Thorington's,
6  correct?
7      A.   Correct.
8      Q.   Prior to that meeting, what meetings did
9  you have with Zack or Tiffany discussing what
10 decision might be made in that meeting?
11          MR. THOMPSON:  And to the extent that
12 counsel was present, I'd direct you not to answer.
13 BY MR. DANIEL WILKERSON:
14     Q.   Did you have any meetings where an
15 attorney was not present with them?
16     A.   Yes.
17     Q.   Please explain.
18     A.   Formal meetings, no, but there was
19 meetings to discuss any updates that we may have
20 had, the need for the doctor's note.
21     Q.   What do you mean when you say the need
22 for the doctor's note?
23     A.   We need something from the doctor
24 regarding his status.
25     Q.   So you discussed the doctor's note.  What

71

1  else did you discuss?
2      A.   The discussion was had regarding -- these
3  are not all at the same time.
4      Q.   Understood.
5      A.   FMLA.
6      Q.   What about the FMLA?
7      A.   Needing to get -- initially to get the
8  paperwork started.  Then later the discussion on
9  coming to the end of FMLA and the City needing to
10 make a decision on his status, his employment
11 status.
12     Q.   Why did the City need to make a decision
13 on his employment status?
14     A.   A decision needed to be made on how long
15 this could go on.
16     Q.   Was city budget discussed at all?
17     A.   I don't recall specifically.
18     Q.   Were your staffing needs for officers
19 discussed at all?
20     A.   Yes.
21     Q.   Anything else discussed?
22     A.   The extension for his temporary
23 certification and then trying to identify a date to
24 get him into the academy, and that was more just me
25 letting them know what we had done.

72

1   Q.   What do you refer to when you say his
2   extension and trying to get him into the academy?
3   Please explain.
4   A.   Temporary peace officer certification is
5   good for 12 months.  In that 12 months, they need
6   to attend the Wyoming Law Enforcement Academy.  His
7   temporary certification was going to expire prior
8   to -- he was scheduled to attend the academy in the
9   fall, and that obviously could not occur, so we got
10  him into the next class and got an extension on his
11  temporary certification to encompass that next
12  class.
13  Q.   So his certification was extended to be
14  able to make that next class?
15  A.   Correct.
16  Q.   Who in your department filed for that
17  extension?
18  A.   That was Lieutenant McCaslin.
19  Q.   So you said informal discussions multiple
20  times prior to January 7th.  You and/or Zack
21  Thorington and/or Tiffany Brando discussed Officer
22  Davis's doctor's note, the FMLA, his status and
23  longevity, your staffing needs with officers, the
24  extension of his temporary status and when he would
25  go to the academy.  Anything else you discussed?

73

1    A.    I believe that's all.
2    Q.    Did Zack Thorington ever bring up the
3  American with Disabilities Act?
4    A.    I don't recall.
5    Q.    Did Tiffany Brando?
6    A.    I don't recall.
7    Q.    Did you?
8    A.    I don't believe so.
9    Q.    Did you ever think to bring it up?
10   A.    I'd say not by specific name.
11   Q.    Okay.  What I will provide you now
12 Mr. Thompson has marked confidential pursuant to
13 protective order, so this will be his first file,
14 Mr. Thompson, that's protected, if you want to look
15 at that briefly.
16         Would you please mark this as the next
17 exhibit.  And this was provided to us through Tom.
18 I want it to be the next exhibit.  It doesn't say
19 confidential, Tom, but it appears to be from his
20 employee file.
21         MR. THOMPSON:  Okay.
22         MR. DANIEL WILKERSON:  So we are happy to
23 stipulate that that needs to be confidential.
24         MR. THOMPSON:  I didn't produce this
25 because there's no Bates stamp on it.