# Exhibit S

Dr. Kelly Christensen Deposition Excerpts

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

```
RYAN DAVIS, an individual,) Case No.:  23-CV-230-S
                           )
            Plaintiff,     )
                           )
vs.                        )
                           )
THE CITY OF POWELL,        )
WYOMING, ET AL.,           )
                           )
            Defendants.    )
_____)
```

ZOOM DEPOSITION OF KELLY E. CHRISTENSEN, M.D.

TAKEN ON BEHALF OF THE DEFENDANTS

JANUARY 7, 2025 AT 8:23 A.M.

REPORTED BY:

JOAN F. MARSHALL, C.S.R.
Notary Public

```
 1      Q.   All right.  Doctor, have you done
 2   anything in preparation for your deposition this
 3   morning?
 4      A.   I just reviewed my visits and -- visits
 5   that are in our medical record, briefly.
 6      Q.   And have you talked to anyone in
 7   preparation for your deposition this morning?
 8      A.   Sara Welling prepared me to come over
 9   here and get set up for this, but that's it.
10      Q.   And Sara is your office assistant?
11      A.   Essentially, yeah.  She would like a
12   different title than that, but. . .
13      Q.   Doctor, can you tell me a little bit
14   about your practice as it exists today.
15      A.   So I'm a family practice doctor.  I
16   mostly do clinic work.  I take care of babies in
17   the hospital.  I need to go do two circumcisions
18   when we finish here.  I see patients for all kinds
19   of different illnesses, though, adults and
20   children.
21      Q.   And when you talk about clinic time or
22   clinic work, is that through Powell Valley
23   Healthcare Clinic?
24      A.   Yes.
25      Q.   And can you tell me what Powell Valley
```

8

1  Healthcare Clinic is, what it consists of.  Is it a
2  number of different doctors with different
3  specialties?  Could you explain that?
4      A.   Yeah.  It's the hospital in Powell, the
5  hospital system in Powell.  It's tech supported.
6  The hospital employs physicians as well as I think
7  400-some employees.  So we have a nursing home, a
8  hospital, an ICU.  We deliver babies, we do
9  surgery, have an emergency room and then have
10 outpatient clinics as well with surgeons and
11 orthopedic surgeons and oncology, internal
12 medicine, family practice, have a radiology
13 department, x-ray, labs, the whole thing.  It's a
14 full-service hospital.
15     Q.   And is part of your practice with Powell
16 Valley Healthcare Clinic, is it standard practice
17 to rely upon other doctors' medical notes when
18 treating a patient?
19     A.   Absolutely.  I'm a family practice doc,
20 so I'm kind of the gatekeeper.  So I do some
21 things, and then I refer patients out to other
22 doctors to do more specialized things sometimes.
23     Q.   Okay.  Very good.
24          Doctor, I just want to talk a little bit
25 now about your professional qualifications.  I

37

1    A.   I don't know if she was able -- she was
2  not able to locate something there.  I have a
3  long-haul COVID work release in the chart -- oh,
4  that's the note.  Okay.  And then there is a note
5  Workers' -- Wyoming Workers' Compensation Division.
6  There's a note standing in the chart from 3/24 that
7  I signed saying he can go back to full duty.
8  BY MR. THOMPSON:
9    Q.   Okay.  Doctor, would it be possible at
10 the conclusion of the deposition to have your
11 office send that to us?
12        MS. WELLING:  I will work with our
13 medical records.
14        MR. THOMPSON:  Okay.
15        MS. WELLING:  That's where that release
16 would need to come through.
17 BY MR. THOMPSON:
18   Q.   Okay.  And you have a release from the
19 patient, so if you need that again, please let us
20 know.  But I'm going to go ahead and mark that
21 release that you're referring to as Deposition
22 Exhibit Number 5.
23        And so as I understand your reference to
24 that note, Doctor, as of March 24th, 2021, you had
25 really -- or 2022, I'm sorry, you had released

39

1    about him going back to school?
2        A.    No.
3        Q.    Under the physical exam for his heart,
4    it's all normal, correct?
5        A.    Correct.
6        Q.    And as far as the plan for Mr. Davis, he
7    was to follow up with his cardiologist in another
8    six months, correct?
9        A.    Correct.
10       Q.    Do you see anything in the chart notes
11   from Dr. Kelly where he released Mr. Davis to
12   return to work as of June 16, 2022?
13       A.    I don't think he released him to go back
14   to work because I had already done that.
15       Q.    Okay.  Is that just your assumption?  I
16   mean you didn't have any conversation with
17   Dr. Kelly, correct?
18       A.    Right, but I mean once I released him to
19   go back to work, I have as much of a medical
20   license as he does.  He didn't need to release him
21   to go back to work.
22       Q.    And that occurred in March of '22?
23       A.    Yes.
24       Q.    Which again, we've covered that was less
25   than six months from the initial diagnosis of

