UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | |
|---|---|
| Plaintiff, | ) |
| | ) |
| RYAN DAVIS, an individual, | ) |
| | ) |
| v. | ) Case No. 23-CV-230-S |
| | ) |
| Defendant, | ) |
| | ) |
| THE CITY OF POWELL, WYOMING | |

---

# PLAINTIFF'S MEMORANDUM IN OPPOSITION OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, Officer Davis, respectfully submits this Memorandum in Opposition to Defendant's Motion for Summary Judgment.

## MATERIAL FACTS

### A. Application and Hiring Process with the City Powell

1. After an extensive interview process, Officer Davis was offered employment by the City of Powell, Wyoming as a police officer, "Police Officer 1." (ECF No. 34 at 4, ¶ 16).

2. Officer Davis received an offer letter stating his position, his start date, and his pay. Notably, this "Final Offer of Employment" states nothing about a probationary offer (Exhibit A, Final Offer of Employment).

3. Officer Davis received a probationary process and review process wherein he was told he would be guaranteed employment with satisfactory marks. (ECF No. 34 at 20, ¶ 49).

4. Officer Davis took a significant pay reduction from his current job in California in reliance on the job offer from the City of Powell, he sold his home in California, and moved his whole family, including his parents, to Powell Wyoming to live the rest of his life there, or so he thought. (ECF No. 34 at 4-5, ¶¶ 15-16).

**B. Medical Diagnosis and Disability**

5. Officer Davis contracted Long COVID and Tachycardia in the Fall of 2021 and was hospitalized in October of 2021. (ECF No. 34 at 5, ¶19). He was not cleared to go to work from October 2021 to March 2022. *Id.*

6. Dr. Kelly Christensen, M.D., treated Ryan on three different occasions, October 19, 2021; January 11, 2022; and March 24, 2022. (Exhibit B, Deposition of Dr. Kelly E. Christensen, p. 24, Line 17, and p. 41, Lines 22-25). Dr. Christensen states Officer Davis was hospitalized for COVID, weakness, fatigue, being hypoxic, and having Tachycardia. *Id.,* p. 42, Lines 6-8. Dr. Christensen notes that Officer Davis was on a high dose of the medication Metoprolol, which is a beta blocker, in order to block the effects of adrenaline on the heart and slow the heart rate due to Officer Davis's diagnosis of Tachycardia. *Id.* at p. 25. Dr. Christensen was also adjusting medication and treatment due to Officer Davis's COVID. *Id.* Dr. Christensen states that Officer Davis was on work leave because of his illness, and Dr. Christensen remembers Officer Davis saying he wanted to go back to work. *Id.* at p. 34, Lines 5-9. In January of 2022, when Dr. Christensen met with Officer Davis, he did not release him to go to work because was "still too symptomatic to go back to work" and Officer Davis still had quite a bit of fatigue. *Id.* at p. 43, line 25 and p. 44, lines 9-11. Dr. Christensen made it clear that Officer Davis's COVID was not completely resolved, or might ever be resolved, when he was released to return to work in March of 2022. *Id.,* Lines 11-20.

7. Dr. Brian D. Kelly, D.O., Cardiologist, treated Officer Davis at least six times for medical visits between November of 2021 and June of 2022 (Exhibit C, Transcript of Brian D. Kelly). On December 9, 2021, Dr. Kelly diagnosed Officer Davis with COVID and Long COVID. (Exhibit C, Deposition of Brian D. Kelly, at p. 24, lines 22-25). This required oxygen use by Officer Davis and pulmonary rehabilitation. *Id.* at p. 25, lines 1-8.

**B. Notice of Impairment or Disability**

8. The following are examples on the record of The City of Powell knowing that Officer Davis had a sickness, or impairment, or disability, or condition that affected one or more of his major life activities:

(a) Police Chief Eckerdt stated that he knew Officer Davis was absent from work due to COVID, and the Chief knew this before Officer Davis was fired. (Exhibit D, Deposition of Roy S. Eckerdt, p. 30 lines 1-2).

(b) Police Chief Eckerdt stated that when Officer Davis would come into the office in the Fall of 2021 that he would be "dragging" an oxygen tank with him because Officer Davis was unable to get enough air. *Id.* at p. 29, line 18-21.

