# Exhibit F

Matt J. McCaslin
Deposition Excerpts

```
                                                              1

 1              IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF WYOMING
 2

 3     RYAN DAVIS, an individual,) Case No.:  23-CV-230-S
                                  )
 4               Plaintiff,       )
                                  )
 5     vs.                        )
                                  )
 6     THE CITY OF POWELL,        )
       WYOMING, ET AL.,           )
 7                                )
                  Defendants.     )
 8     _____)

 9

10

11

12

13            DEPOSITION OF MATT J. McCASLIN

14            TAKEN ON BEHALF OF THE PLAINTIFF

15                 AT POWELL, WYOMING

16            OCTOBER 2, 2024 AT 1:34 P.M.

17

18

19

20

21

22     REPORTED BY:

23     JOAN F. MARSHALL, C.S.R.
       Notary Public
24

25

              Two Sisters Reporting Service
                    (307) 438-1629
```

```
                                                              22
 1   other agencies, his coworkers.  These are the
 2   observations that I remember.
 3        Q.    It's my understanding the initial FTO
 4   period lasts 14 weeks.  Does that sound right?
 5        A.    Yes, sir.
 6        Q.    At 14 weeks, did you have any issue
 7   putting him out on his own?
 8        A.    No, sir.
 9        Q.    Then from 14 weeks through his six-month
10   review and then up until the time he got sick, what
11   would your same analysis or summary of him be?
12        A.    Much the same.  I don't recall working
13   with him in the field very much, but seemed to be
14   very good with most people.  Coworkers, myself
15   included, didn't have any real issues with him.
16        Q.    Okay.  So no real issues --
17        A.    No, sir.
18        Q.    -- we could talk about?
19              Tell me -- I want to ask you now about
20   when he was sick and in the hospital and some
21   questions there.  Please feel free and let me know
22   if I can clarify some questioning.
23              The first question to start is, who in
24   the police department gathers information on
25   workers' comp, FMLA, disability type things?  Who
```

```
                                                    23
 1   in the department would gather that paperwork?
 2            MR. THOMPSON:  Objection as to form and
 3   foundation.
 4        A.   Can you restate that question?
 5   BY MR. DANIEL WILKERSON:
 6        Q.   Yeah, let me be very specific.  If a
 7   police officer is applying for workers'
 8   compensation, who would the police officer give the
 9   filled out paperwork to?
10        A.   Give it to the supervisor or to City
11   Hall.
12        Q.   So they would give it to their direct
13   supervisor --
14        A.   Correct.
15        Q.   -- or to City Hall?
16        A.   (Deponent nodded.)
17        Q.   Do you know in Officer Davis's case who
18   received the workers' compensation paperwork?
19        A.   I believe I received most of it.
20        Q.   It came across your desk?
21        A.   Correct.
22        Q.   And then did you forward it to City Hall?
23        A.   Yes.
24        Q.   And when we say forward it to City Hall,
25   my understanding is the human resource manager is
```

```
                                                          24
 1   Tiffany Brando.
 2        A.    Correct.
 3        Q.    Would have been taken to Ms. Brando?
 4        A.    Either to her -- I don't know if some of
 5   it -- if she's not available, it would go to one of
 6   the other ladies in there.
 7        Q.    Who are the other ladies in there?
 8        A.    Kaela Nelson, Jessica Gimmeson, Leanne
 9   Wolfe and Anna Rodgers.
10        Q.    Thank you.
11              Do you remember approximately your first
12   understanding or when it was that Officer Davis was
13   sick?
14        A.    I don't recall a date.
15        Q.    Do you remember the first information
16   that came to you, what that information was?
17        A.    I believe the first time I knew, he was
18   already in the hospital.  I don't recall if I was
19   out of town at the time.