40

1  COVID?
2      A.   Correct.
3      Q.   Correct.  Doctor, I have one last
4  question, and then Mr. Wilkerson will have the
5  ability to ask some questions.
6           Are the opinions that you've provided
7  today by way of your medical -- by way of your
8  testimony as well as your medical records, are they
9  given to a reasonable degree of medical
10 probability?
11     A.   Yes.
12          MR. THOMPSON:  All right.  Can we take a
13 short break, about three minutes, and then we can
14 come back on the record?  Good with that, Dan?
15          MR. WILKERSON:  Sounds great, Tom.
16          MR. THOMPSON:  Thank you.
17          (Whereupon, a recess was taken at 9:21
18 and subsequently reconvened at 9:25.)
19          MR. WILKERSON:  Tom, are you okay if I go
20 ahead?
21          MR. THOMPSON:  Yes, I am.  Thank you.
22                    EXAMINATION
23 QUESTIONS BY MR. WILKERSON:
24     Q.   Dr. Christensen, my name is Dan
25 Wilkerson.  Good to be with you today.  We will

41

1  continue your deposition.  Do you have any
2  questions for me before we begin?
3      A.    No.
4      Q.    And you understand you're still under
5  oath, Doctor?
6      A.    Yes.
7      Q.    Thank you again for your time.  I will,
8  instead of going through a long list of questions
9  and repeating a lot of what Mr. Thompson has gone
10 through with you, I'll try to just narrow it on
11 some areas and keep this as brief as possible.
12 Certainly, I might have you repeat things, Doctor,
13 but we'll try to be as efficient as possible.
14          Can you please refer to your notes again
15 for the October 5th of 2021 visit.
16     A.    October 5th.  I don't believe I saw him
17 on October 5th, did I?  The emergency room note?
18     Q.    Doctor, I might have that date wrong.
19 When was your -- oh, excuse me, your October 19th
20 of 2021 visit.  That was my mistake.
21     A.    All right. I'm good.
22     Q.    On October 19th of 2021 was your first of
23 three visits with Officer Davis; is that right?
24     A.    Correct.
25     Q.    And in general, why did he see you that

44

1   wanting to get back on the testosterone.  Yeah, so
2   that's when we reviewed that and decided he's far
3   enough out from the COVID that his risk of a blood
4   clot was low, so we worked on getting him back on
5   the testosterone.
6       Q.   Let me ask again, and this might be
7   repeat.  Why wasn't Officer Davis released to go
8   back to work in January of 2022?
9       A.   I think he was still too symptomatic to
10  go back to work at that point.  Again, largely I
11  think that depends on how the patient is feeling,
12  and he wasn't asking about it, and I must have felt
13  that --
14      Q.   You said in your testimony to
15  Mr. Thompson that he wanted to go back to work, but
16  it was more than just that, correct?  It mattered
17  how he was feeling, too?
18           MR. THOMPSON:  I don't believe the doctor
19  had finished his answer when you asked the
20  question, so. . .
21      A.   I don't remember what I was saying.
22  BY MR. WILKERSON:
23      Q.   Go ahead.  Well, let me refresh what we
24  were talking about.  We were talking about why he
25  wasn't released, Officer Davis wasn't released to

45

1  go back to work in January of '22.
2      A.   Yeah.  I don't think that we actually
3  addressed going back to work at that time in that
4  visit.  I think generally he was still not doing
5  great, and so while he was improved, we, I would
6  assume, did not feel like we were at the point
7  where we were ready to address him going back to
8  work yet.  He still had quite a bit of fatigue,
9  yeah.
10     Q.   Doctor, I don't have any further
11 questions.  Tom, I don't believe I have more
12 questions.
13              FURTHER EXAMINATION
14 QUESTIONS BY MR. THOMPSON:
15     Q.   Yeah, I just have one follow-up question
16 in regards to his return to work.  Doctor, is it
17 fair to say that as of January 11th, 2022, your
18 chart note -- well, you intended to see him back in
19 March of 2022; is that correct?
20     A.   Well, I referred to it that he was going
21 to follow up with cardiology in March.  I did not
22 tell him when to come back for a particular day or
23 a month for a follow-up appointment.
24     Q.   So would it be fair --
25     A.   I frequently do that.  I don't tell

46

1  people, I need to see you back in a month, like
2  some doctors do.  I'm more like I'm seeing you when
3  you need to see me, but I knew he would follow up
4  with cardiology.
5     Q.   Very good.  So is it fair to say as of
6  January 11th, 2022, there was no expectation that
7  he was going to see you in March?
8     A.   Correct.
9     Q.   And there was no plan by you as of
10 January 11th, 2022 that he was going to be released
11 to return to work at a date specific?
12    A.   Not at a date specific.
13    Q.   And it would have been symptom based
14 based upon the subjective reporting of Mr. Davis?
15    A.   Correct.
16    Q.   Okay.  Doctor.  I don't believe I have
17 any further questions for you.  That concludes your
18 deposition.  You have the right to read and sign,
19 or you may waive.  That is entirely up to you.
20    A.   I'm happy.
21    Q.   We have a good court reporter, so I'm
22 sure if she has any questions, she can get ahold of
23 Sara or you as far as spellings.  Joan, we're off
24 the record.
25         (Whereupon, discussion was held off the