(c) Police Chief Eckerdt stated that he saw Officer Davis's "doctor notes," and Chief Eckerdt confirmed that those notes would have been given to Tiffany Brando, HR Manager, at City Hall. *Id.* at p. 43, line 14-35.

(d) Tiffany Brando, HR Manager, stated that she knew Officer Davis was ill and that he was not able to come into work, in fact, she initiated him filling out long-term disability paperwork. (Exhibit E, Deposition of Tiffany Brando, at p. 43, lines 6-23).

(e) Lieutenant Matt J. McCaslin stated that he knew Officer Davis was sick from his first hospitalization and because Workers' Compensation documents came across his desk,

and Lieutenant McCaslin believes he received most of the Workers' Compensation paperwork and forwarded it to City Hall. (Exhibit F, Deposition of Lieutenant Matt J. McCaslin, at p. 23, lines 17-25, and at p. 24, lines 1-21).

(f) City Manager Zachary Thorington stated that he learned Officer Davis was sick and had COVID. (Exhibit G, Deposition of Zachary Thorington, at p. 26, line 11-16).

(g) Officer Ryan Davis states that he gave every medical document he received to Lieutenant Matt McCaslin as was the order he was told to follow. (Exhibit H, Deposition of Ryan S. Davis, at p. 104, line 25, and p. 105, lines 1-14).

(h) Additionally, not only was the City notified of the disability, Officer Davis requested light duty while he was recovering. (ECF No. 34, at p. 5, ¶ 18).

**C. Termination of Employment**

9. Human Resource Manager Tiffany Brando stated prior to Officer Davis being terminated at the January 7, 2022 meeting, there was no discussion concerning Officer Davis's rights under the ADA, nor was there any discussion concerning the City's need to engage in interactive discussions with Officer Davis concerning reasonable accommodations. (Exhibit E, Deposition of Tiffany Brando, at p. 55, line 5-22, and p. 57, lines 1-20).

10. City Manager Zach Thorington, whose decision it was to terminate Officer Davis, never engaged anyone, including Officer Davis, in discussions concerning Officer Davis's rights under the ADA or the need for the City to engage in interactive discussions concerning reasonable accommodations. (Exhibit G, Deposition of Zachary Thorington, at p. 9, lines 3-11); (Exhibit E, Deposition of Tiffany Brando, at p. 55, lines 1-25, and p. 56, lines 1-25, and p. 57, lines 1-20).

**I.     LEGAL STANDARD**

The Court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court views the record and inferences in the light most favorable to the party opposing summary judgment. *Dahl v. Charles F. Dahl, MD., P.C. Defined Ben. Pension Trust,* 744 F.3d 623, 628 (10th Cir. 2014).

**II.    ARGUMENTS**

  **A.     American with Disabilities Act (ADA)**

Under the ADA, a person has a disability if they have a physical impairment that substantially limits one or more major life activities, or if there is record of such impairment, or if they are regarded as having such impairment. U.S.C. Section § 12102(1). The types of major life activities included in the law are expansive, but include performing manual tasks, walking, standing, lifting, and breathing. U.S.C. Section § 12102(2)(A).

Officer Ryan Davis has stated that his disability, or condition that affects major life activities, includes the symptoms that led to his Long COVID, Pneumonia, and Tachycardia diagnoses. (ECF No. 34 at 17, ¶ 33). These diagnoses, and Officer Davis's physical condition relate to what he was suffering with and rendered him disabled within the framework of the ADA. For example, one of the major life activities that was substantially limited is his breathing.

Addressing Defendant's argument concerning Wyoming Workers' Compensation, Officer Davis is not arguing that Wyoming Workers' Compensation law defines what a disability is under the ADA. Rather, there are symptoms associated with having an "injury" under the Workers' Compensation law that also can rise to the level of a disability under the ADA. The

determination of Wyoming was not proof of a violation of the ADA, rather, evidence of what was happening with Officer Davis's health.