20        Q.    Were you told why he was in the hospital?
21        A.    My understanding was he had COVID.
22        Q.    Did you go see him at the hospital?
23        A.    No, I did not.
24        Q.    Did other officers go see him?
25        A.    I don't know.
```

```
                                                              27
1   BY MR. DANIEL WILKERSON:
2        Q.    Did anyone discuss with you the need to
3   create a process of seeing how we could work with
4   him?
5              MR. THOMPSON:  Objection as to form,
6   vague.
7        A.    No.
8   BY MR. DANIEL WILKERSON:
9        Q.    You understood what I said there, right?
10       A.    I believe so.
11       Q.    Yeah, yeah.
12             Did anyone discuss light duty, him having
13  light duty?
14             MR. THOMPSON:  Objection as to form,
15  foundation.
16       A.    Not with me.
17  BY MR. DANIEL WILKERSON:
18       Q.    Did you hear anyone discuss an
19  alternative work role for a few weeks until he got
20  back up to speed?
21       A.    No.
22       Q.    Do you know Officer -- I want to say this
23  right -- Koritnik?  Am I saying that correct, Matt
24  Koritnik?
25       A.    Koritnik.
```

```
                                                          28
1      Q.   Officer Matt Koritnik.  Thank you.  Are
2  you familiar with the situation where he was
3  injured on a bicycle?
4      A.   Yes.
5      Q.   How long was it before he was up to full
6  speed again?  Do you remember?
7      A.   I don't recall.
8      Q.   Do you remember the light duty he was
9  given?
10          MR. THOMPSON:  Objection as to form,
11 foundation.
12     A.   He wasn't given light duty, to my
13 knowledge.
14 BY MR. DANIEL WILKERSON:
15     Q.   How many weeks was he off?
16     A.   I don't know.
17     Q.   Did he do any type of work?
18     A.   He did.
19     Q.   So he did work that wasn't patrol work,
20 correct?
21     A.   Correct.
22     Q.   If you wouldn't call that light duty,
23 what would your nomenclature be?  What would you
24 call it?
25          MR. THOMPSON:  Objection as to form.
```

```
                                                      29
1       A.    It was extra duties.
2   BY MR. DANIEL WILKERSON:
3       Q.    Extra duties.  Thank you.
4             Did you discuss with Officer Davis while
5   he was sick him doing some extra duties?
6       A.    No, not that I recall.
7       Q.    Did Chief Eckerdt ever say to you, we
8   need to discuss possible extra duties that Officer
9   Davis can do?
10      A.    No.
11      Q.    Okay.  And this is going back a bit, but
12  did you ever work with, I believe -- I want to get
13  this right.  Was it Sergeant Brilakis?  Am I saying
14  that correctly?
15      A.    Yes, sir.
16      Q.    Sergeant Brilakis.  Did you ever work
17  with him when he was ill or going through medical
18  conditions?
19      A.    Yes.
20      Q.    Did he have extra duties at times?
21      A.    At times.
22      Q.    Do you remember for what time periods?
23      A.    No, sir.
24      Q.    If I remember right, he was dealing with
25  serious medical conditions for a period of time.
```

```
                                                           30
 1   Is that right?
 2        A.   Correct.
 3        Q.   So he might have had extra duties for
 4   months and months.  Would that be fair?
 5        A.   I don't recall a time frame.
 6        Q.   In your -- I want to say in your opinion,
 7   but in your explanation, how would you describe
 8   what are extra duties?
 9        A.   Officers within the department will often
10   have extra duties that they take on, whether
11   it's -- some of those are administrative, could be
12   somebody being an evidence custodian, evidence
13   tech.  There could be certain training functions
14   that they have that are outside the role of patrol.
15        Q.   You do a lot of extra duties, don't you?
16        A.   Yes, sir.
17        Q.   It fills your life with administrivia,
18   right?
19             Have you yourself, since you work for the
20   Powell Police Department, had a situation where for
21   a short period of time, you needed to do extra
22   duties only until you were back up to speed
23   medically to be an officer?
24        A.   Not that I recall.
25        Q.   20 years, huh?  That's pretty awesome.
```