**Transitory and Minor**

"A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B). Nothing in the Court record shows that Long COVID, nor what Officer Davis was actually experiencing, only lasts 6 months or less. The exact opposite is true. Doctor Christensen stated that Officer Davis was not at 100% health when he was cleared for work and that he may never fully recover from the effects of Long COVID. Defendant has provided no proof that the medical community accepts Long COVID, and its effects, to have a normal duration of less than six months.

> Furthermore,
>
> Recent regulatory guidance suggests that, in some circumstances, COVID-19 may be considered a disability under the ADA. See Matias, 2021 WL 4206759, at *4. For example, the Department of Health and Human Services and Department of Justice jointly developed the Guidance on "Long COVID" as a Disability Under the ADA, Section 504 and Section 1557, DEP'T OF HEALTH & HUM. SERVS. & DEP'T OF JUSTICE (July 26, 2021), https://www.ada.gov/long_covid_joint_guidance.pdf ("ADA Guidance"). The ADA Guidance notes that COVID-19 may be a "physical or mental impairment under the ADA." Id. at 3. The guidance further notes that certain forms of COVID-19 can "substantially limit major life activity" as required to be considered a disability under the ADA. Id. at 4. Examples include, but are not limited to, limited "respiratory function, among other major life activities." Id.
>
> The Equal Employment Opportunity Commission ("EEOC") also recently released guidance about when COVID-19 can constitute a disability under the ADA. See What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, U.S. EQUAL EMP. OPPORTUNITY COMM'N (Dec. 14, 2021), https://www.eeoc.gov/wysk/whatyou-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws ("EEOC Guidance"). The EEOC Guidance notes that COVID-19 may be a disability, but it is not always a disability. Id. at N.3. Whether COVID-19 is an actual disability under the ADA requires a "case-by-case determination." Id. at N.2. Further, according to the EEOC, an individual who is asymptomatic or who has mild symptoms will not have a

> disability within the meaning of the ADA. Id. However "a person with COVID-19 has an actual disability if the person's medical condition...substantially limits one or more major life activities." Id. (alterations omitted). *5
>
> While not binding on the Court, "this guidance is helpful in deciding the issue of whether COVID-19 can be a disability; and it guides that COVID-19 can be a disability, so long as the condition is sufficiently severe to impair major life activities." Brown v. Roanoke Rehab. & Healthcare Ctr., 21-cv-00590-RAH, 2022 WL 532936, at *3 (M.D. Ala. Feb. 22, 2022) (analyzing an ADA COVID-19 disability claim based on regulatory guidance). However, the common theme in this regulatory guidance is that COVID-19 may be a disability when it is long-term—lasting for months—not when it is acute. See ADA Guidance, at 1; EEOC Guidance, at N.4. The ADA Guidance refers to individuals with "Long COVID," who experience symptoms "months after first being infected, or may have new or recurring symptoms at a later time." ADA Guidance, at 1. The EEOC Guidance also refers to individuals who experience symptoms lasting for months. EEOC Guidance, at N.4.

*Baum v. Dunmire Property Management,* WL 889097 (D. Colo 2022).

**Otherwise Qualified and Reasonable Accommodations**

Officer Davis requested light duty while he was recovering. (ECF No. 34, at pg. 5, ¶ 18). Officer Davis was never offered light duties, "extra duties," which he could have performed, and probably was otherwise qualified for, while he was recovering from Long COVID because the City of Powell never offered him anything, not even a chance to discuss. (ECF No. 34 at p. 17-18, ¶ 33). Other officers were injured or medically not able to return to all duties while working for Powell Police Department and were given desk duties, "extra duties," which are lighter duties to accommodate them as they recovered. *Id.* For example, Officer Matt Koritnik and Sargeant Matthew Brilakis, Officers with the Powell Police Department, were given light duty, "extra duties," while they were injured, ill, on sick leave, or not able to perform all the duties of field officers. (Exhibit F, Deposition of Lieutenant Matt J. McCaslin, at p. 27, lines 9-25, and p. 28 1-25, and p. 29, lines 1-25.) "Extra Duties," at the City of Powell Police Department, include administrative duties, evidence duties, and certain training functions—which duties Officer

Davis could have possibly performed if he was given the chance since he wanted to get back to work. *Id.* at p. 30, lines 9-14.

Regardless of the fact that other officers were given light duty, or "extra duty" accommodations when injured or sick, the City of Powell had an affirmative duty to engage in discussions with Officer Davis concerning reasonable accommodation. This never happened.

In *Hampton v. Utah Department of Corrections,* 87 F.4th 1183 (10th Cir. 2023), the Court emphasized the following concerning essential job functions, reasonable accommodations, and the interactive process:

(1) While the employer's judgment regarding essential functions is entitled to weight, applying an automatic exemption to any accommodation request which may be inconsistent with an employer's neutral rules would defeat the ADA's intended objectives. *Id.* at 1194.

(2) The ADA has provided specific examples of reasonable accommodations, which include job restructuring, part-time or modified work schedules, and acquisition or modification of equipment or devices. *Id.* As a result, a plaintiff is entitled to ask a jury if the employer failed to provide him with a reasonable accommodation. *Id* at 1196.

(3) From the Court:

> In applying these factors, we must decide how to determine whether a job function is essential. We've sometimes regarded this inquiry as mixed, containing both a legal and factual component. See Mason v. Avaya Commc'ns, Inc., 357 F.3d 1114, 1122 (10th Cir. 2004) ("The question of whether an employee can perform the essential functions of her job is a mixed question of law and fact."). Other times, we've said that the inquiry is factual. See Davidson v. Am. Online, Inc., 337 F.3d 1179, 1191 (10th Cir. 2003) ("Determining whether a particular function is essential is a factual inquiry."). But even when we've described the inquiry as mixed, we've acknowledged that the inquiry is primarily factual. Rascon v. US W. Commc'ns, Inc., 143 F.3d 1324, 1333 (10th Cir. 1998), overruling recognized on other grounds, Herrmann v. Salt Lake City Corp., 21 F.4th 666, 677 (10th Cir. 2021); accord Tuck v. HCA Health Servs. of Tenn., 7 F.3d 465, 471 (6th Cir. 1993) (stating that issues involving the essential functions

> of a job "are primarily factual issues"). So even if we regard the inquiry as mixed, the determination of the job's essential functions would primarily involve facts rather than law. Given the factual nature of the inquiry, disagreements over a job's essential functions are typically not suitable for summary judgment. Rorrer v. City of Stow, 743 F.3d 1025, 1039 (6th Cir. 2014).

*Id.* at 1205.

(4) Engaging in the interactive process is an affirmative obligation to undertake a good faith back-and-forth process between the employer and the employee, with the goal of identifying the employee's precise limitations and attempting to find a reasonable accommodation for those limitations. *Id.* at Footnote 18.

From another 10th Circuit Case: There is a duty and obligation to make an effort to discover exactly what an employee's limitations are or to explore whether any accommodations are available. *Dansie v. Union Pacific Railroad,* 42 F.4th 1184 (10th Cir. 2022).

The City of Powell was required to engage in the interactive process with Officer Davis. It did nothing.  The City of Powell cannot stand on the footing that disregarding a reasonable accommodation offering for Officer Davis outright because it appeared unreasonable or contrary to an internal policy, practice, or rule. The interactive process would have provided the City of Powell an opportunity to gain information about the nature of the Officer Davis's disability and the limitations which may impact his ability to perform and what essential functions he could perform. There was no assessment. How could the City conclude an undue hardship without a process? The City of Powell failed its obligation to make an effort to discover exactly what Officer Davis's limitations were or to explore whether any accommodations were available. The City of Powell did not develop and document reasons that it decided as it did with Officer Davis after an interactive process. There was no effort to even attempt to work with Officer Davis to accommodate him.

Just because an employer has a rule that others without a disability must obey, that cannot in itself show that an accommodation is not reasonable. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 398, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002). To conclude otherwise, would prevent Congress's disability legislation from "accomplish[ing] its intended objective." *Id*. at 397, 122 S.Ct. 1516. After all, most employers "will have neutral rules governing the kinds of actions most needed to reasonably accommodate a worker with a disability." Id. at 398, 122 S.Ct. 1516. For example, in this case, if the City of Powell Wyoming has a rule that there is no light duty work, which rule it also applies to those with a disability, that is not reasonable and diminishes the intended objection of the ADA.

### B. Other Claims

#### 1. **Breach of Contract**

Wyoming recognizes at-will employment, but that can be overcome by an implied-in-fact contract. *Worley v. Wyoming Bottling Company, Inc., 1 P.3d at 620.* "When parties act in a manner conveying mutual agreement and an intent to promise, an implied-in-contract may arise." *Id.* To determine if an implied employment contract exists, courts look to outward manifestations of an employer's assent sufficient to create reliance by the other party. *McDonald v. Mobil Coal Producing Inc.,* 820 P.2d 986 9 (Wyo. 1991). For example, policies, letters, performance evaluations, and an employer's course of dealing my provide terms for an implied-in-fact employment contract. *Worley,* 1 P.3d at 621. Additionally, whether an implied contract exists in employment is normally a question of fact for the jury. *Aglemyer v. Hamilton County Hospital,* 58 F.3d at 537.

Here, on the record, are manifestations from the City of Powell Wyoming showing that they were going to continue Officer Davis's employment. The City of Powell keeps stating that

Officer Davis was on paper a probationary employee, but it did not act that way when he was employed. Officer Davis was never treated like a probationary employee. Officer Davis received a review process wherein he was told he would be guaranteed employment with satisfactory marks. (ECF No. 24 at 20, ¶ 49). There were no issues with Officer Davis and his supervisors were comfortable putting him in the field. (Exhibit F, Deposition of Matt J. McCaslin, at p. 22, lines 12-15). It is reasonable for Officer Davis to claim that he felt pretty sure of continued employment, and that based on the conduct of the City of Powell he had no doubt he would continue but for him being wrongly terminated.

1. **Procedural Due Process Claim**

First, Officer Davis was not given the opportunity to answer in writing the statement of the Police Chief as to the cause for his discharge under the minimum process outlined in Wyoming's Civil Service Statute, Wyo. Stat. Ann section 15-5-112(c)(ii).

Second, and more importantly, Officer Davis was provided no pre-termination process and no opportunity to be heard at all. (ECF no. 34, at p. 5-6, ¶20). Officer Davis was called to a meeting on January 7, 2022, and terminated without being given a reasonable explanation. *Id.* at 20. He was simply told that his illness was a hardship to the department and that he was a financial hardship to the budget. *Id.* He was not given notice, nor given the opportunity to be heard, nor given the opportunity to participate in any meaningful discussions about his termination. He was not afforded the opportunity to be represented by counsel nor given a later post-termination process.

2. **Promissory Estoppel**

Promissory estoppel has been adopted in Wyoming to protect "employees who in good faith detrimentally rely upon an employer's action, in turn binding the employer to fulfill a

promise to an employee despite that lack of an employment contract." *Worley,* 1 P.3d at 623. The elements of a promissory estoppel claim are the existence of an agreement, proof the employee acted in reliance, and equity supports enforcement of the agreement. *Id.*

Officer Davis took a significant pay reduction from his current job in California in reliance on the job offer from the City of Powell, he sold his home in California, and moved his whole family, including his parents, to Powell Wyoming to live the rest of his life there, or so he thought. (ECF No. 34 at 4-5, ¶¶ 15-16). He relied on the City of Powell's promises, received good reviews, and had no reason to believe he should not be employed. But for his wrongful termination, he would not have suffered the damages he has suffered.

**CONCLUSION**

Officer Davis has offered sufficient facts to support his ADA claims. He has alleged sufficiently facts for his due process claim. His breach of contract and promissory estoppel claims are also supported. For the foregoing reasons, Plaintiff, Officer Davis, respectfully requests that the Court deny all parts of Defendant's Motion for Summary Judgment.

DATED March 11, 2025

/s/ Daniel B. Wilkerson
Daniel B. Wilkerson, Bar No. 7-6415

**CERTIFICATE OF SERVICE**

I hereby certify that I have electronically filed the foregoing with the Clerk of Court and the foregoing was served on March 11, 2025 the by following means:

| | |
|---|---|
| Thomas A. Thompson<br>Wyoming Local Government Liability Pool<br>tthompson@lglp.net | [X] EMAIL<br><br>/s/ Jennifer M. Hieb_____<br>Jennifer M. Hieb, Paralegal<br>Wilkerson Law Group |